# EXHIBIT A
Docket 1, Complaint

FILED

2020 Dec-15  PM 01:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| D███ S███, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| JEFFERSON DUNN; GRANTT CULLIVER; | )   Case No.: _____ |
| CHARLES DANIELS; JEFFERY | ) |
| WILLIAMS; EDWARD ELLINGTON; | ) |
| KARLA JONES; GWENDOLYN GIVENS; | ) |
| ANTHONY BROOKS; CARL SANDERS; | ) |
| GARY MALONE; KEVIN WHITE; CARLA | ) |
| GRAHAM; CHRISTY VINCENT; | ) |
| ANGELIA GORDY; WILLIAM | ) |
| RAGSDALE; NEKETRIS ESTELLE; | ) |
| GERALD MCMILLIAN; CHRISTOPHER | ) |
| BOYD; JEFFERY BALDWIN; SHANNON | ) |
| CALDWELL; ERROL PICKENS; LISA | ) |
| BONNER; ALLEN KNOTT; CAPTAIN | ) |
| PICKETT; SERGEANT MCCORDLES; | ) |
| OFFICER TERRY; OFFICER STREETER; | ) |
| OFFICER GARLAND; and TANYA ARY, | ) |
| | ) |
| Defendants. | ) |
| | )   JURY TRIAL DEMANDED |
| | ) |
| | ) |

## COMPLAINT

Plaintiff D███ S███, by his attorneys with the law firms of Loevy & Loevy and the

Dagney Johnson Law Group, files this Complaint against Defendants Jefferson Dunn, Grantt

Culliver, Charles Daniels, Jeffery Williams, Edward Ellington, Karla Jones, Gwendolyn Givens,

Anthony Brooks,  Carl Sanders, Gary Malone, Kevin White, Carla Graham, Christy Vincent,

Angelia Gordy, William Ragsdale, Neketris Estelle, Gerald McMillian, Christopher Boyd,

Jeffery Baldwin, Shannon Caldwell, Errol Pickens, Lisa Bonner, Allen Knott, Captain Pickett;

Sergeant McCordles, Officer Terry, Officer Streeter, Officer Garland, and Tanya Ary, stating as follows:

## INTRODUCTION

1.      Plaintiff D███ S███ brings this lawsuit after having been repeatedly victimized while in the custody of Alabama Department of Corrections ("ADOC").

2.      On or about February 2018, Plaintiff was stabbed numerous times by prisoners while incarcerated at Holman Correctional Facility ("Holman").

3.      Plaintiff was then transferred to William E. Donaldson Correctional Facility ("Donaldson"), where he was housed alongside known enemies from the Holman stabbing, and predictably, on or about December 15, 2018, he suffered another brutal attack—a second stabbing—at Donaldson.

4.      Plaintiff was then transferred to St. Clair Correctional Facility ("St. Clair"), where beatings, stabbings, and rapes had become routine and much of the prisoner population possessed contraband weapons either to perpetrate violence or defend against threats of violence.

5.      Defendants took no steps to protect Plaintiff at St. Clair, and thus, on or about January 29, 2019, Plaintiff was again assaulted by prisoners.  This time, Plaintiff was tied up, stabbed, beaten, and brutally raped.

6.      As set forth in more detail below, the dangerous conditions that led to Plaintiff's torturous assaults at Donaldson and St. Clair were well known to Defendants, who exhibited deliberate indifference to his safety and failed to protect him from a substantial risk of serious harm.

7.      Plaintiff brings this action to redress his horrific injuries and to end the assaults and sexual violence perpetrated against him due to Defendants' disregard for his safety.

**JURISDICTION AND VENUE**

8.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the Defendants' deprivation of Plaintiff's rights secured by the U.S. Constitution.

9.     This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state law claims pursuant to 28 U.S.C. § 1367.

10.     Venue is proper under 28 U.S.C. § 1391(b) because the majority of the Defendants reside in this judicial district and the events and omissions giving rise to Plaintiff's claims occurred within this judicial district, at Donaldson and St. Clair.

**PARTIES**

11.     Plaintiff D███ S███ ("D.S.") is a 35-year-old Alabama resident in the custody of the Alabama Department of Corrections who was transferred to Donaldson in the summer of 2018, and to St. Clair in December 2018.

12.     Plaintiff sues each of the Defendants listed below in his or her individual capacity.

13.     Each of the Defendants listed below acted under color of law and within the scope of his or her employment when engaging in the misconduct described herein.

14.     Each of Defendants listed below is above the age of majority.

**The Donaldson Defendants**

15.     Defendant Errol Pickens was a warden at Donaldson leading up to and during the events described in Plaintiff's Complaint at Donaldson. As a warden at Donaldson, Defendant Pickens was responsible for the day-to-day operations of the prison, the safety and security of all prisoners at Donaldson, and the supervision of all subordinate employees. Defendant Pickens's responsibilities as a warden included ensuring adequate supervision and monitoring of prisoners, adequate classification of prisoners, appropriate housing assignments for prisoners, appropriate

discipline and deterrence of prisoner and staff misconduct, and adherence by staff to the requirements of the Prison Rape Elimination Act ("PREA").

16.     Defendant Jeffery Baldwin was a captain at Donaldson leading up to and during the events described in Plaintiff's Complaint. As Captain, Defendant Baldwin was responsible for the safety of all prisoners at Donaldson and the supervision of all security activities and subordinate employees.

17.     Defendant Shannon Caldwell was a captain at Donaldson leading up to and during the events described in Plaintiff's Complaint. As Captain, Defendant Caldwell was responsible for the safety of all prisoners at Donaldson and the supervision of all security activities and subordinate employees.

18.     Defendant Streeter was an officer at Donaldson leading up to and during the events described in Plaintiff's Complaint. Defendant Streeter was responsible for the safety and security of prisoners at Donaldson, and for monitoring and supervising the prisoners there.

19.     Defendant Garland was an officer at Donaldson leading up to and during the events described in Plaintiff's Complaint. Defendant Garland was responsible for the safety and security of prisoners at Donaldson, and for monitoring and supervising the prisoners there.

20.     Defendant Lisa Bonner was a classification supervisor at Donaldson leading up to and during the events described in Plaintiff's Complaint. Her responsibilities included identifying vulnerable prisoners and enemies within the prisoner population and ensuring that all prisoners were assigned to housing units in which they were safe from violence.

21.     Collectively, Defendants Pickens, Caldwell, Baldwin, Street, Garland, and Bonner are referred to as the "Donaldson Defendants."

**The St. Clair Defendants**

22.     The Defendants who violated Plaintiff's rights with regard to the assault at St. Clair (collectively, the "St. Clair Defendants"), consist of three categories of defendants: the "St. Clair Defendant ADOC Supervisors," the "St. Clair Defendant Facility Supervisors," and additional defendants.

*The St. Clair Defendant ADOC Supervisors*

23.     Defendants Jefferson Dunn, Grantt Culliver, Charles Daniels, Jeffrey Williams, Edward Ellington, and Christy Vincent are referred to, collectively, as the "St. Clair Defendant ADOC Supervisors."

24.     Defendant Jefferson Dunn is the Commissioners of the ADOC. The Commissioner is the highest-ranking official in the ADOC and is responsible for the direction, supervision, and control of the Department of Corrections and its employees. Defendant Dunn has held this position since January 2015.

25.     Defendant Grantt Culliver is a former Associate Commissioner for Operations and Institutional Security for the ADOC. Defendant Culliver first undertook that role in August 2014 and returned to the position in mid-2015 after a demotion in early 2015. He was placed on administrative leave in September 2018 and permitted to retire in December 2018. As Associate Commissioner for Operations and Institutional Security, Defendant Culliver was responsible for ensuring the effective and safe daily operations of prison facilities, including overseeing institutional security, staffing, the Classification Review Board, the Training Division, and the Transfer Division.

26.     Defendant Charles Daniels is a former Associate Commissioner for Operations and Institutional Security for the ADOC. Defendant Daniels took over the role after Culliver's

retirement. As Associate Commissioner for Operations and Institutional Security, Defendant Daniels was responsible for ensuring the effective and safe daily operations of prison facilities, including overseeing institutional security, staffing, the Classification Review Board, the Training Division, and the Transfer Division.

27.     Defendant Jeffery Williams is the current Deputy Commissioner of Governmental Relations for the ADOC. During the period between when Culliver went on administrative leave and Daniels took over as Associate Commissioner for Operations and Institutional Security, Williams took over some or all of the responsibilities of Associate Commissioner for Operations and Institutional Security

28.     Defendant Edward Ellington is the Institutional Coordinator for the Northern Region of the ADOC, a role which he assumed in June 2017. In that role, Defendant Ellington was responsible for planning, monitoring, and reviewing the day-to-day operations of correctional institutions in his assigned area, which included St. Clair. His duties included supervising the wardens of St. Clair, ensuring safe conditions at St. Clair, and leading the external security audit team.

29.     Defendant Christy Vincent was the PREA Director for the ADOC up to and during the events described in Plaintiff's Complaint. In that role, Defendant Vincent's responsibilities included overseeing the ADOC's implementation of PREA requirements and ensuring that all ADOC facilities, including St. Clair, were implementing and complying with PREA requirements. Defendant Vincent was responsible for ensuring that ADOC adequately protected against sexual assault and ensured that incidents of sexual assault were appropriately addressed.

