FILED

2024 Oct-06 PM 09:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| ANTONIO CHEATHAM; MARK DUKE; JAMES EDWARDS; DALE GILLEY; FRANKY JOHNSON; MICHAEL MAYS; DERRICK WHITE; ALLAN WILLIAMS and ROBERT WOODS, on behalf of themselves and all others similarly situated | * * * * * * * * | |
| PLAINTIFFS, | * | Civil Action No. _____ |
| vs. | * * | |
| COMMISSIONER KIM THOMAS; ASSOCIATE COMMISSIONER JAMES DELOACH; ASSOCIATE COMMISSIONER TERRANCE MCDONNELL; DEPUTY COMMISSIONER GREG LOVELACE; INSTITUTIONAL COORDINATOR GRANT CULLIVER; WARDEN CARTER DAVENPORT; ASSISTANT WARDEN ERIC EVANS; ASSISTANT WARDEN KAREN CARTER; CAPTAIN CARL SANDERS; CAPTAIN GARY MALONE, in their official capacities, | * * * * * * * * * * * * * * * * * | |
| DEFENDANTS. | * | |

_____

## CLASS ACTION COMPLAINT

_____

**Complaint Exh. A**

## **PRELIMINARY STATEMENT**

Plaintiffs are men presently confined in the custody of the Alabama Department of Corrections ("ADOC") at St. Clair Correctional Facility ("St. Clair" or "the Facility"), where mismanagement, poor leadership, overcrowding, inadequate security, and unsafe conditions, including broken and nonfunctioning locks on the majority of cell doors, have lead to an extraordinarily high homicide rate, weekly stabbings and assaults, and a culture where violence is tolerated, creating conditions of confinement that violate the Eighth and Fourteenth Amendments to the United States Constitution. Because of poor management, drugs and other contraband – in many cases contraband that is brought into the Facility and sold to prisoners by officers or DOC staff – are prevalent. Furthermore, correctional staff fail to follow policies and procedures and sometimes ignore urgent pleas for assistance that then results in serious violence. The potential for violence is exacerbated by the dearth of basic hygiene supplies, including soap, toilet paper, and underclothing, that can only be obtained by purchase or favor. It is also exacerbated by new policies eliminating or severely cutting back mental health and drug treatment services, rehabilitative programming, and removing books and other constructive activities from the housing units. The lack of basic hygiene supplies and opportunities to engage in activities, including reading, creates an oppressive and monotonous environment that

2

**Complaint Exh. A**

accommodates abuse and violence, as well as drug abuse in a population with a high rate of mental illness and prior addiction.

Defendants have failed to reasonably and adequately respond to this extremely high rate of prisoner-on-prisoner assaults and homicides and the dangerous conditions that facilitate the incidents and culture of violence. Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 for injunctive and declaratory relief to redress Defendants' violations of their rights under the Eighth and Fourteenth Amendments to the United States Constitution.

Each paragraph in this complaint incorporates, repeats, and realleges every other paragraph in this complaint.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). Plaintiffs seek declaratory relief pursuant to 28 U.S.C. § 2201. Venue is proper pursuant to § 1391(b).

## PARTIES

PLAINTIFFS:

2. Plaintiffs Antonio Cheatham, Mark Duke, James Edwards, Dale Gilley, Franky Johnson, Michael Mays, Derrick White, Allan Williams, and Robert Woods are prisoners at St. Clair Correctional Facility. Each named Plaintiff has suffered

3

**Complaint Exh. A**

physical harm or is in immediate danger of future harm. They seek to represent themselves and all other current and future prisoners at St. Clair.

DEFENDANTS:

3.  Defendant Kim Thomas is the Commissioner of the Alabama Department of Corrections. As Commissioner, Defendant Thomas is responsible for the direction, supervision, and control of the Department of Corrections. He is the highest ranking official in the Alabama Department of Corrections. Defendant Thomas is sued in his official capacity as Commissioner of the Alabama Department of Corrections.

4.  Defendant James Deloach is the Associate Commissioner for Operations for the Alabama Department of Corrections. As Associate Commissioner, Defendant Deloach is responsible for ensuring the effective daily operations of prison facilities. He supervises the Classification Review Board, the Training Division, the Transfer Division, and the Institutional Coordinators. Defendant Deloach is sued in his official capacity.

5.  Defendant Terrance G. McDonnell is the Associate Commissioner for Plans and Programs for the Alabama Department of Corrections. As Associate Commissioner, Defendant McDonnell is responsible for the Central Records Division, Research and Planning Division, Supervised Reentry Program, Religious Programs, Educational and Vocational Education Programs, and Victim-Constituent Services.

4

**Complaint Exh. A**

Defendant McDonnell is sued in his official capacity.

6.      Defendant Greg Lovelace is the Deputy Commissioner for Maintenance for the Alabama Department of Corrections. As Deputy Commissioner, Defendant Lovelace is responsible for the maintenance and construction of correctional facilities. Defendant Lovelace is sued in his official capacity.

7.      Defendant Grant Culliver is the Institutional Coordinator for the Northern Region of the Alabama Department of Corrections.  Defendant Culliver is responsible for planning, monitoring, and reviewing day-to-day operations of correctional institutions in his assigned area, including St. Clair Correctional Facility.  Defendant Culliver is sued in his official capacity.

8.      Defendant Carter Davenport is the Warden of St. Clair Correctional Facility in Springville, Alabama.  As warden, Defendant Davenport is responsible for the day-to-day operations of the prison, as well as the safety of all inmates at the Facility and the supervision of all subordinate employees.  Defendant Davenport is sued in his official capacity.

9.      Defendant Karen Carter is an Assistant Warden of St. Clair Correctional Facility in Springville, Alabama.  As assistant warden, Defendant Carter is responsible for the day-to-day operations of the prison, as well as the safety of all inmates at the Facility and the supervision of all subordinate employees.  Defendant Carter is sued

5

**Complaint Exh. A**

in her official capacity.