30.     Each of the St. Clair Defendant ADOC Supervisors acted in a supervisory capacity over other St. Clair employees, at all times relevant to this Complaint. Further, the constitutional injuries complained of herein were proximately caused by a pattern and practice of misconduct at St. Clair, which occurred with the consent of the St. Clair Defendant ADOC Supervisors, who personally knew about, facilitated, approved, and/or condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation by their actions or by their deliberate indifference and failure to act.

*The St. Clair Defendant Facility Supervisors*

31.     Defendants Karla Jones, Gwendolyn Givens, Anthony Brooks, Carl Sanders, Gary Malone, Kevin White, Carla Graham, Angelia Gordy, William Ragsdale, and Neketris Estelle are referred to, collectively, as the "St. Clair Defendant Facility Supervisors."

32.     Defendant Karla Jones was the Warden at St. Clair leading up to and during the events described in Plaintiff's Complaint. As Warden of St. Clair, Defendant Jones was responsible for the day-to-day operations of the prison, the safety and security of all prisoners at the St. Clair, and the supervision of all subordinate employees. Defendant Jones's responsibilities as Warden included ensuring adequate supervision and monitoring of prisoners, adequate classification of prisoners, appropriate housing assignments for prisoners, adequate staffing levels, appropriate discipline and deterrence of prisoner and staff misconduct, adherence by staff to the requirements of PREA, adherence by staff to search protocols, adequate implementation of internal security audits, and proper installation, repair, and maintenance of locks, cameras, and other security devices necessary for safety and security.

33.     Defendant Gwendolyn Givens was an Assistant Warden at St. Clair leading up to and during the events described in Plaintiff's Complaint.   As Assistant Warden, Defendant

Givens was responsible for the day-to-day operations of the prison, as well as the safety of all prisoners at St. Clair and the supervision of all subordinate employees.

34.     Defendant Anthony Brooks was an Assistant Warden at St. Clair Correctional Facility leading up to and during the events described in Plaintiff's Complaint. As Assistant Warden, Defendant Books was responsible for the day-to-day operations of the prison, as well as the safety of all prisoners at St. Clair and the supervision of all subordinate employees.

35.     Defendant Carl Sanders was a Captain at St. Clair at the time of the events in Plaintiff's Complaint. As Captain, Defendant Sanders was responsible for the safety of all prisoners at St. Clair and the supervision of all security activities and subordinate employees.

36.     Defendant Gary Malone was a Captain at St. Clair leading up to and during the events described in Plaintiff's Complaint. As Captain, Defendant Malone was responsible for the safety of all prisoners at St. Clair and the supervision of all security activities and subordinate employees.

37.     Defendant Kevin White was a Captain at St. Clair leading up to and during the events described in Plaintiff's Complaint. As Captain, Defendant White was responsible for the safety of all prisoners at St. Clair and the supervision of all security activities and subordinate employees.

38.     Defendant Carla Graham was a Captain at St. Clair leading up to and during the events described in Plaintiff's Complaint. As Captain, Defendant Graham was responsible for the safety of all prisoners at St. Clair and the supervision of all security activities and subordinate employees.

39.     Defendant Angelia Gordy was the Institutional PREA Compliance Manager at St. Clair leading up to and during the events described in Plaintiff's Complaint. Defendants Gordy's

responsibilities included ensuring that St. Clair was implementing and complying with PREA requirements. As Institutional PREA Compliance Manager, Defendant Gordy was responsible for the implementation of PREA and compliance its requirements at St. Clair, and for making sure that incidents of sexual assault were appropriately addressed.

40.     Defendant Lieutenant William Ragsdale was the Backup Institutional PREA Compliance Manager at St. Clair leading up to and during the events described in Plaintiff's Complaint. Defendants Ragsdale's responsibilities included ensuring that St. Clair was implementing and complying with PREA requirements. As Backup Institutional PREA Compliance Manager, Defendant Ragsdale was responsible for the implementation of PREA and compliance with its requirements at St. Clair, and for making sure that incidents of sexual assault were appropriately addressed.

41.     Defendant Neketris Estelle was the Head of Classification at St. Clair at the time of the events at issue in Plaintiff's Complaint and first began working in classification at St. Clair in 2009. As the Head of Classification, Defendant Estelle's responsibilities included conducting initial screenings; conducting semi-annual progress reviews for prisoners, attended by the warden or his designee, to review their disciplinary histories and other developments; serving on the Institutional Segregation Review Board along with the Warden and Segregation Captain; serving on the Sexual Incident Review Team; reclassifying prisoners for segregation if their disciplinary history warranted a segregation placement; reclassifying prisoners for general population if they no longer required a segregation placement; notifying security staff of housing assignment requests; making recommendations that prisoners be transferred to protective custody; and ensuring safe housing assignments for prisoners.

42.     Each of the St. Clair Defendant Facility Supervisors acted in a supervisory capacity over other St. Clair employees at all times relevant to this Complaint. Further, the constitutional injuries complained of herein were proximately caused by a pattern and practice of misconduct at St. Clair, which occurred with the consent of the St. Clair Defendant Facility Supervisors, who personally knew about, facilitated, approved, and/or condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation by their actions or by their deliberate indifference and failure to act.

*Additional St. Clair Defendants*

43.     Defendant Tanya Ary was a classification officer at St. Clair leading up to and during the events described in Plaintiff's Complaint. Her responsibilities included identifying vulnerable prisoners and enemies within the prisoner population and ensuring that all prisoners were assigned to housing units in which they were safe from violence.

44.     Defendant McMillian was an officer at St. Clair leading up to and during the events described in Plaintiff's Complaint. Defendant McMillian was responsible for the safety and security of the prisoners at St. Clair, and for monitoring and supervising the prisoners there.

45.     Defendant McCordles was an officer at St. Clair leading up to and during the events described in Plaintiff's Complaint. Defendant McCordles was responsible for the safety and security of the prisoners at St. Clair, and for monitoring and supervising the prisoners there.

46.     Defendant Terry was an officer at St. Clair leading up to and during the events described in Plaintiff's Complaint. Defendant Terry was responsible for the safety and security of the prisoners at St. Clair, and for monitoring and supervising the prisoners there.

47.     Defendant Parker was an officer at St. Clair leading up to and during the events described in Plaintiff's Complaint. Defendant Parker was responsible for the safety and security of the prisoners at St. Clair, and for monitoring and supervising the prisoners there.

48.     Defendant Knott was a sergeant at St. Clair leading up to and during the events described in Plaintiff's Complaint. He was responsible for the safety and security of the prisoners at St. Clair, and for monitoring and supervising the prisoners there, as well as for supervising subordinate staff.

49.     Defendant Pickett was a Captain of Segregation at Donaldson who also participated in shifts at St. Clair leading up to and during the events described in Plaintiff's Complaint at St. Clair.  While on duty at St. Clair, Defendant Pickett was responsible for the safety and security of the prisoners at St. Clair, and for monitoring and supervising the prisoners there, as well as for supervising subordinate staff.

50.     Defendant Christopher Boyd was a lieutenant at St. Clair leading up to and during the events described in Plaintiff's Complaint. He was responsible for the safety and security of the prisoners at St. Clair, and for monitoring and supervising the prisoners there, as well as for supervising subordinate staff.

**THE DONALDSON DEFENDANTS' FAILURE TO PROTECT D.S.**

51.     On or about February 2018, D.S. was stabbed numerous times by another prisoner with a contraband weapon while incarcerated at the William C. Holman Correctional Facility.

52.     As a result of this stabbing, D.S. was transferred to Donaldson.

53.     Once he arrived at Donaldson, D.S. was originally placed in segregation.

54.     While in segregation, D.S. informed various individuals, including Defendants Baldwin, Pickens, Caldwell, Streeter and Garland that he had enemies relating to his February 2018 attack at Holman.

55.     As D.S.'s classification officer, Defendant Bonner was also on notice that D.S. had enemies relating to his February 2018 attack at Holman.

56.     Defendants Baldwin, Pickens, Caldwell, Bonner, Streeter, and Garland were on notice that D.S. was particularly vulnerable; that he had a prior history of being victimized while in ADOC custody; and that he had known enemies at Donaldson related to the Holman stabbing.

57.     Despite this, Donaldson Defendants including Defendant Bonner moved D.S. into general population housing at Donaldson with his enemies and the Donaldson Defendants took no action to separate, or protect, him from his enemies.

58.     As the Donaldson Defendants were well aware, the commingling of known enemies in housing units results in foreseeable violence.

59.     Predictably, on or about December 15, 2018, D.S. was brutally stabbed by his enemies at Donaldson with a contraband weapon.

60.     The attack that D.S. suffered at Donaldson was incredibly traumatic, and he suffered serious emotional and physical injuries as a result.

61.     Donaldson Defendants including Baldwin, Pickens, Caldwell, and Bonner were on notice that D.S.'s enemies at Donaldson had a history of violence, but nonetheless allowed those enemies to be housed in general population at Donaldson alongside D.S.

62.     Long before the stabbing of D.S., the Donaldson Defendants were also on notice not only of the particular risk of danger to D.S. and the dangerousness of his enemies, but also that assaults and stabbings were an endemic problem at Donaldson.

63.     The number of reported assaults had increased at horrific rates at Donaldson in the timeframe leading up to D.S.'s assault there: 45 in fiscal year 2010; 96 in fiscal year 2011; 139 in fiscal year 2012; 114 in fiscal year 2013; 136 in fiscal year 2014; 146 in fiscal year 2015; 155 in fiscal year 2016; 133 in fiscal year 2017; 185 in fiscal year 2018.