10.     Defendant Eric Evans is an Assistant Warden of St. Clair Correctional
Facility in Springville, Alabama.  As assistant warden, Defendant Evans is responsible
for the day-to-day operations of the prison, as well as the safety of all inmates at the
Facility and the supervision of all subordinate employees.  Defendant Evans is sued
in his official capacity.

11.     Defendant Carl Sanders is a Captain at St. Clair Correctional Facility in
Springville, Alabama.  As a Captain, Defendant Sanders is responsible for safety of
all inmates at the Facility, for supervising the security activities of St. Clair, and the
supervision of all subordinate employees.  Defendant Sanders is sued in his official
capacity.

12.     Defendant Gary Malone is a Captain at St. Clair Correctional Facility in
Springville, Alabama.  As a Captain, Defendant Malone is responsible for safety of
all inmates at the Facility, for supervising the security activities of St. Clair, and the
supervision of all subordinate employees.  Defendant Malone  is sued in his official
capacity.

## FACTUAL ALLEGATIONS

13.     Defendants are aware of the extremely high rate of violence at St. Clair.
There have been six homicides at the Facility in the past 36 months, three of which

**Complaint Exh. A**

occurred in 2014. This constitutes a rate of prisoner-on-prisoner homicides at St. Clair that is drastically higher than the national average in state prisons. Based on the Bureau of Justice Statistics' most recent available annual data from 2011, the national homicide rate in state prisons was approximately 5.4 homicides per 100,000 prisoners. The homicide rate at St. Clair during the same time period was approximately 75.4 homicides per 100,000 prisoners. The homicide rate at St. Clair in 2012 was 75.6 per 100,000 prisoners, 77.7 per 100,000 prisoners in 2013, and the homicide rate to date **for 2014 is approximately 232.4 per 100,000 prisoners**.

14.　　There is also a high rate of stabbings and serious assaults. Based on the most recent data made available by the Alabama Department of Corrections, the rate of serious assaults at St. Clair from January to May 2014 was 848.8 serious assaults per 100,000 prisoners and the rate of fights and assaults combined was 4,321 per 100,000 prisoners.

15.　　Defendants are aware of this extreme level of serious life endangering violence at St. Clair. In a news article from March 16, 2012, Defendant Davenport referred to the overcrowding, contraband, and violence at St. Clair as a "security nightmare." There has been media coverage of each of the prisoner-on-prisoner homicides, which has included official statements from ADOC.

16.　　Furthermore, undersigned counsel sent a letter to Defendant Thomas on

7

**Complaint Exh. A**

April 22, 2014, regarding the alarming rise in violence and unprecedented homicide rate at St. Clair under Warden Davenport's leadership and met with the Commissioner to emphasize these concerns.

17.     Less than two months after this meeting regarding the alarming rise in fatalities at St. Clair, another homicide occurred. Jodey Waldrop was killed inside his cell on June 3, 2014.

18.     On June 9, 2014, following the murder of Mr. Waldrop, undersigned counsel sent a second letter to Defendant Thomas which documented the high rate of violence and the number of homicides at St. Clair in the preceding 30 months. In this letter, and in meetings with the Commissioner and his staff, undersigned counsel detailed the mismanagement and violent conditions at St. Clair and called for immediate reform and change in leadership.

19.     No changes were made following these communications and the violence at St. Clair continued. On September 16, 2014, another prisoner was killed at St. Clair.

20.     Defendants' knowledge of the violent and dangerous conditions is also established by institutional reports prepared by Defendants' employees describing violent incidents and lawsuits filed by prisoners challenging the abuse of authority and conditions of confinement.

**Complaint Exh. A**

21.     Defendants are responsible for the care, custody and control of prisoners in their custody, and, through their acts and omissions, Defendants have allowed a dangerous and violent environment to flourish.   Upon information and belief, Defendants have not made  significant efforts, and have not implemented adequate changes in policy or practice to address, or to improve, the conditions at St. Clair that allows violence to proliferate.   Despite the extraordinary rate of violence and homicides at St. Clair, Defendants have failed to take reasonable, necessary and appropriate steps to prevent and remedy these dangerous conditions.

22.     Where Defendants have responded, their response has been unreasonable. Verbally abusive and physically aggressive intervention by staff heightens the tension and makes the prison more dangerous.   This behavior is modeled by the highest ranking staff in the prison including Defendants Warden Davenport, Captain Sanders, and Captain Malone.

23.     It has been widely publicized that in 2012, Defendant Warden Davenport reportedly punched a handcuffed prisoner in the face.   Warden Davenport was not demoted or removed from his command.

24.     Upon information and belief, Defendant Captain Sanders engages in arbitrary and unpredictable bullying tactics that keep the prison on edge including an incident in 2013 when Captain Sanders snatched a food tray from a prisoner's hands

9

**Complaint Exh. A**

causing a dangerous and volatile situation to erupt leading to serious injuries to officers and prisoners. Upon information and belief, Captain Sanders has taunted prisoners and responded to their safety concerns by telling them to, "get a knife," "kill him or kill yourself," and "if you really don't like him, stab him."

25.   A group of high ranking officers have used excessive force and promulgated the culture of violence through their own actions. This, combined with Defendants' failure to appropriately supervise staff with patterns of incidents involving excessive force or abusive interactions, has created an environment where the risk of physical harm is likely. This is reflected in the numerous assaults on prisoners by a group of correctional staff who have been the subject of repeated complaints of abuse, including but not limited to:

a.   In 2014, Captain Carl Malone punched a prisoner, who was handcuffed, in the head, chipping the prisoner's tooth.

b.   In July 2014, Correctional Officers Donald Lukima and Christopher Smith, officers on Lt. Carter's shift beat a prisoner. Officers Lukima and Smith ordered the prisoner out of his cell in the middle of the night, took him into the hallway outside his block, handcuffed him, and then hit him in the back of the head with handcuffs wrapped around their knuckles, causing injuries requiring staples. Upon information and belief, Lt. Carter observed the assault but did

10

**Complaint Exh. A**

not intervene.

c.     In May 2014, Lt. Carter put his hands around an inmate's neck and applied pressure until he lost consciousness.  The inmate had to be taken to UAB hospital due to his injuries.