64.     The rate of assaults at Donaldson far exceeded typical levels of violence at comparable facilities across the nation.

65.     Below are examples of assaults at Donaldson in the two years preceding the stabbing of D.S.:

    a.  In August 2017, a prisoner woke up to another prisoner hold a knife to his throat. When he reported the assault Captain Baldwin, Captain Baldwin told him that there was nothing he could do. Captain Baldwin ordered the prisoner to pick up a knife and charged him with possession as a reason to send him to segregation. When the prisoner protested the disciplinary being put on his record, officers told him that if he protested the disciplinary, they would place him back in general population with his attacker.

    b.  In March 2018, a prisoner was stabbed as he as leaving segregation.

    c.  In June 2018, a prisoner was stabbed as he was leaving the shower. Because there were no officers present, other prisoners had to go looking for assistance. The prisoner's injuries were so serious that he had to be evacuated by emergency helicopter to an outside hospital.

    d.  In July 2018, a prisoner was stabbed in the head. He was sent back to population after staff put an ace bandage on his head and taped a diaper to it. He eventually had to go to an outside hospital because the wound continued to bleed.

e.  In July 2018, a prisoner was stabbed in the N dorm by another prisoner who was on methamphetamine. The same assailant stabbed another prisoner in N dorm shortly afterward.

f.  In November 2018, a prisoner was stabbed in the jaw and neck by another prisoner who slipped out of his handcuffs as prisoners were being let out of their cells in the mental health segregation unit.

66.  The Donaldson Defendants were on notice of these violent incidents, and that the endemic violence at Donaldson posed a substantial risk of serious harm to vulnerable prisoners such as D.S.

67.  Also adding to the Donaldson Defendants' knowledge of the security crisis at Donaldson were incident reports, reports by the ADOC Investigations & Intelligence division, duty officer reports, disciplinary records, medical records, annual and monthly ADOC data reports, prisoner progress reports, direct observation of incidents, communications among staff, and prisoner lawsuits.

68.  However, the Donaldson Defendants took no steps to protect D.S. from assault at Donaldson by his known enemies.

69.  Defendants Pickens and Bonner also failed to implement effective classification and housing policies and practices at Donaldson, including policies and practices to ensure the separation of enemies and of potential predators from potential victims, creating a substantial risk of serious harm to prisoners such as D.S.  Instead, Defendants Pickens and Bonner allowed prisoners who ought to be kept separate to be commingled in the same, dangerous housing units, resulting in foreseeable violence.

70.     Defendants Pickens and Bonner also failed to implement adequate screening for prisoners' risks of being predatory or vulnerable, as is required by PREA.

71.     The Donaldson Defendants acted with deliberate indifference and their misconduct placed vulnerable prisoners such as D.S. at substantial risk of serious harm and caused his injuries.

## THE ST. CLAIR DEFENDANTS' FAILURE TO PROTECT D.S.

### The Substantial Risk of Serious Harm to D.S. at St. Clair

72.     After D.S.'s assault at Donaldson, he was transferred to St. Clair.

73.     At St. Clair, D.S. was placed in segregation for more than a week.

74.     While in segregation, D.S. spoke with various Defendants during their rounds in the segregation unit or sent written correspondence to them.  D.S. told Defendants including Defendants Malone, White, Jones, Brooks, Estelle, Gordy, Givens, Boyd and McMillian that he had enemies in population.

75.     In addition, as D.S.'s classification officer and classification supervisor, Defendants Ary and Estelle were also on notice of D.S.'s past assaults and enemies.

76.     St. Clair Defendants including Malone, White, Jones, Brooks, Estelle, Gordy, Givens, Boyd, McMillian, and Ary were on notice that D.S. had enemies at St. Clair and had notice of the identities of at least some of these enemies.

77.     These Defendants were also on notice that D.S. was particularly vulnerable; that he had a history of being victimized while in ADOC custody including at Holman and Donaldson; that he had known enemies at St. Clair related to the Holman and Donaldson assaults; and therefore that he was at a high risk of suffering additional assaults.

78.     Despite this, the St. Clair Defendants caused D.S. to be moved out of segregation and into general population, with his enemies.

79.     The assailants who attacked D.S. at St. Clair had a known history of violence, but nonetheless were allowed to reside in general population at St. Clair where they were in a position to assault D.S.

80.     When D.S. was released from segregation, he inquired about whether it was safe for him to be released.

81.     He was told by Defendants Pickett and Malone not to worry and that everything was fine.

82.     When D.S. realized he had been placed into general population with his enemies, he informed Defendant White.

83.     Defendant White told D.S. just to go back to the dorm and not to worry about it.

84.     Defendant Gordy called D.S. to her office after he had been released into the general population.

85.     Again, D.S. informed Defendant Gordy about his enemies.

86.     Despite knowing that D.S. was in general population with his enemies and at substantial risk of serious harm from these enemies, Defendants including Defendants Malone, White, Jones, Brooks, Estelle, Ary, Gordy, Givens, Boyd and McMillian took no meaningful steps to ensure his safety or separate D.S. from his enemies.

87.     As set forth in more detail below, the St. Clair Defendants were also on notice that D.S. was at risk of being beaten, stabbed, and raped at St. Clair because of the complete crisis of safety and security in the facility, particularly in the dangerous P/Q blocks, which had long experienced staggeringly high levels of assaults and sexual violence.

88.     Nonetheless, the St. Clair Defendants took no steps from protect D.S. from the severe risk of being beaten, stabbed, and raped at St. Clair.

89.     Instead, they allowed D.S. to be housed alongside his enemies at St. Clair, where he was vulnerable to assault.

### The Beating, Stabbing, and Rape of D.S. at St. Clair

90.     D.S. was only in population for a short time at St. Clair before he was assaulted.

91.     On or about January 29, 2019, a group of prisoners came to D.S.'s cell in the P block.

92.     The attack began as a robbery.

93.     The attackers tied D.S. up, beat him, stabbed him, and raped him.

94.     The attack continued for a prolonged period of time.

95.     Defendants McCordles, McMillian, and Knott walked by D.S.'s cell at various points while he was tied up, but did nothing to intervene in the violent attack.

96.     D.S. was finally able to escape.

97.     D.S. ran to the shift office, where he immediately told Defendant White about the attack.

98.     Defendant White refused to take any action, and instead ordered D.S. to go back to the dorms.

99.     D.S. ran to the infirmary.

100.     Defendant Terry originally refused to let D.S. enter the infirmary, despite the fact that he had clearly just suffered an attack.

101.     Rather than placing D.S. in the infirmary or in protective custody after the rape, Defendants housed D.S. in the segregation unit.

102.    In segregation, D.S. was again placed with his enemies.

103.    One of D.S.'s enemies acted as a "runner" in segregation, meaning that he was responsible for delivering meals to the prisoners housed in segregation.

104.    For about two days, D.S. was deprived of food because his enemy would not deliver food to him.

105.    Defendants did nothing to intervene and ensure that D.S. was safe from retaliation relating to the brutal attack that he suffered.

106.    D.S. was taken to a clinic for a sexual assault examination, and the examiner documented physical evidence corroborating Plaintiff's assault.

107.    Nonetheless, an ADOC investigator spoke with D.S. only one time about the event.

108.    Rather than try to properly investigate D.S.'s attack, the investigator tried to convince D.S. not to bring charges against his assailants.

109.    The attack was incredibly traumatic, and D.S. suffered lasting and serious emotional and physical injuries.

**The Security Crisis at St. Clair**

110.    Well before the assault of D.S. at St. Clair in January 2019, the St. Clair Defendants were all on notice of a security crisis at St. Clair in which prison beatings, stabbings, and rapes were endemic, particularly in the P/Q blocks.

111.    In 2018, Alabama's prisons for men had the highest homicide rate in the nation for a state prison system.

112.     In the months leading up to D.S.'s assault in P block, at least four men were killed as a result of assaults that took place in whole or in part in the P/Q blocks at St. Clair: Terrence Andrews, Travis Wilson, Terry Pettiway, and Rogarius Bray.

113.     Violence at St. Clair had increased sharply beginning in 2010.

114.     In fiscal year 2010, the number of reported assaults at St. Clair was just 23.

115.     The number of reported assaults grew at an astonishing rate: to 59 in fiscal year 2011; 78 in fiscal year 2012; 101 in fiscal year 2013; 127 in fiscal year 2014; 157 in fiscal year 2015; 249 in fiscal year 2016; 132 in fiscal year 2017; and 163 in fiscal year 2018.

116.     The rate of assaults at St. Clair far exceeded typical levels of violence at comparable facilities across the nation.

117.     Listed below are but some of the assaults at St. Clair in general, and in the P/Q blocks in particular, in the two years preceding D.S.'s attack and rape.

118.     In January 2017, a prisoner was assaulted by two men in a day room in Q-block within sight of the Warden. The prisoner was stabbed in the left temple.

119.     In February 2017, a prisoner was stabbed 9 times by three men who came into his cell and attacked him.

120.     In March 2017, a prisoner was raped and later found by officers tied to a chair and beaten.

121.     That same month, at least four other prisoners were stabbed.

122.     In April 2017, two men were hospitalized with stab wounds after a knife fight. Another stabbing in April 2017 left a prisoner in a coma.

123.    In May 2017, a large violent incident occurred in which 15 prisoners were stabbed. That same month, a prisoner suffered a broken jaw when he was assaulted by another prisoner who used a lock placed in a sock in the assault.