d.     In May 2014, Lt. Carter forced Dale Gilley to stand outside the shift office facing the wall for fourteen hours and, at one point during that period of time, slammed his head against the wall and punched him in the face.

e.     Jermaine Tillman was assaulted in February 2013, by Officers Chad Cleveland, M. Desnides, and W. Howard.  The officers assaulted Mr. Tillman when he was returning to his cell from the showers and was restrained in handcuffs behind his back.   The officers hit Mr. Tillman in the face, slammed his head into a window, and continued to punch, kick, and beat him when he fell to the floor.  Mr. Tillman's injuries included swelling to his head and bruising on his face.

f.     Upon information and belief, inmate Richardo Eason was beaten by multiple St. Clair officers while handcuffed in February 2013.  While assigned to the segregation unit, Mr. Eason was placed in handcuffs before being allowed to leave his cell for a shower. Officer JaMichael Howard left his post and approached Mr. Eason, asked him a question, then punched Mr. Eason

11

**Complaint Exh. A**

several times in the face. Officers Taylor Knight and Chad Cleveland then assisted Howard in slamming Mr. Eason onto the floor.

g.      Upon information and belief, inmate Darrious Mabry was beaten by Officer Matthew Moore in October 2012.  In a dispute over Mr. Mabry leaving the dining hall with extra cake, Officer Moore left his post and attacked Mr. Mabry, who suffered a broken nose, split lip, broken tooth, injured eye, and head contusions.

h.      Upon information and belief, on January 20, 2012, inmate Joseph Shack was beaten by Sgt. John Mason and suffered hearing loss as a result.  Mr. Shack was handcuffed and shackled during the beating.  Sgt. Mason punched him in the head, face, and ear, stomped on his back, kicked him and yelled racial epithets at him.   Mr. Shack had requested the presence of a witness at a disciplinary hearing, and Sgt. Mason responded: "This is what I do to a [n . . .] that tries to tell me how to do my job." Mr. Shack was treated for a ruptured ear, fractured thumb, internal bleeding, and possibly fractured ribs.  He was fitted for a hearing aid following the rupture.

i.      Upon information and belief, James Bonds was beaten by officers and suffered a severe eye injury in September 2011.  Three correctional officers shook down his cell, forced him to remove clothes and to squat and cough.

**Complaint Exh. A**

After they found a cell phone in his cell, the officers sprayed Mr. Bonds with a chemical agent and struck him with batons, then handcuffed him. After Mr. Bonds was handcuffed, Officer Donald Lukima arrived at the scene and struck Mr. Bonds in the eye while Mr. Bonds was handcuffed. Mr. Bonds suffered a serious eye injury, including an orbital wall fracture to his left eye and massive bleeding. His injuries required multiple treatments and surgeries at outside hospitals.

26.     Defendants have also failed to promulgate, implement and enforce adequate policies, procedures, and practices necessary to adequately supervise and monitor the housing units and common areas in the Facility and to maintain the safety and security of prisoners at St. Clair. Defendants are aware that the inadequate supervision by correctional staff has created a dangerous environment, has contributed to numerous homicides and assaults in the Facility, and creates a substantial risk of serious harm. As stated by Defendant Davenport, the conditions at St. Clair make it a "security nightmare." They have failed to take reasonable measures to change their practices, policies, procedures to improve safety and security of the prisoners in the general population housing units.

27.     Defendants fail to adequately supervise and monitor the housing blocks in general population. Upon information and belief, St. Clair has six cellblocks, J, K,

13

**Complaint Exh. A**

L, M, N, O, P, and Q, that house prisoners in general population. Each cellblock is divided into two separate sides, so that they are designated as J1, J2, K1, K2, etc. Blocks J and K are paired blocks that are connected by a hallway, as are L and M, N and O, and P and Q. Each side of a cellblock is comprised of 24 two-man cells, so that 48 prisoners live on each side of a block and 96 prisoners live in each block as a whole. Each cell has a steel door through which prisoners enter and exit their cell. The locking mechanisms on the majority of cell doors are broken or ineffectual and provide no protection. (See ¶¶ 40-44 below.)

28. A single officer is assigned to supervise and monitor each of the housing blocks and the 96 prisoners housed there. The officer is stationed in a "cube," which has windows that allow the officer to see into both sides of the block. Upon information and belief, the cube officer is not permitted to leave their post during their shift. Random patrols of the housing blocks by additional officers occur extremely infrequently. Upon information and belief, most days, officers only walk through the blocks during scheduled count times that occur three to five times in a 24 hour period. Therefore, the cube officer is the only officer monitoring both sides of each block the vast majority of the time. Upon information and belief, the officers in the cube are, at times, asleep, on the telephone, or otherwise not paying attention to the prisoners they are supervising.

**Complaint Exh. A**

29.     Upon information and belief, there are blind spots in all of the blocks that cannot be seen by the cube officer, including the shower area, the TV/day room, and inside all of the cells.  There are few, if any, functioning cameras in the housing blocks.  Consequently, large sections of the housing blocks in general population are not within the view of any officer the majority of the day.

30.     The only means for prisoners to communicate with the officer in the cube is by banging on the glass windows.  If a prisoner is in a locked cell, there is no way for a prisoner in his cell to contact the officer in the cube except by banging on his cell door.

31.     Each of the cellblocks open onto a common yard, referred to as the "G-Yard" and doors leading to the G-Yard from the blocks are located in the hallways that connect the paired blocks together.  The gymnasium used by all of the prisoners in general population is located on the G-Yard.  The prisoners who live in H-dorm and G-dorm also use the G-Yard and the gymnasium.

32.     There are between 200 and 400 prisoners on the yard or in the gym during yard call and gym call.  Upon information and belief, there is one officer assigned to supervise the yard and the gym during yard and gym call and between two and four roving officers.  However, there are often less officers present than are assigned to the gym and yard.