124.    In July 2017, a prisoner at St. Clair was found dead by staff with his hands tied to a bedpost, with clear strangulation marks on his neck.

125.    That same month:

    a. Another prisoner was killed, a second was stabbed in the neck, and a third was stabbed in his sleep;

    b. A prisoner told officers that he was unsafe in Q block and was being extorted, prompting staff to order him to return to Q block, where he was held hostage, raped, and stabbed;

    c. A violent incident in Q-block resulted in the stabbing of 4 prisoners;

    d. A knife fight occurred in P-block and officers witnessed the fight but did nothing to intervene; and,

    e. One prisoner stabbed at least 5 people in 3 separate incidents.

126.    In August 2017, a prisoner was stabbed in his own cell after confronting another prisoner about stealing his property.

127.    That same month:

    a. A prisoner was stabbed near the cubicle in block P-2 by a prisoner who was intoxicated on crystal methamphetamine;

    b. A prisoner was stabbed 13 times in block P-1 shortly after being released from segregation; and,

    c. Another prisoner was stabbed in block P-1.

128.    In September 2017, a prisoner was found under his bed in block Q-2 with multiple stab wounds.

129.    That same month:

    a.   A prisoner at St. Clair was raped;

    b.   A prisoner was stabbed by a known enemy, in a fight that lasted for over 20 minutes before anyone intervened;

    c.   Four prisoners were involved in a fight with box cutters and knives; and,

    d.   A knife fight in G-Yard involved at least 6 prisoners.

130.    In October 2017, a prisoner was sexually assaulted in the P/Q barbershop after he had passed out, and another prisoner was sexually assaulted in the Q block at knifepoint.

131.    That same month:

    a.   A prisoner took another prisoner hostage in his cell and assaulted him over a period of two days;

    b.   A prisoner was sexually assaulted in the H dorm;

    c.   Officers observed a prisoner walk onto the yard wearing only a blanket and socks, after he had been severely beaten and burned on his face;

    d.   A prisoner was stabbed in his sleep in segregation when the cube officer left the cubicle with the door open;

    e.   Three additional prisoners were stabbed in two separate incidents; and,

    f.   Another prisoner slit a prisoner's throat in the O-block after improperly gaining access to the housing unit.

132.    In November 2017, a prisoner was held hostage and sexually assaulted over three days by four prisoners in Q block. The prisoner had recently been released from segregation.

133.     That same month:

   a.   Another prisoner was raped at knifepoint;

   b.   A prisoner stabbed another prisoner who was being escorted by two correctional officers, and then was allowed to escape without recovery of the knife;

   c.   A prisoner stabbed another prisoner who was trying to sexually assault him; and,

   d.   Two prisoners fought with large machete-type knives in the chow hall and then out onto the G-yard, while three officers watched but did not intervene.

134.     In December 2017, two prisoners were sexually assaulted, one at knifepoint.

135.     That same month:

   a.   A prisoner was stabbed 16 times in front of the P/Q block.

   b.   A prisoner was stabbed in his back, knees, and legs while helping another prisoner move his belongings into Q block.

   c.   A prisoner was stabbed 12 times in the arm, side, and back in H-dorm, in view of an officer who was nearby but did not intervene;

   d.   Another prisoner was robbed and assaulted in the N/O blocks;

   e.   Another prisoner was stabbed four times; and,

   f.   A transgender prisoner was assaulted by a prisoner wielding a metal pole.

136.     In January 2018, a prisoner was sexually assaulted at knifepoint in O-block. The assailant had previously been reported as the assailant in a number of sexual assaults at St. Clair.

137.     That same month, a prisoner was stabbed repeatedly in his cell in O block by prisoners carrying out a robbery.

138.    Starting in January 2018 and lasting through June 2018, a prisoner was repeatedly raped by a group of individuals who said he owed them a debt. The rapes occurred on a near daily basis, and officers were aware of the situation but did nothing to intervene.

139.    In February 2018, a prisoner was stabbed repeatedly in Q block.

140.    That same month:

a.    Another prisoner was killed in a knife fight at St. Clair by a prisoner with an extensive history of being disciplined for possession of knives;

b.    A prisoner was stabbed in the back of the head near the P/Q blocks right after being released from segregation;

c.    Another prisoner was stabbed in the P/Q blocks;

d.    A prisoner at St. Clair was repeatedly physically and sexually assaulted over the course of several days by his cell mate, who was also extorting him;

e.    A handcuffed prisoner was stabbed in segregation when another prisoner escaped from his own handcuffs; and,

f.    Another prisoner was stabbed in the G dorm.

141.    In March 2018, a prisoner was stabbed in the P/Q blocks while the prison was on lockdown, and the knife was still embedded in his body when he emerged from the block.

142.    That same month:

a.    A prisoner was sexually assaulted multiple times during his first month at St. Clair;

b.    A prisoner was stabbed in the chest at the doorway to Q block;

c.    A prisoner was stabbed in the leg during an attempted robbery in the gym; and.

d.    At least five other stabbing incidents occurred.

143.    In April 2018, a prisoner was kidnapped and raped in Q block.

144.    That same month:

    a.    A knife fight in P block resulted in a prisoner being stabbed 13 times, including in the chest and head;

    b.    A prisoner was threatened with rape by two men armed with knives, and forced to escape only by cutting his wrists with a razor blade so that he could report what happened to a mental health officer; and,

    c.    A prisoner was stabbed in front of the gym by a prisoner who had recently been released from segregation.

145.    In May 2018, a prisoner was held hostage by four other prisoners and sexually assaulted him. During the two days, officers did not enter the cell and simply asked how many men were inside when they conducted counts. The victim did not press charges after an investigator told him reporting would put his life in danger and promised that he would be transferred if he did not report.

146.    That same month:

    a.    A prisoner was stabbed in his sleep in his cell in Q block;

    b.    A prisoner was sexually assaulted at knifepoint by another prisoner;

    c.    A prisoner was stabbed and beaten outside the doorway to the L/M blocks;

    d.    Another prisoner was stabbed 7 times in the G yard;

    e.    Another prisoner was stabbed in front of officers on his way to a GED class; and,

    f.    Another prisoner was held in a cell and beaten with a wooden paddle.

147.    Also in May 2018, a prisoner was stabbed a group of prisoners outside the entry to Q block. The apparent motive for the attack was that the assailants had seen a document suggesting that the prisoner had provided staff with information related to a prior stabbing.

148.    In June 2018, a prisoner was sexually assaulted in P block. When he reported the rape to Defendant Jones, she told him that she did not care.

149.    In July 2018, three prisoners physically assaulted and attempted to sexually assault another prisoner who returned to P block following a prior sexual assault. The group of prisoners locked him in a cell and beat him with a belt buckle.

150.    That same month:

    a.   A prisoner was stabbed by his cellmate and several other prisoners because he refused to move out of his cell in P block;

    b.   A prisoner was stabbed in his sleep in his cell in Q block;

    c.   Another prisoner was stabbed in Q block;

    d.   Yet another prisoner was stabbed in his cell in Q block after confronting other prisoners about taking his belongings;

    e.   A prisoner taped knives to both his hands and repeatedly stabbed yet another prisoner in Q block;

    f.   Another prisoner was stabbed in the P/Q hallway;

    g.   Another prisoner was stabbed on the porch of the P/Q blocks;

    h.   A robbery resulted in the stabbing of another prison, who passed out from blood loss; and,

i.  A prisoner slit the throat of another prisoner with a razor in the common area of A block in an attack that was witnessed by a correctional officer who did not intervene.

151.  In August 2018, a prisoner was sexually assaulted within a week of his arrival at St. Clair.

152.  That same month:

a.  A prisoner was stabbed over 20 times by a group of prisoners in the P/Q hallway in August 2018, in front of a cubicle officer who observed the incident but did not intervene;

b.  A prisoner was stabbed over 10 times in the Q block in relation to a debt;

c.  A prisoner was given a drink laced with a substance that caused him to lose consciousness; stabbed by several prisoners in the P-2 dayroom while he was unconscious; and left there for about 30 minutes while other prisoners tried to get help from officers who refused to intervene;

d.  A prisoner was stabbed through the tray hole in his cell in B Block by a prisoner who was working as a segregation runner; and,

e.  At least six other separate incidents occurred in which prisoners were stabbed.

153.  In September 2018, a prisoner was stabbed to death at St. Clair. The prisoner had previously been stabbed at St. Clair in July 2017.

154.  That same month:

a.  A prisoner was stabbed in his bed in H dorm by an intoxicated prisoner, who was then attacked and stabbed by another group of prisoners; and,

26

    b.   A prisoner was stabbed in the stomach and the leg, and forced to attempted to sew up the lacerations himself, which eventually became infected.

155.    In October 2018, a prisoner was stabbed by several men in a cell in Q block.

156.    That same month:

    a.   A prisoner was sexually assaulted in P block at knifepoint; and,

    b.   A prisoner was stabbed in the throat while in segregation.

157.    In November 2018, a prisoner was stabbed in the P/Q blocks by an intoxicated prisoner who was acting erratically before the assault.

158.    That same month, another prisoner was stabbed in the H dorm.

159.    In December 2018, a prisoner was stabbed and killed by another prisoner in an altercation that took place in part in the P/Q blocks.