**Complaint Exh. A**

33.     There are also two open bay dorms at St. Clair.  The first is known as "H-Dorm," where prisoners enrolled in the Therapeutic Communities program ("TC"), a substance abuse treatment program, reside.  Upon information and belief, there are approximately 260 prisoners who currently reside in H-Dorm.  The other dorm is known as G-Dorm.  It is a part of the infirmary and typically, prisoners requiring medical care live there.  Upon information and belief, there are approximately 58 prisoners who live in G-dorm.

34.     Upon information and belief, there is one officer who is assigned to sit at a desk at the entrance of H-dorm and who is responsible for supervising the prisoners who reside in the dorm.  That officer is not permitted to leave his assigned post during his shift and is unable to see inside the bathrooms, as well as the back of the dorm where some prisoners' beds are located, from the desk where he sits.  Upon information and belief, random patrols of the dorms by additional officers occur extremely infrequently.  Most days, officers only walk through the blocks during scheduled count times that occur three to five times in a 24 hour period.  Therefore, the officer assigned to the desk is the only officer monitoring each block the vast majority of the time and the officers at the desk are, at times, asleep, on the telephone, or otherwise not paying attention to the prisoners they are supervising.

35.     Upon information and belief, there are blind spots in the dorms.  The

16

**Complaint Exh. A**

officer assigned to monitor the dorm from the desk near the entrance is not able to see a portion of the back of the dorm where some prisoners' beds are located. Additionally, the officer is not able to see into the bathrooms from his or her post. There are few, if any, functioning cameras in the dorms. Consequently, portions of the dorms are not within the view of any officer for large parts of the day.

36.     Defendants are aware that the inadequate supervision in general population contributes to the high rate of prisoner-on-prisoner violence. Inattentive officers, the inability to contact officers in an emergency, and blind spots in the units have contributed to numerous violent incidents, many of which have been stabbings, that have resulted in serious injury or death, including but not limited to:

a.      In June 2014, Jodey Waldrop was stabbed and killed inside his cell, a blind spot to the cube officer, by a prisoner who entered his cell, when the blocks are supposed to be on lock down and no prisoner should have been out of his cell.

b.      In June 2014, Derrick White, who lived in P block, was assaulted in the hallway between P and Q blocks during a movement time by a prisoner who, upon information and belief, was not assigned to either block. There were no officers present when Mr. White was assaulted. He was strangled and then dragged while unconscious into the showers in Q. He was in the showers from

17

approximately 7:30 a.m. until 1 p.m. and was never found by staff, despite the fact that, upon information and belief, a count was conducted during the time he was missing.

c.      In May 2014, Derrick White was stabbed in the gym by another prisoner. Mr. White's assailant also stabbed another prisoner during this incident.  There were approximately 20 prisoners present in the gym and 200 prisoners in the yard at the time of the stabbing.  Upon information and belief, there was one officer supervising the yard and no officers present in the gym.

d.      In May 2014, Antonio Cheatham was assaulted by another prisoner in the bathroom of the H-dorm, a known blind spot, while no correctional officers were in view.  Part of his ear was bitten off and flushed down a toilet before any officers responded to the struggle.

e.      In February 2014, a prisoner was stabbed inside his cell, a blind spot to the cube officer.

f.      In January 2014, Marquette Cummings was stabbed and killed in the TV room, a blind spot to the cube officer.

g.      In January 2014, Michael Mays  was stabbed by another prisoner on the way to the chow hall.  Mr. Mays was stabbed in the neck, in the back, and in the elbow.  Mr. Mays had to be taken to an outside hospital for treatment.

**Complaint Exh. A**

h.    In September 2013, Franky Johnson was burned in his cell in the middle of the night by a prisoner who was able to exit his own cell and enter Mr. Johnson's cell.   That prisoner threw powder hair remover that had been heated in a microwave on Mr. Johnson while he was sleeping, resulting in severe chemical burns.

i.    In July 2013, Mark Duke was stabbed several times by another prisoner in the G-Yard and suffered a punctured lung.

j.    In 2013, a prisoner was stabbed multiple times with an ice pick outside the gym by another prisoner.   At the time there were approximately 200 inmates in the area, but no officers were present to intervene in the conflict. The prisoner made it to the infirmary unassisted and was eventually transported by ambulance to an outside hospital because of the seriousness of his wounds.

k.    In May 2012, John Rutledge was strangled to death inside his cell in the middle of the night when the cells should have been locked down.   Multiple assailants were able to enter Mr. Rutledge's cell and hog-tie and strangle him without being observed by officers.   His cell mate discovered him and reported his condition to the cube officer.   By the time officers reached the cell, Mr. Rutledge was dead from strangulation.

l.    Upon information and belief, Muhammad Al-Ameen, also known as

**Complaint Exh. A**

Terry Rivers, was repeatedly stabbed on the yard by another inmate in May 2012. There were numerous inmates on the yard, but no officers were present when Mr. Al-Ameen was stabbed. Mr. Al-Ameen underwent surgery on his neck and surgery on his hand to repair damaged tendons.

m.     In October 2011, Jabari Bascomb was stabbed to death in his cell, a blind spot to the cube officer, after another prisoner broke into his cell.

n.     Upon information and belief, in January 2011, Anthony Moss was assaulted in his cell, a blind spot to the cube officer, and suffered an injury which caused him to lose the use of his left eye.

37.     Defendants have also failed to promulgate and enforce adequate and effective policies, procedures and practices in the segregation housing units meant to keep prisoners isolated from one another for their protection. Upon information and belief, policy requires that prisoners in segregation be placed in handcuffs before their cell door is opened, and that only one door be open at a time so that prisoners in segregation do not come in contact with each other. In practice, the cube officer frequently rolls the doors from his cube without the placement of handcuffs, allowing for multiple people in segregation to be on the hallway and in the showers at the same time.