160.    That same month, a robbery resulted in a prisoner being stabbed in Q block.

161.    Also in December 2018, a group of prisoners assaulted and threatened to stab a prisoner who had just been released from restricted housing. Because the prisoner would not identify his attackers, he was written up by staff for creating a safety and security hazard.

**Notice of the Substantial Risk of Serious Harm to D.S. at St. Clair**

162.    The St. Clair Defendants had knowledge of the substantial risk of serious harm facing prisoners such as D.S. at St. Clair—particularly, in the P/Q blocks—based on incident reports for the above-identified assaults, as well reports by the ADOC Investigations & Intelligence division, duty officer reports, disciplinary records, medical records, annual and monthly ADOC data reports, prisoner progress reports, and/or prisoner lawsuits.

163.     ADOC's publicly-available reports in the timeframe leading up to the assault of D.S. at St. Clair also reflected that injuries, deaths, and fighting were a systemic problem at St. Clair.

164.     Nonetheless, the St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors failed to take meaningful corrective actions to reduce the substantial risk of serious harm facing prisoners such as D.S. at St. Clair.

165.     In 2014, a security audit of St. Clair was conducted. Defendant Culliver later admitted that, to his knowledge, no corrective action plan of any kind was developed in response to the audit.

166.     In October 2014, following an alarming number of violent attacks and murders at St. Clair, the Equal Justice Initiative ("EJI") filed a class action lawsuit on behalf of St. Clair prisoners seeking injunctive relief to reduce the violence at St. Clair. *See* Exh. A, *Cheatham* Complaint.

167.     The *Cheatham* Complaint also described the policies and practices fueling the outbreak of violence at St. Clair, including inadequate supervision and monitoring of the facility, failure to address the widespread proliferation of contraband weapons at the facility, creation of a dangerous culture of violence and abuse, and failure to respond appropriately to violence and rape.

168.     Each of the St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors were put on notice of the *Cheatham* litigation and deficiencies identified therein long before the assault on D.S.  For example, Defendants Sanders and Malone were each named as Defendants in the *Cheatham* Complaint at the time it was filed and served with the *Cheatham* Complaint. Defendant Dunn received notice of the allegations in the *Cheatham*

Complaint and became a defendant in the action when he took over as ADOC Commissioner in January 2015.

169.    In the aftermath of the *Cheatham* lawsuit, the St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors again failed to take reasonable, necessary, and appropriate steps to remedy the dangerous conditions at St. Clair.

170.    The violence at St. Clair continued to escalate.

171.    In October 2016, the United States Department of Justice ("DOJ") opened an investigation into whether the conditions in Alabama's prisons for men violated the Eighth Amendment of the U.S. Constitution.  The DOJ investigation included inquiries into whether ADOC adequately protects prisoners from physical harm and sexual abuse at the hands of other prisoners and provides prisoners with safe living conditions.

172.    The St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors received notice of the DOJ investigation.

173.    Nonetheless, the St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors failed to take meaningful corrective actions to reduce the substantial risk of serious harm facing prisoners at St. Clair.

174.    The *Cheatham* case settled in November 2017, with the ADOC agreeing to implement an internal classification system to protect prisoners and staff by identifying risks and needs, rather than randomly assigning people to beds; create an incident management system that would allow the prison to prevent, track, and respond to violent incidents; replace faulty locks and install surveillance cameras; and create a transitional unit for prisoners released from segregation, among other things. E.g., Equal Justice Initiative, *Alabama Department of*

*Corrections Agrees to Reforms at St. Clair Prison in Response to EJI Lawsuit* (Nov. 8, 2017), available at https://eji.org/news/alabama-settles-eji-lawsuit-on-st-clair-prison/.

175.    The St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors were on notice of the settlement agreement in *Cheatham*.

176.    However, the St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors failed to take meaningful corrective actions to reduce the substantial risk of serious harm facing prisoners at St. Clair in response.

177.    In June 2018, EJI notified St. Clair Defendant ADOC Supervisors including Defendant Dunn that ADOC had failed to implement the necessary reforms and comply with the settlement agreement.

178.    At the time of D.S.'s assault at St. Clair, the majority (if not all) of the unconstitutional policies and practices identified in the *Cheatham* litigation continued at St. Clair despite the *Cheatham* litigation and settlement.

179.    In a letter dated September 6, 2018, just four months before the January 2019 assault on D.S. at St. Clair, EJI notified Defendant Dunn of a rise of a "concerning increase in serious incidents of violence" at St. Clair.

180.    EJI warned in its letter specifically about the dangers of St. Clair's "'hot bay' dorm management policy that houses individuals with behavior problems together in a single housing unit in general population where they lack programming opportunities and any regular security staff presence" and that "the last two homicides [of Travis Wilson and Terry Pettiway] are a manifestation of the safety problems this kind of management technique creates."

181. EJI also warned Defendant Dunn in its letter that "weapons contraband continues to saturate the prison and continues to contribute to serious incidents of violence at St. Clair," and that "contraband searches continue to be sporadic and ineffectual."

182. EJI further noted in its letter: "Nationally recognized experts who have reviewed operations at St. Clair have recommended specific, detailed steps that are necessary to the detection and elimination of contraband at the facility," including "to completely lock-down the facility 'for several days' and 'conduct a thorough unannounced shake down of all areas including living areas and administrative or program areas before releasing inmates,'" as the "first step in creating a 'sterile' environment," to be followed by a "'regular, routine and effective practice of searching the prison.'"

183. However, St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors including Defendant Dunn failed to take meaningful corrective actions to reduce the substantial risk of serious harm facing prisoners at St. Clair following receipt of this letter.

184. The violence at St. Clair continued unabated.

185. Prisoners filed individual complaints alleging rapes and assaults at St. Clair detailing the dangerous conditions at St. Clair, the prevalence of stabbings and sexual violence, and the failures such as inadequate supervision, monitoring, contraband searches, and sexual assault policies at the prison, including: Complaint, Dkt. 1, *McGregor v. Thomas, et al.*, Case 4:17-cv-00593 (N.D. Ala. Apr. 12, 2017); Amended Complaint, Dkt. 11, *Miller v. Dunn, et al.*, Case 4:17-cv-00180 (N.D. Ala. Mar. 28, 2017); and Complaint, Dkt. 1, *Townsel v. Thomas, et al.*, Case 4:17-cv-00516 (N.D. Ala. Mar. 31, 2017). Defendants including Defendants Dunn, Culliver, Sanders, Malone, Gordy, Estelle, and Ary were named as Defendants in these lawsuits, served with the lawsuits, and provided with notice of the allegations therein, in which they were

accused of having failed to protect prisoners from physical and sexual violence at St. Clair in 2014/2015. Defendants Dunn, Sanders, Malone, Gordy, and Estelle were deposed in the lawsuits, and confronted with evidence of systematic failures at St. Clair to protect prisoners from prisoner-on-prisoner beatings, stabbings, and sexual violence. Defendant Dunn's deposition occurred in November 2018, just months before D.S.'s assault.

186.   Nonetheless, the St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors did not take meaningful corrective actions to reduce the substantial risk of serious harm facing prisoners such as D.S. at St. Clair.

187.   Following its investigation beginning in 2016, the DOJ issued extensive Notice Letters to the ADOC in April 2019 and July 2020 outlining the ADOC's failures with regard to protection of prisoners.

188.   The April 2019 Notice Letter, for example, notified the St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors that ADOC was violating the Eighth Amendment rights of prisoners by failing to prevent prisoner-on-prisoner violence and sexual abuse and failing to provide safe conditions.

189.   The April 2019 Notice Letter went on to conclude that the constitutional "violations are severe, systematic, and exacerbated by serious deficiencies" including those in "ineffective housing and classification protocols"; "inadequate incident reporting"; "inability to control the flow of contraband into and within the prisons, including illegal drugs and weapons"; "ineffective prison management and training"; "the use of segregation and solitary confinement to both punish and protect victims of violence and/or sexual abuse"; and "a high level of violence that is too common, cruel, of an unusual nature, and pervasive." And further, the DOJ found that

"an excessive amount of violence, sexual abuse, and prisoner deaths occur within Alabama's prisons on a regular basis."

190.    The violence at St. Clair continued unabated, and the DOJ filed a lawsuit on December 9, 2020.

191.    Despite having notice of the substantial risk of serious harm facing prisoners at St. Clair in the time leading up to D.S.'s assault at St. Clair, the St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors failed to take reasonable steps to address and reduce the risk of violence to prisoners such as D.S. at St. Clair.

### Defendants' Failure to Provide Adequate Supervision and Monitoring in the P/Q Blocks at St. Clair

192.    The St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors, through their acts and omissions, failed to provide adequate supervision and monitoring of prisoners housed within St. Clair—particularly in the P/Q blocks—to prevent violence.

193.    As set forth above, at the time of Plaintiff's assault at St. Clair in January 2019, the P/Q blocks at St. Clair had long been subject to staggering levels of prisoner-on-prisoner violence.

194.    A large proportion of the prisoners housed in the P/Q blocks had disciplinary problems and histories of violence while in ADOC custody.

195.    Contraband, including knives and prisoner-made weapons, was common in the P/Q blocks.

196.    Despite this, the supervision in this area was virtually non-existent.

197.    Most of the time, a single cube officer was the only officer monitoring the entire area of the P/Q blocks.

198.    The cube officers generally did not leave their cubicles.

199.    Oftentimes, the cube officers had not even undergone basic correctional officer training.

200.    The officers in the cube were, at times, absent, asleep, on the telephone, or otherwise not paying attention to the prisoners they were charged with monitoring.