38.     DOC staff also fail to adequately conduct searches for contraband and

**Complaint Exh. A**

knives in segregation. The failure to follow the policies of permitting only one prisoner out of his cell at a time and searching for contraband creates a significant risk of serious harm because these conditions have been the cause of multiple violent assaults, including but not limited to:

a.      In August 2014, a prisoner was stabbed by the same prisoner that fatally stabbed Jammy Bell in 2013, after the prisoner was assigned to clean the halls in the segregation unit. The officers failed to secure the food-tray slots on the cell doors prior to sending the prisoner into the unit and the other man was able to stab the prisoner in his leg by sticking a knife attached to a broom handle through his open tray slot.

b.      In August 2013, Jammy Bell was fatally stabbed by another prisoner in the segregation unit after an officer failed to follow proper protocol for opening the cell doors.

c.      Upon information and belief, Jovar Gamble was stabbed multiple times in August 2012, while housed in the segregation unit. Mr. Govar was in handcuffs on the walk when another segregation inmate stabbed him.

d.      Upon information and belief, Orlando Porch was assaulted by another inmate while both men were housed in segregation in January 2012.

39.    Defendants are aware of the locations and circumstances in which these

**Complaint Exh. A**

homicides and assaults have occurred and that inadequate supervision was one of the dangerous conditions that made it possible for these incidents to occur. However, they have failed to adequately increase patrols and supervision of the units, have not installed cameras or provided means for prisoners to call for help in an emergency, nor taken any other reasonable action to increase and improve the quality of supervision in general population, leaving the plaintiff class exposed to the continuing real and imminent substantial risk of serious harm.

### DEFENDANTS' FAILURE TO PROVIDE SECURE LOCKING MECHANISMS ON INDIVIDUAL CELL DOORS PLACES INMATES AT RISK OF VIOLENT ASSAULT.

40.     The locking mechanism on the majority of cells are broken and have not been repaired. Defendants rely on a system of locked, secure cells to house inmates safely, rather than visual monitoring, yet Defendants are aware that the locks in the majority of doors at the Facility can be easily tampered with so that they do not lock. Without locking cell doors, prisoners in the cell blocks have no means of protecting themselves inside their cells. Defendants have refused requests to fix cell doors and have failed to take adequate measures to repair the broken cell locks.

41.     The locks on the cell doors in general population can be easily tampered with by using items such as piece of plastic, a razor blade, or paper clips to jam the locking mechanism. Once the locking mechanism is jammed, it does not engage and

22

**Complaint Exh. A**

the door can be "tricked," meaning it can be opened from the inside or from the outside with a plastic ID card which all prisoners carry. The locks on some of the doors in general population are broken and do not work, even if nothing is jamming the mechanism. In some doors, the entire mechanism is missing. Cell doors in general population remain open all day, making it possible for prisoners to jam the locks in other prisoners' doors. The locks on the doors in segregation can also be easily tampered with by jamming an object, such as a toothbrush, in the mechanism that rolls the door, which prevents the lock from engaging.

42. Consequently, Plaintiffs cannot keep other prisoners from entering their cells and prisoners are able to enter or exit their own and other prisoners' cells at any time, even during lockdown. This creates a particularly dangerous environment because cells are "blind zones" in the blocks, meaning that officers in the cube cannot see inside the cells and there is no way for a prisoner to call an officer for help in the event of an emergency, other than banging on the cell to try to get the attention of the cube officer. (See ¶¶ 28-29 above) Because cube officers are frequently asleep or are otherwise inattentive, this is not an effective means for a prisoner being assaulted to get help.

43. Defendants know that the locks on most cells do not work. St. Clair staff have made comments demonstrating their knowledge, have used their own ID cards

**Complaint Exh. A**

to open cell doors, and have seen prisoners come out of their cells when the unit is supposed to be on lockdown. Upon information and belief, there is an indicator light panel in the cube that indicates to the cube officer when cell doors are not locked. Furthermore, Defendants are aware that the lack of functioning locks creates dangerous conditions because prisoners have been assaulted in their cells during times when the unit was on lockdown. These incidents include, but are not limited to:

    a.    In June 2014, Jodey Waldrop was murdered in his cell by another prisoner, who was able to enter Mr. Waldrop's cell in the middle of the night when the block was on lockdown, due to the cell door not locking.

    b.    In August 2013, Jammy Bell was stabbed by another prisoner in segregation after his cell door was tampered with.

    c.    In May 2012, John Rutledge was strangled to death by other prisoners who entered his cell in the middle of the night, when the cells should have been on lockdown.

    d.    Upon information and belief, in May 2011, Derrick Averhart was stabbed in the arm, head, and face by another inmate while handcuffed in his cell in segregation.

44.    Defendants have failed to respond in a reasonable manner to the continuing real and imminent substantial risk of serious harm posed to the plaintiff

24

**Complaint Exh. A**

class by the broken locks on the general population cell doors. Defendants do not adequately train younger staff how to determine if a door is tricked, do not regularly check cell doors to make sure the lock is functioning properly or repair locks they know are broken, have refused Plaintiffs' requests to repair broken locks, and have taken no other reasonable or adequate action to ameliorate the risk of harm created by cell doors that do not lock.

### VULNERABLE INMATES, INCLUDING THE DISABLED AND ELDERLY, ARE HOUSED IN VIOLENT UNITS WHERE THEIR RISK OF VIOLENT ATTACK IS INCREASED.

45.     Defendants' lack of risk assessment and classification system puts prisoners at risk of violence. Defendants fail to effectively separate prisoners who are at risk for a violent conflict. Defendants fail to adequately screen incoming prisoners to determine if they have enemies in the Facility, based either on personal conflicts, prior conflicts at other facilities in ADOC, or gang-based conflicts, and do not adequately take such considerations into account when making housing assignments. Without the ability to identify enemies and vulnerable inmates, St. Clair cannot appropriately manage risks of violence, thus exposing prisoners to harm.

46.     Upon information and belief, Defendants do not adequately factor in a prisoner's security level, including his offense of conviction, sentence, and disciplinary record, in making housing assignments. Minimum, medium, and

**Complaint Exh. A**

maximum custody prisoners can be, and are, assigned to the same units and cells as each other. Therefore, prisoners with short term of years sentences, convictions for relatively minor offenses and clean or only minor disciplinary histories can be assigned to the same unit, and assigned to share a cell with, prisoners who have life sentences, were convicted of more serious offenses, or with a violent institutional history. It is unreasonable of Defendants to fail to make housing assignments based on security classification status or other vulnerabilities.