201.    Random patrols of the P/Q blocks by additional officers occurred extremely infrequently.

202.    Due to lax supervision, security staff at St. Clair often failed to observe violent incidents and only discovered the victim after the violence and/or injuries had occurred.

203.    Due to lax supervision, security staff at St. Clair sometimes watched violent or troubling incidents unfold without intervening.

204.    The P/Q blocks also lacked adequate surveillance cameras to monitor the housing units.

205.    Blind spots on the units, in concert with inadequate staff presence, officer inattentiveness, and the lack of surveillance equipment, created a further substantial risk of serious harm to prisoners such as D.S. and had contributed to numerous violent incidents in the years leading up to the assault of D.S.

206.    Exacerbating these problems was the absence of emergency call buttons in the cells to summon assistance from staff.

207.    The St. Clair Defendants were aware of the particular dangerousness of the P/Q blocks, the high proportion of prisoners housed there with disciplinary problems and histories of violence while in ADOC custody, the lack of adequate monitoring of prisoners in the P/Q blocks,

the acute inattentiveness of officers stationed there, and the proliferation of contraband weapons, lack of cameras, and the existence of blind spots in the P/Q blocks at St. Clair.

208.    The St. Clair Defendants were also aware that when prisoners were in a cell, they had no way of contacting a security officer other than banging on their cell doors or shouting— wholly ineffective means for getting help because security officers were frequently asleep, inattentive, absent, or otherwise out of earshot.

209.    The St. Clair Defendants were likewise aware that the resulting inadequate supervision and monitoring of prisoners created a substantial risk of serious harm that facilitated and encouraged homicides and assaults such as the beating, stabbing, and rape of D.S.

210.    In addition, the St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors knew that a lack of programming opportunities in the P/Q blocks left prisoners there idle and that idleness, along with inadequate supervision and monitoring, increased the likelihood of violence in those blocks.

211.    Despite this, the St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors including Defendants Dunn, Culliver, Daniels, Williams, Ellington, Karla Jones, Gwendolyn Givens, Anthony Brooks, Carl Sanders, Gary Malone, Kevin White, and Carla Graham, failed to improve supervision and monitoring in the P/Q blocks.

212.    These Defendants did not provide any additional staffing to the P/Q block or improve supervision and monitoring of existing staff in the P/Q blocks.

213.    These Defendants took no meaningful steps to address the substantial risk of serious harm to prisoners in the P/Q blocks such as D.S., prior to his assault.

214.    These Defendants acted with deliberate indifference and their misconduct placed vulnerable prisoners such as D.S. at substantial risk of serious harm and caused his injuries.

**Defendants' Failure to Address the Widespread
Proliferation of Contraband Weapons at St. Clair**

215.    The St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors including Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, and Graham, through their acts and omissions, permitted contraband weapons to proliferate at St. Clair and failed to effectively control the introduction, manufacture, and use of contraband weapons by prisoners at St. Clair, exhibiting deliberate indifference to the substantial risk of serious harm that such weapons created to prisoners such as D.S.

216.    As set forth above, both the widespread availability of weapons at St. Clair and the resulting stabbings and other violent incidents at St. Clair were brought to the attention of the St. Clair Defendants through, for example, incident reports, the *Cheatham* lawsuit, EJI's September 6, 2018 letter, and individual prisoner lawsuits.

217.    The widespread proliferation of contraband weapons within St. Clair contributed to the high rate of violence, sexual abuse, and death and created a substantial risk of serious harm to prisoners such as D.S.

218.    By the time of D.S.'s assault at St. Clair, it was a matter of common knowledge among St. Clair staff that the prisoner population at St. Clair was heavily armed.

219.    Prisoners believed they needed to arm themselves at St. Clair for protection because of the endemic violence at the facility.

220.    Stab wounds were seen on a weekly, if not daily, basis.

221.    Large machete-type knives have been reported at St. Clair.

222.    At least one knife found at St. Clair was over 2 feet long.

36

223.    In the words of St. Clair Correctional Officer Jonathan Truitt, a single 24-person cell block at St. Clair could contain "30 to 40" contraband knives; contraband was "out of control"; and prisoners were being "being assaulted in every way imaginable." Cam Ward, Alabama Correctional Officer Numbers Down 20%, Montgomery Advertiser, Jan. 8, 2017.

224.    Staff at St. Clair frequently responded with deliberate indifference when prisoners were observed with contraband weapons and failed to discipline prisoners found with contraband weapons.

225.    The failure to discipline prisoners in possession of contraband weapons created a dangerous culture whereby prisoners knew they could possess such weapons with impunity and felt emboldened to use such weapons without fear of incurring any disciplinary action.

226.    As set forth above, knives, box cutters, and other contraband weapons were commonly used in assaults at St. Clair.

227.    Despite this, the St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors permitted contraband weapons to proliferate at St. Clair and took no meaningful action to curtail the widespread availability of contraband weapons at St. Clair, exhibiting deliberate indifference to prisoners such as D.S. who were likely to be victimized by such weapons.

228.    In the months leading up to the attack on D.S., contraband searches continued to be ineffective and sporadic.

229.    Defendant Culliver has admitted that the contraband search protocols at St. Clair were inadequate.

230.    As of January 2019, the St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors had made no meaningful changes to increase and improve contraband searches at St. Clair.

231.    As of January 2019, the St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors had made no meaningful changes to improve discipline for prisoners found with contraband weapons at St. Clair.

232.    These Defendants acted with deliberate indifference and their misconduct placed vulnerable prisoners such as D.S. at substantial risk of serious harm and caused his injuries.

**Defendants' Failure to Protect Vulnerable Prisoners from Enemies**

233.    St. Clair Defendants including Defendants Dunn, Culliver, Daniels, Williams, Ellington, Vincent, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Gordy, Ragsdale, Estelle, and Ary had an unreasonable and longstanding policy and practice of failing to protect prisoners who had been subject to victimization while in ADOC custody such as D.S., and failing to separate prisoners such as D.S. from known enemies and other predatory and violent prisoners.

234.    Defendants maintained these policies and practices even though they knew that the failure to adequately protect vulnerable prisoners, separate prisoners known to be enemies, and segregate predatory prisoners had contributed to many violent incidents in the past.

235.    Defendants, through their acts and omissions, failed to implement effective classification and housing policies, thereby resulting in violence caused by commingling prisoners who should have been kept separate.

236.    For example, D.S. was known to be vulnerable, having been victimized both at Holman and Donaldson.

237.    D.S. was also known to have enemies related to his assaults at Holman and Donaldson.

238.    Nonetheless, Defendants including Estelle, Gordy, and Ary caused D.S. to be housed D.S. along with his enemies in a poorly-supervised housing block at St. Clair.

239.    Defendants Dunn, Culliver, Daniels, Williams, Ellington, Vincent, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Gordy, Ragsdale, Estelle, and Ary acted with deliberate indifference and their misconduct placed vulnerable prisoners such as D.S. at substantial risk of serious harm and caused his injuries.

**Defendants' Failure to Adequately Respond to and
Discipline Instances of Prisoner Misconduct**

240.    The St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors, through their acts and omissions, failed to properly respond to and discipline prior instances of prisoner misconduct in the time period leading up to Plaintiff's assault at St. Clair.

241.    ADOC staff failed to properly investigate and discipline acts of violence by prisoners at St. Clair, emboldening violent prisoners such as D.S.'s assailants.

242.    ADOC staff routinely discouraged victims from reporting incidents of violence or threats of violence at St. Clair.

243.    ADOC staff routinely retaliated against prisoners who reported violence and threats of violence by subjecting such prisoners to discipline in conjunction with the prisoners' reports of violence and threats of violence. This retaliation had the effect of deterring prisoners from reporting violence and threats of violence.

244.    In many cases, prisoners were subjected to discipline for refusing to name the individuals who they feared might harm them.

245.    St. Clair did not have an established grievance system, limiting prisoners' ability to report threats of violence or sexual abuse was thus substantially limited.

246.    ADOC staff responded with deliberate indifference when prisoners were extorted by other prisoners at St. Clair, resulting in serious physical injuries and sexual abuse.

247.    These failures created a dangerous culture of violence at St. Clair, which, in turn, posed a substantial risk of serious harm to prisoners such as D.S.

248.    The St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors were on notice of these failures, as well as the substantial risk of serious harm that resulted for prisoners such as D.S.

249.    The St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors were put on notice of the culture of violence at St. Clair through their roles at St. Clair and ADOC, internal ADOC reports, communications with staff and prisoners, lawsuits, and media coverage.

250.    The Defendant Supervisors were also put on notice of the culture of violence at St. Clair through EJI's *Cheatham* Complaint, which described in detail the ways in which Defendants fostered and encouraged a culture of abuse and violence at St. Clair and the resulting risks to prisoners such as D.S.

251.    The St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors fostered the culture of violence at St. Clair through their acts and omissions.

252.    For example, the St. Clair Defendant ADOC Supervisors and Defendant Jones failed to act provide an established grievance system at St. Clair.

253.    The St. Clair Defendant Facility Supervisors, through their acts and omissions, discouraged victims from reporting incidents of violence or threats of violence at St. Clair.

254.    The St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors failed to ensure proper investigation and discipline of violence by prisoners, emboldening violent prisoners such as D.S.'s assailants.