47.     Upon information and belief, Defendant Sanders, the captain of general population is responsible for authorizing all housing movement and has repeatedly assigned older, physically disabled, or otherwise vulnerable prisoners to units and cells with young prisoners with a history of violent conduct. He has also failed to authorize a change in housing assignment when such prisoners request a bed change based on fear for their safety. (See ¶¶ 52-53 below.)

a.     James Edwards, who is 56 years old, has recently been assigned to cells with much younger prisoners who engage in risky activities that put him at risk and who steal his property. In 2012, while living in a prior block, Mr. Edwards' cell mate would leave the cell door unlocked at night in order to obtain drugs and engage in other prohibited behavior. Mr. Edwards complained to Captain Sanders and requested a bed transfer because his cell mate was using drugs and

26

**Complaint Exh. A**

taking his property. Captain Sanders refused to move him and told him, "When I see one of y'all on a stretcher, I know it's a problem."

b.    In June 2014, a 60 year old, physically disabled prisoner, was robbed at knife point by another prisoner, who, upon information and belief, is a 23 year-old mentally ill prisoner. The prisoner was robbed less than 24 hours after being transferred from the Honor Dorm to L Block, a much more violent block, housing younger inmates.

c.    Robert Woods was recently reassigned by Defendant Sanders from a block where many older prisoners live, to a violent block where he is vulnerable because he is 57 years old and physically disabled. When he expressed fear for his safety to Defendant Sanders, Sanders responded "If you ain't got a knife, I'll give you one." When Mr. Woods' property box was broken into in his cell and he reported the theft to Defendant Sanders, Sanders responded that he had moved Mr. Woods so that something like that would happen to him. When Mr. Woods spoke to Defendant Davenport about Defendant Sanders' response to his fears, Defendant Davenport responded by asking Mr. Woods if he had a knife yet. When Mr. Woods responded that he had not, Defendant Davenport told Mr. Woods to do what he needed to do to survive on his new block. Mr. Woods made one final request to Defendant

27

Sanders to move him from his new block and Defendant Sanders responded by placing several box cutters on a table and told Mr. Woods to make a knife to protect himself.

48.    Upon information and belief, Defendants fail to adequately and effectively separate prisoners who have had violent confrontations at St. Clair. Defendants do not have reasonable policies and procedures in place that would enable re-classification of prisoners who may be identified as violent as a result of actions in the Facility.

49.    In response to violence between prisoners, Defendants place the victim and the aggressor in punitive isolation for an indefinite period.  The victim is then placed in a catch-22 position of remaining indefinitely in punitive isolation or signing a "living agreement" with the other inmate(s) involved in the altercation in order to be released from segregation back into general population. Upon information and belief, once a living agreement has been signed, Defendants can and do assign prisoners who have engaged in violence or threatened each other to the same unit. Defendants' requirement that victims of violent assaults must either remain in segregation or sign a "living agreement," and then be placed back in contact with the prisoner(s) who assaulted them, is not a reasonable response to violent incidents between prisoners.

**Complaint Exh. A**

50.     Defendants do not adequately consider an inmate's mental health status or history of violent conflict with other prisoners in making housing assignment. Upon information and belief, inmates with serious mental health problems and histories of repeated violent conflict live in general population and do not get adequate treatment or supervision.   Defendants also fail to provide adequate training or supervision to staff on how to respond to prisoners who report threats of violence made by prisoners with known histories of mental instability and violent conflict. Defendants' failure to adequately classify and treat prisoners with mental illness and histories of repeated violent assaults, as well as their failure to provide adequate training or supervision of staff on how to respond to mentally ill or violent prisoners has resulted in substantial harm to Plaintiffs.

51.     Defendants have failed to create and enforce adequate procedures, practices, and policies for investigating and responding to inmate requests to be moved to a new cell assignment based on threats or fear for their safety in their current housing assignment.  Defendants have rejected inmate requests for movement out of hand with little or no effort made to determine the veracity and seriousness of the threat.

52.     Upon information and belief, all bed change requests must be approved by Defendant Sanders.  Defendant Davenport, as well as Captain Sanders, Lieutenant

29

**Complaint Exh. A**

Carter, and Lieutenant Scott have responded to Plaintiffs' requests to move based on threats to their safety by telling them to arm themselves with knives, by making comments to the effect that they are tough enough to handle the potential violence, by telling the threatened prisoners that Defendants do not care what happens to them, or by telling them that the only option for transfer is to be moved into segregation. If a threatened prisoner agrees to move to segregation for his safety, Defendants have also denied that request.

53.    Defendants are aware that their refusal to classify prisoners and refusing to investigate and grant movement requests based on a prisoner's safety concerns creates a substantial risk of serious harm because prisoners have been assaulted after their requests to move housing assignments were denied. These incidents include, but are not limited to:

a.    In June 2014, prior to being assaulted, Derrick White requested to be moved back to segregation because he believed his life was in danger. His request was refused and he was stabbed soon after.

b.    In June 2014, a 60 year old, physically disabled prisoner, was robbed at knife point by another prisoner, who, upon information and belief, is a 23 year-old mentally ill prisoner.

c.    In February 2014, a prisoner requested to be moved out of his unit after

30

**Complaint Exh. A**

his cell mate tried to stab him and threatened to kill him. His request was denied without adequate investigation and he was later stabbed by his cell mate inside his cell.

d.    In September 2013, Allan Williams was stabbed by a prisoner, who, upon information and belief, is a mentally ill prisoner. Mr. Williams was stabbed while he was walking back from his shower. Upon information and belief, the man who stabbed Mr. Williams had a violent history and had stabbed another prisoner a few years before he stabbed Mr. Williams.

e.    Upon information and belief, Freddie James Stallworth was stabbed multiple times by another prisoner who was his cell mate. The stabbing caused serious injuries including a punctured lung, and required surgery at a free world hospital. Prior to attack, Mr. Stallworth notified Lt. Carla Graham in November 2013, that he was in danger from his cell mate, and requested a move. His request was denied without adequate investigation. He was stabbed soon thereafter.

f.    In 2011, a prisoner was stabbed by another prisoner, who had requested to go to segregation for his own protection but his requests were denied. Upon information and belief, the assailant feared for his safety due to outstanding debts he owed other prisoners for drugs and attacked the prisoner in order to get

31

**Complaint Exh. A**

moved into segregation where he felt he would be safer.