255.    The St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors, through their acts and omissions, also failed to prevent prisoners from extorting other prisoners, resulting in serious physical injuries and sexual abuse and presenting a substantial risk of serious harm to prisoners at St. Clair.

256.    The St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors acted with deliberate indifference and their misconduct placed vulnerable prisoners such as D.S. at substantial risk of serious harm and caused his injuries.

### Defendants' Failure to Adequately Prevent, Detect, and Respond to Prior Instances of Sexual Abuse at St. Clair

257.    The St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors also failed, through their acts and omissions, to protect prisoners at St. Clair such as D.S. from sexual assault.

258.    The St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors, through their acts and omissions, allowed for high levels of prisoner-on-prisoner sexual abuse to occur at St. Clair without taking reasonable measures to keep prisoners such as D.S. safe from such abuse.

259.    At the time of D.S.'s rape, the St. Clair Defendants, including Defendants Vincent, Gordy, Jones, Ragsdale, Estelle, and Ary, were aware of the high rate of incidents of sexual violence at St. Clair, including the sexual assaults at St. Clair identified above, which all took place between January 2017 and January 2019.

260.    The St. Clair Defendants were also aware that numerous sexual assaults at St. Clair had gone unreported.

261.    The St. Clair Defendants ADOC Supervisors, St. Clair Defendant Facility Supervisors, and Defendant Ary likewise knew at the time of D.S.'s rape that St. Clair's policies and procedures, including inadequate supervision and monitoring in dangerous housing units, the proliferation of weapons contraband, the failure to protect vulnerable prisoners from enemies and predatory prisoners, the failure to discipline instances of prisoner misconduct, and the creation and encouragement of a culture of violence and abuse, all created a substantial risk of serious harm from sexual violence to vulnerable prisoners.

262.    EJI's *Cheatham* lawsuit and individual lawsuits further put the St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors on notice of the prevalence of prisoner-on-prisoner sexual violence at St. Clair, as well as the inadequacies of the policies and practices at St. Clair related to the detection, prevention, and response to incidents of sexual violence.

263.    The St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors were also well aware of their obligations to address sexual abuse at St. Clair to reduce the substantial risk of serious harm to prisoners such as D.S.

264.    In 2003, Congress passed the Prison Rape Elimination Act of 2003, cautioning that "[s]tates that do not take basic steps to abate prison rape" demonstrate deliberate indifference to prisoners' constitutional rights. 42 U.S.C. § 15601(13).

265.    PREA, in turn, established a body known as the National Prison Rape Elimination Commission ("NPREC") to investigate prison rape. NPREC's 2009 report found that: "Sexual abuse is not an inevitable feature of incarceration. Leadership matters because corrections

administrators can create a culture within facilities that promotes safety instead of one that tolerates abuse." National Prison Rape Elimination Commission Report, June 2009, at 5 (available at https://www.ncjrs.gov/pdffiles1/226680.pdf). The NPREC report, too, issued findings on the importance of proper classification, supervision, staffing, and responses to complaints of rape. *Id.* at 5-8.

266. PREA also resulted in the 2011 promulgation of the National PREA Standards, which imposed requirements on correctional facilities in such areas as supervision and monitoring, screening for risk of victimization and abusiveness, proper official responses following an inmate report of sexual assault, and disciplinary sanctions for perpetrators. *See* 28 C.F.R. § 115.11 - 115.18 (standards for adult prisons and jails).

267. As the St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors were aware, PREA, the PREA National Standards, and ADOC's 2014 PREA policy required Defendants to fulfill their obligation to protect prisoners in ADOC custody from sexual assault.

268. Nonetheless, the St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors were deliberately indifferent to the substantial risk of serious harm that sexual violence posed to prisoners such as D.S.

269. The St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors continued and maintained general policies and practices that heightened the risk of sexual assault, including inadequate supervision, deficient security, inadequate search procedures to eliminate weapons contraband, failure to safely house prisoners who express fear, and encouragement of violence.

270.    The St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors also fostered a longstanding and unreasonable policy and practice pursuant to which St. Clair staff failed to identify and segregate known or likely perpetrators of sexual violence to ensure the safety of other prisoners at St. Clair.

271.    The St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors failed to adequately and effectively segregate predatory prisoners even though they knew that the failure to do so had contributed to violence in the past.

272.    The St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors likewise did not protect victims from retaliation, including by providing sight and sound separation between the victims and their assailants and by protecting victims from gang associates of their assailants.

273.    For those prisoners courageous enough to report rapes at St. Clair, retaliation frequently followed from their assailants or associates of their assailants, and the St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors took no meaningful steps to prevent or address this retaliation.

274.    Furthermore, the St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors engaged in a longstanding practice of placing prisoners who report sexual abuse in isolation cells in segregation which discouraged prisoner reports of sexual abuse, and, in turn, increased the risk of sexual assault and undermined the ability of staff to detect and prevent sexual abuse.

275.    Furthermore, when prisoners reported sexual assaults, the St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors such as Defendant Jones failed

to ensure that thorough investigations were completed of those sexual assault complaints, victims notified of the results of investigations, and perpetrators disciplined.

276.    St. Clair Defendants including Vincent, Gordy, and Ragsdale also regularly declined to ensure that sexual assault victims were provided with mental health treatment, proper forensic medical examinations, adequate post-incident medical care, and/or testing for sexually-transmitted infections.

277.    The failure of the St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors to properly prevent or respond to incidents of sexual assault emboldened perpetrators and heightened the risk of sexual violence to prisoners such as D.S.

278.    Despite the prevalence of sexual assault at St. Clair prior to D.S.'s rape, and their knowledge of the same, the St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors failed to implement any corrective action to reduce the substantial risk of serious harm to prisoners such as D.S., exhibiting deliberate indifference to their safety.

279.    These Defendants acted with deliberate indifference and their misconduct placed vulnerable prisoners such as D.S. at substantial risk of serious harm and caused his injuries.

### Defendants' Failure to Respond to and Discipline
### Excessive Force at St. Clair

280.    St. Clair Defendants including Defendants Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, and McMillian also fueled a culture of abuse at St. Clair by tolerating and condoning excessive uses of force by staff members, and in the case of Defendants Malone and McMillian, engaging in excessive force and abusive tactics themselves.

281.    These Defendants' acts and omissions created a culture of abuse at St. Clair in which staff excessive force against prisoners occurred with impunity.

282.    For example:

a.  In March 2017, Officer Howard and other officers assaulted a prisoner with severe mental health issues after he told them he thought his skin was falling off. The officers sprayed the prisoner with mace, beat him with handcuffs, and left him in his cell for three days rather than taking him to the infirmary. He was subsequently rushed to the hospital because his esophagus closed up. Defendant Malone was present during the assault.

b.  In June 2017, a prisoner was sprayed with a large volume of mace in his cell at the direction of Defendant Malone after officers discovered a broken window in his cell. He was left alone in the cell with mace for approximately one hour despite having asthma.

c.  In August 2017, guards assaulted an 84-year-old prisoner who was confined to a wheelchair. He had to be taken to an outside hospital due to the severity of his injuries.

d.  In November 2017, an officer slapped a prisoner without provocation in front of a large group of officers and incarcerated men before a meeting of the segregation board. The officer had previously been encouraged by other officers to "slap [prisoners] upside the head" whenever they "talk crazy."

e.  In November 2017, a handcuffed prisoner was beaten by officers in the segregation yard.

f.  In December 2017, Defendant McMillian and Officer McLemore assaulted a handcuffed prisoner in D block. The prisoner had requested to be taken to a

suicide cell, and the officers punched him in the face, head, and body for multiple minutes.

g. In January 2018, Sergeant Weaver and other officers assaulted a prisoner after he reported fearing for his life and requesting to be placed in segregation. Sgt. Weaver and the officers dragged the prisoner by his feet from the shift office, struck him in the head, and sprayed him with mace. Officer Walker witnessed the event and did nothing to intervene.

h. In March 2018, Sgt. McLemore and others handcuffed a prisoner in the infirmary, sprayed him with a large volume of Sabre Red chemical agent so that he could not see clearly, and then proceeded to punch and kick his entire body for over 10 minutes, using particularly violence against his head, face, and testicles. The prisoner has experienced ongoing injuries, including difficulty with his vision.

i. Also in March 2018, a prisoner was assaulted by Officer Chapman at a meeting of the segregation board. The prisoner reportedly made a statement about an officer during his segregation board hearing, and Officer Chapman interjected that he was lying and slammed him forcefully into the doorframe while other officers watched. The prisoner's nose was broken in the incident, and he was then disciplined for failure to obey a direct order for leaving the place prisoners are forced to stand during their segregation board hearings.

j. In May 2018, a prisoner was assaulted by officers after he cut his wrists in segregation, where he had been placed after suffering a sexual assault several days earlier. He was struck in the face while handcuffed by Sgt. Dent and then had his head slammed into a brick wall by Officer Jones.

k.  Also in May 2018, Sgt. Dent assaulted a prisoner in B block, breaking his jaw.

l.  In August 2018, Sgt. Dent, Officer Kendrick, and Defendant McMillian assaulted a prisoner in B block after he asked to be moved from the top tier to the lower tier.

m.  In September 2018, a prisoner made a comment that an officer interpreted as disrespectful, so the officer tried to have his cell assignment changed so he would be next to a prisoner who had previously stabbed him. When the prisoner refused to go, Defendant Malone sprayed him with Sabre Red chemical agent and wrote a false report that the prisoner had threatened to kill an officer and charged at him.

n.  In October 2018, Sgt. Dent, Officer Burns, and Officer Kendrick attacked a prisoner who had been beating on his cell door trying to get help after smoking a cigarette that had been laced with methamphetamine without his knowledge. The officer sprayed him with mace, picked him up by the handcuffs and ankle cuffs, scraped him on the concrete, and beat on him while he was on the ground. He was taken to an outside hospital for treatment.

o.  In December 2018, Sgt. Dent sprayed a prisoner in the face with mace and then force the prisoner to go outside with his hands and feet shackled, while it was sleeting and the prisoner was wearing only boxer shorts.

p.  In early January 2019, Sgt. McLemore sprayed a prisoner in B block, left him for more than 30 minutes without decontaminating him, then told him to cuff up forcing him to remove the splint he wore for carpal tunnel syndrome. As the prisoner walked out of the cell in cuffs, Sgt. McLemore jumped him from behind, busting his head open and injuring his arm. Defendant Malone had Sgt.