54.     These incidents of violence demonstrate Defendants' awareness that the failure to classify prisoners based on security status, a history of conflict, and mental health status and to investigate housing movement requests based on fear or threats of violence creates a substantial risk of serious harm.  Even though Defendants know that their current policies and practices contribute to serious incidents of violence, they have failed to take adequate action to address the problems in classification. Upon information and belief, there have not been significant or effective changes to the classification system or to how Defendants respond to movement requests in response to these violent incidents, leaving the plaintiff class exposed to the continuing real and imminent substantial risk of serious harm.

### DEFENDANTS' FAILURE TO ADEQUATELY ENFORCE HOUSING ASSIGNMENTS PUTS PRISONERS AT RISK OF VIOLENCE.

55.     Defendants do not take reasonable measures to ensure prisoners only have access to the housing unit where they are assigned. Despite the fact that prisoners are required to wear colored wristbands that correspond to their housing assignment, Defendants fail to regularly enforce dorm assignments and officers in the cube will frequently let prisoners into a unit where they are not assigned without verifying they reside in the unit.   In the absence of officer enforcement, prisoners are forced to forge

**Complaint Exh. A**

associations with other prisoners for their protection in the blocks. In the absence of officer supervision and enforcement, movement between blocks and block occupancy is enforced through physical threats and violence.

56.     Upon information and belief, despite regulations that require that only one unit at a time to move to meal, work, shower, and mail call, the doors to the housing units regularly remain unlocked during movement times and all units on G-Yard have yard call at the same time. Upon information and belief, during movement times, regulations require that an officer be posted to the door or hallways in and out of the unit to ensure only prisoners assigned to the unit are allowed to enter but officers are very rarely or never posted to these locations during movement times. Therefore, it is easy for prisoners to enter a unit they are not assigned to.

57.     Upon information and belief, staff conduct a bed roster count twice a week, making it possible for prisoners to stay overnight in a unit or cell to which they are not assigned.

58.     Defendants are aware that the failure to enforce housing assignments contributes to the high rate of violence and creates a significant risk of serious harm. There have been numerous incidents of violence where the failure to enforce housing unit assignments has contributed to the circumstances that made the assault possible and where a prisoner was assaulted in their unit by another prisoner who was not

33

**Complaint Exh. A**

assigned to that unit, including but not limited to:

   a.    In June 2014, Derrick White was attacked when another prisoner strangled him in the hallway between P and Q and was able to drag Mr. White into Q-2, which required him to go through the main unit doors.  Upon information and belief, Mr. White's assailant was not assigned to either P or Q.

   b.    In July 2013, Mark Duke threatened at knife point in an attempted robbery in his cell by a prisoner who was not assigned to his block.

   c.    Upon information and belief, Stanley Joe Flambo was assaulted in July 2013, by another prisoner, who was armed with a knife and punched him and attempted to force him over the top tier railing of the cell block.  His assailant was not assigned to his cell block.

   d.    Upon information and belief, Benjamin Howlet was stabbed in his cell in November 2011, when correctional officers permitted two unauthorized inmates to enter Mr. Howlet's cell.  Mr. Howlet suffered numerous injuries to his face, rib area, and stomach requiring surgery at an outside hospital.

   59.    Despite Defendants' knowledge that the failure to enforce block and cell assignments contributes to serious violent incidents, Defendants have failed to implement adequate changes in procedure and practice to address the substantial risk of serious harm.  Upon information and belief, there has been no meaningful increase

**Complaint Exh. A**

in enforcement of housing assignments following the incidents of violence, leaving the plaintiff class exposed to the continuing real and imminent substantial risk of serious harm.

### DEFENDANTS FAIL TO PROVIDE ADEQUATE REHABILITATIVE PROGRAMMING AND THERAPEUTIC SERVICES.

60.     In addition to creating an environment where abuse and violence are the norm, Defendants have failed to provide adequate positive, rehabilitative, recreational, or religious programming, as well as treatment and services for drug addiction and mental illness.   Upon information and belief, Defendants provide inadequate counseling services that are aimed at addressing mental illness, disability and drug addiction, despite data that show that the vast majority of prisoners suffer from one or both of these afflictions.   The failure to provide adequate treatment for these conditions contributes to the high level of violence.   Furthermore, rather than providing services, Defendants respond to prisoners suffering from mental illness, disability and drug addiction by placing them in punitive segregation, which isolates them and can exacerbate their symptoms.   These prisoners are then released back into general population more impaired and more traumatized.

61.     Upon information and belief, Defendants have severely restricted programs that are aimed at reducing violence, giving prisoners a forum to voice

**Complaint Exh. A**

concerns and resolve issues, incentivizing good behavior, and providing prisoners an opportunity to educate themselves. Upon information and belief, Defendants have drastically limited access to outside religious organizations that minister to prisoners. The unavailability of positive and constructive programming contributes to conflicts and tensions among prisoners and to the high rate of violence.

62.     Upon information and belief, Defendant Davenport has eliminated or drastically limited prisoners' access to books. Upon information and belief, Defendant Davenport removed most or all of the books from the housing units that were previously available to prisoners, including religious books, self-help books, educational books for men trying to earn their GEDs, and novels.

### DEFENDANTS' FAILURE TO MONITOR AND POLICE THE ROLE OF DOC STAFF IN PROFITING FROM THE CIRCULATION OF CONTRABAND PUTS PRISONERS AT RISK OF VIOLENCE.