McLemore take photos of the prisoner after the assault. The prisoner was then written up for disorderly conduct and disobeying a direct order.

283.    The St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors were on notice of the culture of abuse, as well as the incidents identified above, through internal sources including use-of-force reports, incident reports, duty officer reports, and medical reports, and external sources such as the *Cheatam* Complaint.

284.    The failure to discipline officers for excessive force and other misconduct signaled to the correctional officers at St. Clair that they could abuse, or fail to protect, prisoners without fear of any adverse consequences.

285.    The failure to discipline officers for excessive force and other misconduct signaled to prisoners at St. Clair that they could abuse other prisoners without fear of any adverse consequences.

286.    The St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors were on notice of the culture of abuse at St. Clair through their roles at St. Clair and ADOC, internal ADOC reports, communications with staff and prisoners, prisoner lawsuits, and media coverage.

287.    The Defendant Supervisors were also on notice of this culture of abuse through EJI's *Cheatham* Complaint, which described in detail the ways in which Defendants fostered and encouraged a culture of abuse at St. Clair and the resulting risks to prisoners.

288.    Defendants' conduct created a dangerous culture of violence at St. Clair, which, in turn, heightened the risk of prisoner assaults on vulnerable prisoners such as D.S.

289.    The St. Clair Defendant ADOC Supervisors and St. Clair Defendant Facility Supervisors acted with deliberate indifference and their misconduct placed vulnerable prisoners such as D.S. at substantial risk of serious harm and caused his injuries.

## PLAINTIFF'S DAMAGES

290.    As a result of the Defendants' wrongful actions, Plaintiff has suffered severe physical and emotional trauma and injuries.

## CLAIMS

### Count I - 42 U.S.C § 1983
### Eighth Amendment Failure to Protect
### Against the Donaldson Defendants and St. Clair Defendants

291.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

292.    Pursuant to the Eighth Amendment of the United States Constitution, Plaintiff is entitled to be free from a substantial risk of serious harm while in the custody of the State.

293.    Defendants, acting individually and in conspiracy with other Defendants, failed to protect Plaintiff.

294.    Defendants knew of and consciously disregarded the substantial risk that Plaintiff would be seriously harmed while in custody, failing to protect him from harm.

295.    The misconduct described in this cause of action was undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of D.S. and others, and was objectively unreasonable.

296.    Defendants' misconduct directly and proximately caused D.S. to be subjected to a substantial risk of serious harm and to suffer horrific physical and emotional injuries.

### Count II - 42 U.S.C § 1983
### Eighth and Fourteenth Amendment State-Created Danger
### Against the Donaldson Defendants and St. Clair Defendants

297.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

50

298.    Pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, Plaintiff is entitled to be free from a known and substantial risk of serious harm while in the custody of the State, including from a State-created danger.

299.    Defendants limited Plaintiff's ability to care for himself in prison.

300.    Defendants affirmatively placed Plaintiff in a position of danger he would not have otherwise faced.

301.    In violation of Plaintiff's Eighth and Fourteenth Amendment rights, Defendants knew of and consciously disregarded the substantial risk that Plaintiff would be seriously harmed while in custody, including from a State-created danger.

302.    Defendants, acting individually and in conspiracy with other Defendants, then failed to take reasonable steps to address the known and substantial risk of serious harm to Plaintiff, including from a State-created danger.

303.    The misconduct described in this cause of action wasundertaken with deliberate indifference, malice, willfulness, and reckless indifference to the rights of prisoners such as D.S., and was objectivelyunreasonable.

304.    Defendants' misconduct directly and proximately caused D.S. to be subjected to a substantial risk of serious harm, and caused him to suffer horrific physical and emotional injuries.

### Count III - 42 U.S.C § 1983
### First, Eighth, and Fourteenth Amendment Unlawful Retaliation
### Against the St. Clair Defendants

305.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

306.    As set forth in more detail above, Defendants, individually and in conspiracy, violated Plaintiff's First, Eighth, and Fourteenth Amendments rights by subjecting Plaintiff to

retaliation for exercising his constitutional right to report a personal grievance to prison authorities.

307.    Defendants subjected Plaintiff to segregation and exposure to his enemies to retaliate against him for reporting his sexual assault.

308.    Defendants' retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights.

309.    A causal connection existed between Defendants' retaliatory actions and the Plaintiff's protected speech and acts.

310.    As a direct and proximate result of Defendants' retaliatory actions, Plaintiff suffered damages, including extreme emotional pain and suffering.

## Count IV - 42 U.S.C § 1983
## Civil Conspiracy
## Against the Donaldson Defendants

311.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

312.    As described more fully in the preceding paragraphs, the Donaldson Defendants and other co-conspirators not fully known to Plaintiff acted in concert with one another to accomplish an unlawful purpose by unlawful means.

313.    The Donaldson Defendants and other co-conspirators not yet known to Plaintiff reached an agreement among themselves to deprive Plaintiff of his right to be free from unreasonable harm, subject him to unlawful retaliation, and fail to intervene to prevent harm from occurring to Plaintiff, in violation of Plaintiff's constitutional rights, in the manner described above, with regard to both the assault of Plaintiff at Donaldson.

314.    In furtherance of this conspiracy, and as set forth in the Complaint above, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

315.    As a direct and proximate result of the illicit agreement referenced above, Plaintiff's rights were violated and he suffered damages.

### Count V - 42 U.S.C § 1983
### Civil Conspiracy
### Against the St. Clair Defendants

316.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

317.    As described more fully in the preceding paragraphs, the St. Clair Defendants and other co-conspirators not yet known to Plaintiff acted in concert with one another to accomplish an unlawful purpose by unlawful means.

318.    The St. Clair Defendants and other co-conspirators not yet known to Plaintiff reached an agreement among themselves to deprive Plaintiff of his right to be free from unreasonable harm, subject him to unlawful retaliation, and fail to intervene to prevent harm from occurring to Plaintiff, in violation of Plaintiff's constitutional rights, in the manner described above, with regard to both the assault of Plaintiff at St. Clair.

319.    In furtherance of this conspiracy, and as set forth in the Complaint above, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

320.    As a direct and proximate result of the illicit agreement referenced above, Plaintiff's rights were violated and he suffered damages.

### Count VI - 42 U.S.C § 1983
### Failure to Intervene
### Against the Donaldson Defendants and St. Clair Defendants

321.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

322.    As described more fully in the preceding paragraphs, Defendants knew that Plaintiff's rights were being violated, and had the realistic opportunity to intervene to prevent or stop the constitutional misconduct alleged above, but failed to do so.

323.     The misconduct described in this cause of action was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

324.     As a result of the Defendants' failure to intervene, Plaintiff's constitutional rights were violated and he suffered damages.

## Count VII – State Law
## Intentional Infliction of Emotional Distress
## Against All Defendants

325.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

326.     The acts of Defendants as set forth above were both extreme and outrageous.

327.     Defendants intended to cause, or acted in reckless disregard of the probability that they would cause, severe emotional distress to Plaintiff.

328.     The misconduct described above was undertaken with malice, willfulness, and reckless indifference to Plaintiff's rights.

329.     As a direct and proximate result of the misconduct described above, Plaintiff's rights were violated and he suffered damages.

## Count VIII – State Law
## Negligence
## Against All Defendants

330.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

331.     Defendants had a duty of care to Plaintiff.

332.     Defendants breached that duty of care.

333.     In doing so, Defendants acted willfully, maliciously, fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of the law.

334.     Defendants' breach of their duty of care to Plaintiff directly and proximately caused Plaintiff to suffer damages, including physical and emotional pain and suffering.

WHEREFORE, Plaintiff D.S. respectfully requests that this Court enter a judgment in his favor and against all Defendants, awarding compensatory damages, punitive damages, interest and attorneys' fees and costs against each Defendant, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

**D.S.**

BY: /s/ Ruth Brown
    *Counsel of Record*

BY: /s/ Anil Mujumdar
    *Local Counsel*

*Ruth Z. Brown (pro hac vice application forthcoming)
Megan Pierce (pro hac vice application forthcoming)
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
T: 312-243-5900
F: 312-243-5902
E: ruth@loevy.com, megan@loevy.com
*Counsel of Record

Anil A. Mujumdar (ASB-2004-L65M)
Dagney Johnson Law Group
2170 Highland Avenue, Suite 250
Birmingham, AL 35205
T: 205.590.6986
F: 205.809.7899
E: anil@dagneylaw.com