63.     Because of poor management, drugs, including methamphetamine, methadone, heroin, suboxone, and marijuana, are prevalent at St. Clair and drug abuse and addiction among prisoners is widespread. Upon information and belief, many of the drugs are brought into the Facility by DOC staff. Over the past two years, there have been dozens of reports of staff willfully violating DOC policy, including smuggling in contraband. This has enabled widespread corruption among officers and officers are able to extort money and favors from prisoners in exchange for drugs.

**Complaint Exh. A**

64.     Drugs create a substantial risk of serious harm and are a major source of conflict at St. Clair, both because of behavior stemming from addiction, for which Defendants have failed to provide adequate services and treatment, and because of the dynamics of debt created by officers' and prisoners' participation in drug sales.

65.     Defendants are indifferent to the circulation of drugs in the Facility and have failed to adequately prevent officers bringing in and participating in the sale of drugs to prisoners in the Facility.  Upon information and belief, Defendants do not employ effective search protocols and procedures when officers enter the Facility. Furthermore, Defendants' failure to provide meaningful incentives, programming, and treatment, contributes to prisoners engaging in risky behavior, such as gambling and drug use.  (See ¶¶ 60-62 above.)  Defendants' failure to reasonably and adequately respond to the prevalence of drugs in the Facility leaves the plaintiff class exposed to the continuing real and imminent substantial risk of serious harm

## CLASS ACTION ALLEGATIONS

66.     Plaintiffs bring this action on behalf of all present and future prisoners at St. Clair Correctional Facility.  This action is brought pursuant to the Federal Rules of Civil Procedure 23(a), (b)(1), and (b)(2).  The class meets the requirements of Rule 23 as follows:

a.     There are approximately 1,300 prisoners confined at any one time to St.

37

**Complaint Exh. A**

Clair Correctional Facility, who are subject to a substantial risk of a violent assault. The membership of this class continually changes, rendering joinder of all members impracticable. Upon information and belief, dozens of incidents of violent assaults are filed each year. Many more incidents go unreported.

b.      The questions of law and fact presented by the named Plaintiffs are common to all members of the class, and include whether Defendants' policies and practices subject prisoners to a substantial and unreasonable risk of significant harm. The policies and practices include whether Defendants have failed to adequately monitor and supervise prisoners at St. Clair; whether Defendants have failed to adequately assess prisoners for risk of violence and failed to implement an adequate classification system; whether Defendants have failed to adequately enforce housing block, dorm, and cell assignments; whether Defendants have failed to adequately investigate housing movement requests based on fear of harm; whether Defendants have failed to provide secure locking mechanisms on individual cell doors; whether Defendants have failed to adequately monitor and police the role of ADOC staff in the availability of contraband items; whether Defendants have failed to adequately train, supervise, and discipline staff with a history of harassing and abusing prisoners, and whether supervisory Defendants have failed to adequately

**Complaint Exh. A**

screen, assign, train and supervise staff.  As a result, every prisoner confined to St. Clair risks being subjected to  these unlawful practices.  The claims and practices alleged in this complaint are common to all members of the class.

c.     The violations suffered by the named Plaintiffs are typical of those suffered by the class.  The entire plaintiff class will benefit from the injunctive and declaratory relief sought.

d.     Plaintiffs Antonio Cheatham, Mark Duke, James Edwards, Dale Gilley, Franky Johnson, Michael Mays, Derrick White, Allan Williams, and Robert Woods are presently incarcerated at St. Clair Correctional Facility.  These named Plaintiffs will fairly and adequately protect the interests of the class.

e.     The named plaintiffs are represented by The Equal Justice Initiative, a non-profit legal services organization with decades of experience challenging unconstitutional conditions of confinement.

f.     The Defendants have acted or failed to act, on grounds generally applicable to the class, thereby making injunctive relief appropriate with respect to the class as a whole.

## **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

67.     There are no administrative remedies within the Alabama Department of Corrections for named Plaintiffs or other members of the plaintiff class to exhaust.

**Complaint Exh. A**

# CLAIMS FOR RELIEF

## CAUSE OF ACTION

### Cruel and Unusual Punishment

68.     Defendants, through their policies, practices, acts and omissions, exhibit deliberate indifference to the continuing real and imminent substantial risk of serious physical harm, in violation of the right of plaintiff class of prisoners to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

69.     Defendants, through their policies, practices, acts and omissions, subject the plaintiff class of prisoners to be free from unnecessary and wanton infliction of pain, and emotional and physical injury in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

70.     With deliberate indifference to the substantial risk of serious harm to the plaintiff class, Defendants failed to appropriately train, assign, and supervise staff, subjecting the plaintiff class to substantial risk of serious bodily harm in violation of the Eighth and Fourteenth Amendment to the United States Constitution.

**Complaint Exh. A**

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court:

1.  Assume jurisdiction over this action;

2.  Personally conduct an unannounced inspection of St. Clair Correctional Facility and all relevant institutional records and files;

3.  Grant Plaintiffs a full trial and discovery in this matter;

4.  Adjudge and declare that the acts and omissions of the Defendants with regard to the classmembers violate the Eight and Fourteenth Amendments to the United States Constitution;

5.  Order Defendants to comply with the Constitution and enjoin Defendants from subjecting Plaintiffs to cruel and unusual punishment;

6.  Award Plaintiffs appropriate costs for expert fees and collateral litigation expenses; and

**Complaint Exh. A**

7.      Order such additional relief as the Court may deem just and proper.

Respectfully submitted this 13th day of October, 2014.

Respectfully submitted,

/s/ Bryan A. Stevenson
Bryan A. Stevenson (ASB-3184--N75B)
Charlotte R. Morrison (ASB-5897-T80M)
Jennae R. Swiergula (ASB-8265-A35S)
Carla C. Crowder* (ASB-8573-L74C)
Ryan C. Becker* (ASB-7228-R48B)
Equal Justice Initiative
122 Commerce Street
Montgomery, AL 36104
PH: (334) 269-1803
FX: (334) 269-1806
email: bstevenson@eji.org
       cmorrison@eji.org
       jswiergula@eji.org
       ccrowder@eji.org
       rbecker@eji.org

*Counsel for Plaintiffs*

*Application for admission pending

**Complaint Exh. A**