# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| D.S., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| JEFFERSON DUNN; GRANTT CULLIVER; | ) Case No. 2:20-cv-02012-RDP |
| CHARLES DANIELS; JEFFERY | ) |
| WILLIAMS; EDWARD ELLINGTON; | ) |
| KARLA JONES; GWENDOLYN GIVENS; | ) |
| ANTHONY BROOKS; CARL SANDERS; | ) |
| GARY MALONE; KEVIN WHITE; CARLA | ) |
| GRAHAM; CHRISTY VINCENT; | ) |
| ANGELIA GORDY; WILLIAM | ) |
| RAGSDALE; NEKETRIS ESTELLE; | ) |
| GERALD MCMILLIAN; CHRISTOPHER | ) |
| BOYD; LISA BONNER; WILLIAM | ) |
| MCLEMORE; and TANYA ARY, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) JURY TRIAL DEMANDED |
| | ) |

## THIRD AMENDED COMPLAINT

Plaintiff D.S., by his attorneys with the law firms of Loevy & Loevy and the Dagney Johnson Law Group, files this Complaint against Defendants Jefferson Dunn, Grantt Culliver, Charles Daniels, Jeffery Williams, Edward Ellington, Karla Jones, Gwendolyn Givens, Anthony Brooks, Carl Sanders, Gary Malone, Kevin White, Carla Graham, Christy Vincent, Angelia Gordy, William Ragsdale, Neketris Estelle, Gerald McMillian, Christopher Boyd, Lisa Bonner, William McLemore, and Tanya Ary, stating as follows:

## INTRODUCTION

1.      Plaintiff D.S. brings this lawsuit after having been repeatedly victimized while in the custody of Alabama Department of Corrections ("ADOC").

2.      On or about February 2018, Plaintiff was stabbed numerous times by prisoners while incarcerated at Holman Correctional Facility ("Holman").

3.      Plaintiff was then transferred to William E. Donaldson Correctional Facility ("Donaldson"), where he was housed alongside known enemies from the Holman stabbing, and predictably, he suffered another brutal attack—a second stabbing—at Donaldson.

4.      Plaintiff was then transferred to St. Clair Correctional Facility ("St. Clair"), where beatings, stabbings, and rapes had become routine and much of the prisoner population possessed contraband weapons either to perpetrate violence or defend against threats of violence.

5.      Defendants took no steps to protect Plaintiff at St. Clair even though they knew he was housed in dangerous conditions with known enemies and their associates, and thus, on or about January 29, 2019, Plaintiff was again assaulted. This time, Plaintiff was tied up, stabbed, beaten, and brutally raped.

6.      As set forth in more detail below, the dangerous conditions that led to Plaintiff's torturous assault at St. Clair were well known to Defendants, who exhibited deliberate indifference to his safety and failed to protect him from a substantial risk of serious harm.

7.      Plaintiff brings this action to redress his horrific injuries and to seek accountability for the assault and sexual violence perpetrated against him due to Defendants' disregard for his safety.

## JURISDICTION AND VENUE

8.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the Defendants' deprivation of Plaintiff's rights secured by the U.S. Constitution.

9.     This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state law claims pursuant to 28 U.S.C. § 1367.

10.    Venue is proper under 28 U.S.C. § 1391(b) because the majority of the Defendants reside in this judicial district and the events and omissions giving rise to Plaintiff's claims occurred within this judicial district, at Donaldson and St. Clair.

## PARTIES

11.    Plaintiff D.S.[1] is a 36-year-old Alabama resident in the custody of the Alabama Department of Corrections who was transferred to Donaldson in the summer of 2018, and to St. Clair in December 2018.

12.    Plaintiff sues each of the Defendants listed below in his or her individual capacity.

13.    Each of the Defendants listed below acted under color of law and within the scope of his or her employment when engaging in the misconduct described herein.

14.    Each of Defendants listed below is above the age of majority.

### The Defendants

15.    The Defendants who violated Plaintiff's rights with regard to the assault at St. Clair (collectively, the "Defendants"), consist of three categories of defendants: the "Defendant ADOC Supervisors," the "Defendant St. Clair Facility Supervisors," and additional defendants.

---

[1] Plaintiff proceeds by pseudonym pursuant to the Court's January 29, 2021 order at Dkt. 28.

*The Defendant ADOC Supervisors*

16.    Defendants Jefferson Dunn, Grantt Culliver, Charles Daniels, Jeffrey Williams, Edward Ellington, and Christy Vincent are referred to, collectively, as the "Defendant ADOC Supervisors."

17.    Defendant Jefferson Dunn is the Commissioner of the ADOC. The Commissioner is the highest-ranking official in the ADOC and is responsible for the direction, supervision, and control of the ADOC and its employees, including ensuring that departmental employees are properly trained to perform their assigned duties and are properly carrying out their assigned duties. Defendant Dunn is responsible for setting departmental policies and customs at ADOC and its facilities, including St. Clair; overseeing institutional policies and customs at facilities including St. Clair; supervising the adoption of changes in departmental and institutional policies and customs or corrective action plans as needed; planning, directing, controlling, and otherwise managing ADOC facilities including St. Clair to ensure the safety and security of its prisoners. Defendant Dunn has held this position since January 2015.

18.    Defendant Grantt Culliver is a former Associate Commissioner for Operations and Institutional Security for the ADOC. Defendant Culliver first undertook that role in August 2014 and returned to the position in mid-2015 after a demotion in early 2015, and he remained in the position until he was placed on administrative leave in September 2018. As Associate Commissioner for Operations and Institutional Security, he was responsible for ensuring the effective and safe daily operations of prison facilities including Holman, Donaldson, and St. Clair. This included overseeing institutional security, staffing, the Classification Review Board, and the Transfer Division; administering the training program for departmental employees and overseeing the Training Division; managing the Security Audit Team, ensuring that security

audits were properly conducted to assess the adequacy of institutional policies and procedures and whether staff were following institutional policies and procedures; and overseeing the design and implementation of any necessary corrective action plans. As Associate Commissioner of Operations, Culliver had the authority to conduct unannounced security audits at his discretion and received copies of all security audits, and was the point person on the ADOC administrative team regarding security issues and prisoner-on-prisoner violence at Holman, Donaldson and St. Clair.

19. Defendant Charles Daniels is a former Associate Commissioner for Operations and Institutional Security for the ADOC. Defendant Daniels took over the role after Culliver's retirement. As Associate Commissioner for Operations and Institutional Security, Defendant Daniels was responsible for ensuring the effective and safe daily operations of prison facilities including Holman, Donaldson, and St. Clair. This included overseeing institutional security, staffing, the Classification Review Board, and the Transfer Division; administering the training program for departmental employees and overseeing the Training Division; managing the Security Audit Team, ensuring that security audits were properly conducted to assess the adequacy of institutional policies and procedures and whether staff were following institutional policies and procedures; and overseeing the design and implementation of any necessary corrective action plans. As Associate Commissioner of Operations, Daniels had the authority to conduct unannounced security audits at his discretion and received copies of all security audits, and was the point person on the ADOC administrative team regarding security issues and prisoner-on-prisoner violence at Holman, Donaldson and St. Clair.

20. Defendant Jeffery Williams is the current Deputy Commissioner of Governmental Relations for the ADOC. During the period between when Culliver went on administrative leave

and Daniels took over as Associate Commissioner for Operations and Institutional Security, Williams took over the responsibilities of Associate Commissioner for Operations and Institutional Security. In that role, he was responsible for ensuring the effective and safe daily operations of all ADOC prison facilities including Holman, Donaldson, and St. Clair. This included overseeing institutional security, staffing, the Classification Review Board, and the Transfer Division; administering the training program for departmental employees and overseeing the Training Division; managing the Security Audit Team, ensuring that security audits were properly conducted to assess the adequacy of institutional policies and procedures and whether staff were following institutional policies and procedures; and overseeing the design and implementation of any necessary corrective action plans. As Associate Commissioner of Operations, Williams had the authority to conduct unannounced security audits at his discretion and received copies of all security audits, and was the point person on the ADOC administrative team regarding security issues and prisoner-on-prisoner violence at Holman, Donaldson and St. Clair.

21. Defendant Edward Ellington is the Institutional Coordinator for the Northern Region of the ADOC, a role which he assumed in June 2017. In that role, Defendant Ellington was responsible for planning, monitoring, and reviewing the day-to-day operations of correctional institutions in his assigned area, which included St. Clair. His duties included supervising the wardens of St. Clair; ensuring safe conditions at St. Clair; identifying and understanding problems that arose at the facility; implementing ADOC's security and operational policies at St. Clair; leading the external security audit team, including receiving and reviewing any security audits of St. Clair, reviewing and overseeing any corrective action plans for St. Clair created in response to security audits, and following-up on and monitoring all unresolved recommendations identified by the security audit process; and directing and shakedowns/contraband searches at St. Clair.

22.     Defendant Christy Vincent was the PREA Director for the ADOC up to and during the events described in Plaintiff's Complaint. In that role, Defendant Vincent's responsibilities included overseeing the ADOC's implementation of PREA requirements and ensuring that all ADOC facilities, including St. Clair, were implementing and complying with PREA requirements. Defendant Vincent was responsible for ensuring that ADOC adequately protected against sexual abuse and ensured that incidents of sexual abuse were appropriately addressed. She was also responsible for assessing wardens' facility staffing plans and ensuring that they provided for adequate staffing levels to protect prisoners against sexual abuse and making adjustments if needed.

23.     Each of the Defendant ADOC Supervisors acted in a supervisory capacity over St. Clair employees, at all times relevant to this Complaint. Further, the constitutional injuries complained of herein were proximately caused by a pattern and practice of misconduct at St. Clair, which occurred with the consent of the Defendant ADOC Supervisors, who personally knew about, facilitated, approved, and/or condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation by their actions or by their deliberate indifference and failure to act.

*The Defendant St. Clair Facility Supervisors*

24.     Defendants Karla Jones, Gwendolyn Givens, Anthony Brooks, Carl Sanders, Gary Malone, Kevin White, Carla Graham, Angelia Gordy, William Ragsdale, and Neketris Estelle are referred to, collectively, as the "Defendant St. Clair Facility Supervisors."

25.     Defendant Karla Jones was the warden of St. Clair leading up to and during the events described in Plaintiff's Complaint. As warden, Defendant Jones was responsible for setting institutional policies and customs at St. Clair; adopting and implementing changes in institutional

policies and customs as needed; planning, directing, controlling, and otherwise managing St. Clair to ensure the safety and security of its prisoners; managing the internal security audit team; debriefing external security audits with the external security audit team; conducting inspections of the facility; creating and implementing improvement plans in response to internal and external security audits and inspections; reviewing and signing off on incident reports; overseeing the day-to-day operations of the prison; and supervising and monitoring all subordinate employees, including assistant wardens and captains. Defendant Jones was responsible for ensuring adequate supervision and monitoring of prisoners (including developing and documenting a facility staffing plan to provide for adequate staffing levels to protect prisoners against sexual abuse and physical assaults); adequate classification and housing of prisoners (including providing input on prisoners' classification status and housing assignments based on behavior and other considerations); appropriate discipline and deterrence of prisoner and staff misconduct; adherence by staff to the requirements of the Prison Rape Elimination Act ("PREA"); and adherence by staff to contraband search protocols.

26.     Defendant Gwendolyn Givens was the Warden II at St. Clair leading up to and during the events described in Plaintiff's Complaint. As Warden II, Defendant Givens was responsible for the day-to-day operations of the prison and the safety of all prisoners at St. Clair; all security operations at St. Clair; the supervision of all security personnel, including the captains; reviewing and signing off on all incident reports, duty officer reports, Investigations & Intelligence ("I&I") division reports, shakedown reports, segregation summaries from classification, and disciplinary hearing documents; serving as the chair of the Segregation Review Board, including reviewing all reclassification recommendations (i.e. placing a prisoner in or removing a prisoner from segregation); conducting weekly formal inspections, including of the housing units, and

following up on any issues; and overseeing searches for weapons and other contraband. It was also the responsibility of Defendant Givens to ensure that the standard operating procedures (SOPs) were being followed at St. Clair, including by reviewing incident and other reports.

27.     Defendant Anthony Brooks was the Warden I at St. Clair Correctional Facility leading up to and during the events described in Plaintiff's Complaint. As Warden I, Defendant Books was responsible for the day-to-day operations of the prison and safety of all prisoners at St. Clair; monitoring the activities of all subordinates (including the captains); monitoring the operations of the facility; conducting inspections of the facility; and writing policies and standard operating procedures for the facility. As Warden I, Brooks was also responsible for reviewing and signing off on incident reports, and preparing the Institutional Vulnerability Analysis. He also had the responsibility for ensuring that prisoners were safely housed, and the authority to adjust prisoners' housing assignments.

28.     Defendant Carl Sanders was a Captain at St. Clair at the time of the events in Plaintiff's Complaint. As Captain, Defendant Sanders was responsible for the safety of all prisoners at St. Clair, security activities, and ensuring that subordinate staff were where they were supposed to be, carrying out their responsibilities and following ADOC and facility security procedures, including ensuring that staff were carrying out required monitoring of housing units, security checks, and contraband searches. He also had the responsibility for ensuring that prisoners were safely housed, and the authority to adjust prisoners' housing assignments.

29.     Defendant Gary Malone was a Captain at St. Clair leading up to and during the events described in Plaintiff's Complaint. As Captain, Defendant Malone was responsible for the safety of all prisoners at St. Clair, security activities, and ensuring that subordinate staff were where they were supposed to be, carrying out their responsibilities and following ADOC and facility

security procedures, including ensuring that staff were carrying out required monitoring of housing units, security checks, and contraband searches. He also had the responsibility for ensuring that prisoners were safely housed, and the authority to adjust a prisoners' housing assignments.

30.    Defendant Kevin White was a Captain at St. Clair leading up to and during the events described in Plaintiff's Complaint. As Captain, Defendant White was responsible for the safety of all prisoners at St. Clair, security activities, and ensuring that subordinate staff were where they were supposed to be, carrying out their responsibilities and following ADOC and facility security procedures, including ensuring that staff were carrying out required monitoring of housing units, security checks, and contraband searches. He also had the responsibility for ensuring that prisoners were safely housed, and the authority to adjust prisoners' housing assignments.

31.    Defendant Carla Graham was a Captain at St. Clair leading up to and during the events described in Plaintiff's Complaint. As Captain, Defendant Graham was responsible for the safety of all prisoners at St. Clair, security activities, and ensuring that subordinate staff were where they were supposed to be, carrying out their responsibilities and following ADOC and facility security procedures, including ensuring that staff were carrying out required monitoring of housing units, security checks, and contraband searches. She also had the responsibility for ensuring that prisoners were safely housed, and the authority to adjust a prisoner's housing assignment.

32.    Defendant Angelia Gordy was the Institutional PREA Compliance Manager at St. Clair leading up to and during the events described in Plaintiff's Complaint. Defendants Gordy's responsibilities included ensuring that St. Clair was implementing and complying with PREA requirements, including the separation of likely victims from likely perpetrators of sexual violence. As Institutional PREA Compliance Manager, Defendant Gordy was responsible for making sure that incidents of sexual abuse were appropriately addressed.

33.     Defendant Lieutenant William Ragsdale was the Backup Institutional PREA Compliance Manager at St. Clair leading up to and during the events described in Plaintiff's Complaint. Defendants Ragsdale's responsibilities included ensuring that St. Clair was implementing and complying with PREA requirements, including the separation of likely victims from likely perpetrators of sexual violence. As Backup Institutional PREA Compliance Manager, Defendant Ragsdale was responsible for making sure that incidents of sexual abuse were appropriately addressed.

34.     Defendant Neketris Estelle was the Head of Classification at St. Clair at the time of the events at issue in Plaintiff's Complaint and first began working in classification at St. Clair in 2009. As the Head of Classification, Defendant Estelle's responsibilities included conducting initial screenings; conducting semi-annual progress reviews for prisoners, attended by the warden or his designee, to review their disciplinary histories and other developments, and adjust their classification and housing status; serving on the Institutional Segregation Review Board along with the Warden and Segregation Captain; serving on the Sexual Incident Review Team; reclassifying prisoners for segregation if their disciplinary history warranted a segregation placement; reclassifying prisoners for general population if they no longer required a segregation placement; notifying security staff of housing assignment requests; making recommendations that prisoners be transferred to protective custody; and ensuring safe housing assignments for prisoners.

35.     Each of the Defendant St. Clair Facility Supervisors acted in a supervisory capacity over other St. Clair employees at all times relevant to this Complaint.

36.     Further, the constitutional injuries complained of herein were proximately caused by a pattern and practice of misconduct at St. Clair, which occurred with the consent of the Defendant St. Clair Facility Supervisors, who personally knew about, facilitated, approved, and/or

condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation by their actions or by their deliberate indifference and failure to act.

*Additional Defendants*

37.     Defendant Tanya Ary was a classification officer at St. Clair leading up to and during the events described in Plaintiff's Complaint. Her responsibilities included identifying vulnerable prisoners and enemies within the prisoner population and ensuring that all prisoners were assigned to housing units in which they were safe from violence. Defendant Ary was responsible for the safe and effective classification of D.S.

38.     Defendant McMillian was a correctional officer at St. Clair leading up to and during the events described in Plaintiff's Complaint. Defendant McMillian was responsible for the safety and security of the prisoners at St. Clair, and for monitoring and supervising the prisoners there.

39.     Defendant McLemore was a correctional officer at St. Clair leading up to and during the events described in Plaintiff's Complaint. Defendant McLemore was responsible for the safety and security of the prisoners at St. Clair, and for monitoring and supervising the prisoners there.

40.     Defendant Christopher Boyd was a lieutenant at St. Clair leading up to and during the events described in Plaintiff's Complaint. He was responsible for the safety and security of the prisoners at St. Clair, and for monitoring and supervising the prisoners there, as well as for supervising subordinate staff.

41.     The Defendant ADOC Supervisors, Defendant St. Clair Facility Supervisors, and Defendants Ary, McMillian, McLemore, and Boyd are collectively referred to as the "St. Clair Defendants."

42.     Defendant Lisa Bonner was a classification supervisor at Donaldson leading up to and during the events described in Plaintiff's Complaint. Her responsibilities included identifying vulnerable prisoners and enemies within the prisoner population and separating them; ensuring that all prisoners were assigned to housing units in which they were safe from violence; and notifying facilities to which a prisoner was transferred of known enemies and vulnerabilities. Defendant Bonner was responsible for the safe and effective classification of D.S. at Donaldson, and for notifying the receiving facility of vulnerabilities and risks to D.S. when he was transferred from Donaldson to St. Clair.

**D.S. Suffers Multiple Violent Attacks in ADOC Custody**

43.     On or about February 2018, D.S. was stabbed over 20 times by a group of prisoners with contraband weapons while incarcerated at the William C. Holman Correctional Facility. Some or all of the individuals responsible for the attack were identified and made known to Defendants and ADOC staff by D.S. and/or through ADOC's own investigation.

44.     Several months later and as a result of this stabbing, D.S. was transferred to Donaldson.

45.     Once he arrived at Donaldson, D.S. was originally placed in segregation.

46.     While in segregation, D.S. learned that one or more individuals involved in his attack at Holman were also being incarcerated at Donaldson with D.S.

47.     D.S. then informed various staff members that he had enemies at Donaldson relating to his February 2018 attack at Holman.

48.     Specifically, as D.S.'s classification officer, Defendant Bonner received notice from D.S. and/or his file that D.S. had enemies relating to his February 2018 attack at Holman; that one or more of these enemies was incarcerated at Donaldson with D.S.; that D.S. was

particularly vulnerable; and that D.S. had a prior history of being victimized while in ADOC custody.

49.     Despite this, Defendant Bonner moved D.S. into general population housing at Donaldson with one or more of his enemies and took no action to separate or protect him from his enemies.

50.     Predictably, at Donaldson, D.S. was brutally stabbed with a contraband weapon by one of his enemies who had carried out the brutal attack of D.S. at Holman.

51.     The attack that D.S. suffered at Donaldson was incredibly traumatic, and he suffered serious emotional and physical injuries as a result.

### THE ST. CLAIR DEFENDANTS' FAILURE TO PROTECT D.S.

### The Substantial Risk of Serious Harm to D.S. at St. Clair

52.     After D.S.'s assault at Donaldson, he was transferred to St. Clair because of the dangerous risks posed to him by his enemies.

53.     Defendant Bonner signed off on this transfer and the reason for it, which was identified on his transfer paperwork.

54.     At St. Clair, D.S. was placed in segregation for more than a week.

55.     During this time, D.S. learned that one or more of his enemies and their associates were now at St. Clair.

56.     While in segregation, D.S. spoke with various St. Clair staff, including Defendants Malone, White, Jones, Brooks, McMillian, Estelle and Boyd, during their rounds or other visits in the segregation unit. He informed them that he had enemies at St. Clair and identified at least one of those enemies and their associates. D.S. also sent written correspondence to St. Clair staff,

including Defendant Estelle, notifying them that he had enemies at St. Clair and identifying at least one of those enemies and their associates.

57. Defendants Malone, White, Jones, Brooks, Estelle, Gordy, Ragsdale, Givens, Boyd and McMillian were also aware from the fact of D.S.'s transfer and the accompanying transfer reports that he had a history of suffering violent attacks while in custody and that he had various known enemies.

58. Through documents in D.S.'s file and reports from D.S. himself, Defendants Malone, White, Jones, Brooks, Estelle, Gordy, Ragsdale, Givens, Boyd, McMillian, and Ary knew that D.S. was particularly vulnerable; that he had a history of being victimized and violently assaulted while in ADOC custody including at Holman and Donaldson; that he had known enemies and their associates at St. Clair related to the Holman and Donaldson assaults; and therefore that he was at a high risk of suffering additional assaults.

59. In addition, as D.S.'s classification officer and classification supervisor, Defendants Ary and Estelle also knew of the past assaults of D.S. and of his enemies, as those individuals and assaults were identified in his classification reports, transfer reports, and other documents that they reviewed in order to classify D.S. and assign him to housing following his transfer to St. Clair.

60. Defendants Malone, White, Jones, Brooks, Estelle, Gordy, Ragsdale, Givens, Boyd, McMillian, and Ary were thus on notice that D.S. had enemies at St. Clair and had notice of the identities of at least some of these enemies and their associates.

61. In the alternative, Defendant Bonner failed to include critical information about D.S.'s previous attacks and enemies (and their associates) in her classification documents and to otherwise notify the staff at St. Clair about the enemies that he had there.

62.     Moreover, D.S. was classified as a PREA victim prior to his assault at St. Clair, putting Defendants Jones, Givens, Estelle, Gordy, Ragsdale, Ary and others on notice that he was particularly vulnerable to sexual violence and that he needed to be housed separately from those prisoners likely to commit sexual violence.  Estelle and Ary signed the PREA victim designation themselves, and Jones, Givens, Gordy, and Ragsdale were notified of D.S.'s victim designation due to their roles.

63.     As discussed in detail above, Defendants Malone, White, Jones, Brooks, Estelle, Gordy, Ragsdale, Givens, Boyd, McMillian, and Ary were responsible for ensuring D.S.'s safety.

64.     Despite knowledge of the risks posed to D.S., Defendants Estelle, Ary, Jones, Givens, Ragsdale, Brooks, Malone, White, McMillian, Boyd, and Gordy caused D.S. to be moved out of segregation and into general population, with his enemies and their associates. Ary and Estelle reviewed D.S.'s file, which documented his previous attacks and enemies and his status a PREA victim, and nonetheless made the recommendation to the Segregation Review Board to remove D.S. from segregation and place him in general population with his enemies, specifically in P block. As chair of the Segregation Review Board, Givens reviewed D.S.'s file, which documented his previous attacks and enemies and status as a PREA victim, and approved the reclassification recommendation removing D.S. from segregation and placing him in general population (P block) with his enemies. Jones was also apprised of D.S.'s vulnerabilities, prior assaults, enemies, and status as a PREA victim, and nonetheless approved the decision to house him in P block in general population. McMillian actually removed D.S. from segregation to general population.

65.     The assailants who attacked D.S. at St. Clair had a history of violence that was known to Defendants Jones, Estelle, Givens, and Brooks through their experience at St. Clair and

their review of reports, including incident reports and classification documents, but Defendants Jones, Estelle, Givens, and Brooks nonetheless housed D.S.'s assailants in general population at St. Clair where they were in a position to assault D.S.

66.     When he was released from segregation, D.S. again informed Defendant Malone about his enemies at St. Clair and identified at least one of those enemies and their associates. He inquired about whether it was safe for him to be released from segregation and whether he would be protected from his enemies.

67.     Defendant Malone told D.S. not to worry, even though Malone was aware of the presence of D.S.'s enemies and their associates at St. Clair and the acutely dangerous conditions at St. Clair, as discussed in further detail below in paragraphs 98-180.  Defendant Malone further told D.S. that he would face repercussions if he did not go to the general population dorm as instructed.

68.     But following his release into general population, D.S. began to receive threats from associates of his enemies and was told that one of his enemies had put out an order to stab D.S.

69.     D.S. immediately informed Defendant White of these threats and the fact that he was being housed with enemies and the associates of his enemies.

70.     Defendant White told D.S. just to go back to the dorm and not to worry about it; he did this despite knowledge of D.S.'s enemies and their associates, the risks posed to D.S., and the acutely dangerous conditions at St. Clair, as discussed in further detail below in paragraphs 98-180.

71.     Defendant Gordy called D.S. to her office after he had been released into the general population.

72.     Again, D.S. informed Defendant Gordy about his enemies and their associates and the risks he faced in general population.

73.     While in general population, D.S. similarly informed Defendant Givens about his enemies and their associates and the risks he faced in general population at St. Clair.

74.     Despite knowing that D.S. was in general population with his enemies and their associates and at substantial risk of serious harm from these individuals, Defendants Malone, White, Jones, Brooks, Estelle, Ary, Gordy, Ragsdale, Givens, Boyd and McMillian took no meaningful steps to ensure his safety or separate D.S. from his enemies.

75.     As set forth in more detail below, Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vicente, Gordy, Ragsdale, Estelle, Ary, McMillian, Boyd, and McLemore were also on notice that D.S. was at risk of being beaten, stabbed, and raped at St. Clair because of the complete and obvious crisis of safety and security in the facility, particularly in the dangerous P/Q blocks where he was housed, which had long experienced staggeringly high levels of assaults and sexual violence. They were also aware of the high levels of contraband weapons and the free and unhindered movement of prisoners throughout the facility, as well as assaults that had been facilitated by high levels of contraband weapons and free and unhindered movement of prisoners.

76.     None of the Defendants took any steps to protect D.S. from the severe risk of being beaten, stabbed, and raped at St. Clair.

77.     Instead, they allowed D.S. to be housed alongside his enemies and their associates at St. Clair, where he was vulnerable to assault.

**The Beating, Stabbing, and Rape of D.S. at St. Clair**

78.     D.S. was only in population for a short time at St. Clair before he was assaulted.

79.     One of his enemies organized and initiated the assault.

80.     On or about January 29, 2019, a group of prisoners came to D.S.'s cell in the P block.

81.     Several of these prisoners came freely from housing units other than P/Q, without any interference from staff or barriers to keep them from moving unhindered through the facility.

82.     The attackers tied D.S. up, beat him, stabbed him, and raped him.

83.     The attack continued for a prolonged period of time.

84.     Defendants McLemore and McMillian walked by D.S.'s cell at various points while he was tied up, and saw that D.S. was being assaulted, but did nothing to intervene in or end the prolonged and violent attack even though they could have intervened or sought assistance to end the assault.

85.     D.S. was finally able to escape.

86.     D.S. ran to the shift office, where he immediately told Defendant White about the attack.

87.     Defendant White refused to take any action, and instead ordered D.S. to go back to the dorms where, as White knew, D.S.'s enemies would continue to have access to D.S. and were likely to retaliate against him for reporting the assault.

88.     D.S. ran to the infirmary.

89.     An ADOC staff member originally refused to let D.S. enter the infirmary, despite the fact that he had clearly just suffered an attack.

90.     Rather than placing D.S. in the infirmary or in protective custody after the rape, Defendants including Defendants Estelle, Ary, Gordy housed D.S. in the segregation unit, *again* placing him with his enemies, who retaliated against him.

91.    For example, one of D.S.'s enemies acted as a "runner" in segregation, meaning that he was responsible for delivering meals to the prisoners housed in segregation.

92.    D.S. was deprived of food and medical care because his enemy would not deliver food to him in segregation or alert the cube officer that D.S.'s wounds had begun bleeding again, causing him to suffer harms including pain and infection.

93.    No Defendant did anything to intervene and ensure that D.S. was safe from retaliation relating to the brutal attack that he suffered.

94.    D.S. was taken to a clinic for a sexual assault examination, and the examiner documented physical evidence corroborating Plaintiff's assault.

95.    Nonetheless, an ADOC investigator spoke with D.S. only one time about the event.

96.    Rather than try to properly investigate D.S.'s attack, the investigator tried to convince D.S. not to bring charges against his assailants.

97.    The attack was incredibly traumatic, and D.S. suffered lasting and serious emotional and physical injuries.

**The Security Crisis at St. Clair**

98.    Well before the assault of D.S. at St. Clair in January 2019, Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vicente, Gordy, Ragsdale, Estelle, Ary, McMillian, Boyd, and McLemore were all on notice of a security crisis at St. Clair in which prison beatings, stabbings, and rapes were endemic, violence and terror reigned, and the threat of assault was constant, particularly in the P/Q blocks.

99.    In 2018, Alabama's prisons for men had the highest homicide rate in the nation for a state prison system.

100.    In the months leading up to D.S.'s assault in P block, at least four men were killed as a result of assaults that took place in whole or in part in the P/Q blocks at St. Clair: Terrence Andrews (killed in December 2018), Rogarius Bray (killed in September 2018); Terry Pettiway (killed in September 2018), and Travis Wilson (killed in February 2018).

101.    Violence at St. Clair had increased sharply beginning in 2010.

102.    In fiscal year 2010, the number of reported assaults at St. Clair was just 23.

103.    The number of reported assaults grew *sevenfold* in the eight years leading up to Plaintiff's assault: from 23 in fiscal year 2010; to 59 in fiscal year 2011; to 78 in fiscal year 2012; 101 in fiscal year 2013; 127 in fiscal year 2014; 157 in fiscal year 2015; 249 in fiscal year 2016; 132 in fiscal year 2017; and 163 in fiscal year 2018. Many additional assaults went unreported.

104.    The rate of assaults at St. Clair far exceeded typical levels of violence at comparable facilities across the nation. In 2018, ADOC's per capita rate of over 34 homicides per 100,000 people incarcerated was more than 600 percent greater than the national average, and more than five times greater than the rate ADOC *itself* saw from 2001 to 2014. Of all the prisons operated by ADOC, St. Clair experienced the highest number of prisoner-on-prisoner homicides in 2018.

105.    Listed below are but some of the assaults at St. Clair in general, and in the P/Q blocks in particular, in the two years preceding D.S.'s attack and rape.

106.    In January 2017, a prisoner was assaulted by two men in a day room in Q-block within sight of the Warden. The prisoner was stabbed in the left temple.

107.    In February 2017, a prisoner was stabbed 9 times by three men who came into his cell and attacked him.

108.    In March 2017, a prisoner was raped and later found by officers tied to a chair and beaten.

109. That same month, at least four other prisoners were stabbed.

110. In April 2017, two men were hospitalized with stab wounds after a knife fight. Another stabbing in April 2017 left a prisoner in a coma.

111. In May 2017, a large violent incident occurred in which 15 prisoners were stabbed. That same month, a prisoner suffered a broken jaw when he was assaulted by another prisoner who used a lock placed in a sock in the assault.

112. In July 2017, a prisoner at St. Clair was found dead by staff with his hands tied to a bedpost, with clear strangulation marks on his neck.

113. That same month:

   a. Another prisoner was killed, a second was stabbed in the neck, and a third was stabbed in his sleep;

   b. A prisoner told officers that he was unsafe in Q block and was being extorted, prompting staff to order him to return to Q block, where he was held hostage, raped, and stabbed;

   c. A violent incident in Q-block resulted in the stabbing of 4 prisoners;

   d. A knife fight occurred in P-block and officers witnessed the fight but did nothing to intervene; and,

   e. One prisoner stabbed at least 5 people in 3 separate incidents.

114. In August 2017, a prisoner was stabbed in his own cell after confronting another prisoner about stealing his property.

115. That same month:

   a. A prisoner was stabbed near the cubicle in block P-2 by a prisoner who was intoxicated on crystal methamphetamine;

b. A prisoner was stabbed 13 times in block P-1 shortly after being released from segregation; and,

c. Another prisoner was stabbed in block P-1.

116. In September 2017, a prisoner was found under his bed in block Q-2 with multiple stab wounds.

117. That same month:

a. A prisoner at St. Clair was raped;

b. A prisoner was stabbed by a known enemy, in a fight that lasted for over 20 minutes before anyone intervened;

c. Four prisoners were involved in a fight with box cutters and knives; and,

d. A knife fight in G-Yard involved at least 6 prisoners.

118. In October 2017, a prisoner was sexually assaulted in the P/Q barbershop after he had passed out, and another prisoner was sexually assaulted in the Q block at knifepoint.

119. That same month:

a. A prisoner took another prisoner hostage in his cell and assaulted him over a period of two days;

b. A prisoner was sexually assaulted in the H dorm;

c. Officers observed a prisoner walk onto the yard wearing only a blanket and socks, after he had been severely beaten and burned on his face;

d. A prisoner was stabbed in his sleep in segregation when the cube officer left the cubicle with the door open;

e. Three additional prisoners were stabbed in two separate incidents; and,

f. Another prisoner slit a prisoner's throat in the O-block after improperly gaining access to the housing unit.

120. In November 2017, a prisoner was held hostage and sexually assaulted over three days by four prisoners in Q block. The prisoner had recently been released from segregation.

121. That same month:

a. Another prisoner was raped at knifepoint;

b. A prisoner stabbed another prisoner who was being escorted by two correctional officers, and then was allowed to escape without recovery of the knife;

c. A prisoner stabbed another prisoner who was trying to sexually assault him; and,

d. Two prisoners fought with large machete-type knives in the chow hall and then out onto the G-yard, while three officers watched but did not intervene.

122. In December 2017, two prisoners were sexually assaulted, one at knifepoint.

123. That same month:

a. A prisoner was stabbed 16 times in front of the P/Q block.

b. A prisoner was stabbed in his back, knees, and legs while helping another prisoner move his belongings into Q block.

c. A prisoner was stabbed 12 times in the arm, side, and back in H-dorm, in view of an officer who was nearby but did not intervene;

d. Another prisoner was robbed and assaulted in the N/O blocks;

e. Another prisoner was stabbed four times; and,

f. A transgender prisoner was assaulted by a prisoner wielding a metal pole.

124. In January 2018, a prisoner was sexually assaulted at knifepoint in O-block. The assailant had previously been reported as the assailant in a number of sexual assaults at St. Clair.

125.    That same month, a prisoner was stabbed repeatedly in his cell in O block by prisoners carrying out a robbery.

126.    Starting in January 2018 and lasting through June 2018, a prisoner was repeatedly raped by a group of individuals who said he owed them a debt. The rapes occurred on a near daily basis, and officers were aware of the situation but did nothing to intervene.

127.    In February 2018, a prisoner was stabbed repeatedly in Q block.

128.    That same month:

a.    Another prisoner was killed in a knife fight at St. Clair by a prisoner with an extensive history of being disciplined for possession of knives;

b.    A prisoner was stabbed in the back of the head near the P/Q blocks right after being released from segregation;

c.    Another prisoner was stabbed in the P/Q blocks;

d.    A prisoner at St. Clair was repeatedly physically and sexually assaulted over the course of several days by his cell mate, who was also extorting him;

e.    A handcuffed prisoner was stabbed in segregation when another prisoner escaped from his own handcuffs; and,

f.    Another prisoner was stabbed in the G dorm.

129.    In March 2018, a prisoner was stabbed in the P/Q blocks while the prison was on lockdown, and the knife was still embedded in his body when he emerged from the block.

130.    That same month:

a.    A prisoner was sexually assaulted multiple times during his first month at St. Clair;

b.    A prisoner was stabbed in the chest at the doorway to Q block;

c.    A prisoner was stabbed in the leg during an attempted robbery in the gym; and.

d. At least five other stabbing incidents occurred.

131. In April 2018, a prisoner was kidnapped and raped in Q block.

132. That same month:

a. A knife fight in P block resulted in a prisoner being stabbed 13 times, including in the chest and head;

b. A prisoner was threatened with rape by two men armed with knives, and forced to escape only by cutting his wrists with a razor blade so that he could report what happened to a mental health officer; and,

c. A prisoner was stabbed in front of the gym by a prisoner who had recently been released from segregation.

133. In May 2018, a prisoner was held hostage by four other prisoners and sexually assaulted him. During the two days, officers did not enter the cell and simply asked how many men were inside when they conducted counts. The victim did not press charges after an investigator told him reporting would put his life in danger and promised that he would be transferred if he did not report.

134. That same month:

a. A prisoner was stabbed in his sleep in his cell in Q block;

b. A prisoner was sexually assaulted at knifepoint by another prisoner;

c. A prisoner was stabbed and beaten outside the doorway to the L/M blocks;

d. Another prisoner was stabbed 7 times in the G yard;

e. Another prisoner was stabbed in front of officers on his way to a GED class; and,

f. Another prisoner was held in a cell and beaten with a wooden paddle.

135.    Also in May 2018, a prisoner was stabbed a group of prisoners outside the entry to Q block. The apparent motive for the attack was that the assailants had seen a document suggesting that the prisoner had provided staff with information related to a prior stabbing.

136.    In June 2018, a prisoner was sexually assaulted in P block. When he reported the rape to Defendant Jones, she told him that she did not care.

137.    In July 2018, three prisoners physically assaulted and attempted to sexually assault another prisoner who returned to P block following a prior sexual assault. The group of prisoners locked him in a cell and beat him with a belt buckle.

138.    That same month:

    a.    A prisoner was stabbed by his cellmate and several other prisoners because he refused to move out of his cell in P block;

    b.    A prisoner was stabbed in his sleep in his cell in Q block;

    c.    Another prisoner was stabbed in Q block;

    d.    Yet another prisoner was stabbed in his cell in Q block after confronting other prisoners about taking his belongings;

    e.    A prisoner taped knives to both his hands and repeatedly stabbed yet another prisoner in Q block;

    f.    Another prisoner was stabbed in the P/Q hallway;

    g.    Another prisoner was stabbed on the porch of the P/Q blocks;

    h.    A robbery resulted in the stabbing of another prison, who passed out from blood loss; and,

i. A prisoner slit the throat of another prisoner with a razor in the common area of A block in an attack that was witnessed by a correctional officer who did not intervene.

139. In August 2018, a prisoner was sexually assaulted within a week of his arrival at St. Clair.

140. That same month:

a. A prisoner was stabbed over 20 times by a group of prisoners in the P/Q hallway in August 2018, in front of a cubicle officer who observed the incident but did not intervene;

b. A prisoner was stabbed over 10 times in the Q block in relation to a debt;

c. A prisoner was given a drink laced with a substance that caused him to lose consciousness; stabbed by several prisoners in the P-2 dayroom while he was unconscious; and left there for about 30 minutes while other prisoners tried to get help from officers who refused to intervene;

d. A prisoner was stabbed through the tray hole in his cell in B Block by a prisoner who was working as a segregation runner; and,

e. At least six other separate incidents occurred in which prisoners were stabbed.

141. In September 2018, a prisoner was stabbed to death at St. Clair. The prisoner had previously been stabbed at St. Clair in July 2017.

142. That same month:

a. A prisoner was stabbed in his bed in H dorm by an intoxicated prisoner, who was then attacked and stabbed by another group of prisoners; and,

b. A prisoner was stabbed in the stomach and the leg, and forced to attempted to sew up the lacerations himself, which eventually became infected.

143. In October 2018, a prisoner was stabbed by several men in a cell in Q block.

144. That same month:

a. A prisoner was sexually assaulted in P block at knifepoint; and,

b. A prisoner was stabbed in the throat while in segregation.

145. In November 2018, a prisoner was stabbed in the P/Q blocks by an intoxicated prisoner who was acting erratically before the assault.

146. That same month, another prisoner was stabbed in the H dorm.

147. In December 2018, a prisoner was stabbed and killed by another prisoner in an altercation that took place in part in the P/Q blocks.

148. That same month, a robbery resulted in a prisoner being stabbed in Q block.

149. Also in December 2018, a group of prisoners assaulted and threatened to stab a prisoner who had just been released from restricted housing. Because the prisoner would not identify his attackers, he was written up by staff for creating a safety and security hazard.

**Notice of the Substantial Risk of Serious Harm to D.S. at St. Clair**

150. Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vicente, Gordy, Ragsdale, Estelle, Ary, McMillian, Boyd, and McLemore had knowledge of the substantial risk of serious harm facing prisoners such as D.S. at St. Clair—particularly, in the P/Q blocks—based on incident reports for the above-identified assaults, as well reports by the ADOC Investigations & Intelligence division, duty officer reports, disciplinary records, medical records, annual and monthly ADOC data reports, prisoner progress reports, direct observation, internal communications, and/or prisoner lawsuits. The security crisis

at St. Clair was also obvious and common knowledge to those employees who physically worked at St. Clair or who oversaw security at St. Clair, including all St. Clair Defendants.

151.    ADOC's publicly available reports in the timeframe leading up to the assault of D.S. at St. Clair also reflected that injuries, deaths, and fighting were a systemic problem at St. Clair.

152.    Nonetheless, the Defendant ADOC Supervisors and Defendant St. Clair Facility Supervisors—Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, and Estelle—failed to take meaningful corrective actions to reduce the substantial risk of serious harm facing prisoners such as D.S. at St. Clair.

153.    In 2014, a security audit of St. Clair was conducted. As Defendant Culliver later admitted, no corrective action plan of any kind was developed or carried out in response to the audit despite the horrific and escalating violence at St. Clair.

154.    In October 2014, following an alarming number of violent attacks and murders at St. Clair, the Equal Justice Initiative ("EJI") filed a class action lawsuit on behalf of St. Clair prisoners seeking injunctive relief to reduce the violence at St. Clair. *See* Exh. A, *Duke v. Dunn* Complaint.

155.    The *Duke* Complaint also described the policies and practices fueling the outbreak of violence at St. Clair, including inadequate supervision and monitoring of the facility, failure to address the widespread proliferation of contraband weapons at the facility, creation of a dangerous culture of violence and abuse, and failure to respond appropriately to violence and rape.

156.    Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, and Estelle were each aware of the

*Duke* litigation and deficiencies identified therein long before the assault on D.S. For example, Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, and Malone, were all either directly named as Defendants or automatically substituted as Defendants in the *Duke* litigation, and Defendants White, Graham, Vincent, Gordy, Ragsdale, and Estelle were aware of the litigation and the deficiencies identified therein.

157.    In the aftermath of the *Duke* lawsuit, the Defendant ADOC Supervisors and Defendant St. Clair Facility Supervisors--—Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, and Estelle—again failed to take reasonable, necessary, and appropriate steps to remedy the dangerous conditions at St. Clair.

158.    The violence at St. Clair continued to escalate.

159.    In October 2016, the United States Department of Justice ("DOJ") opened an investigation into whether the conditions in Alabama's prisons for men, including St. Clair, violated the Eighth Amendment of the U.S. Constitution. The DOJ investigation included inquiries into whether ADOC adequately protects prisoners from physical harm and sexual abuse at the hands of other prisoners and provides prisoners with safe living conditions at prisons including St. Clair.

160.    Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, and Estelle received notice of the DOJ investigation.

161.    Nonetheless, Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, and Estelle failed to take meaningful corrective actions to reduce the substantial risk of serious harm facing prisoners at St. Clair.

162. The *Duke* case settled in November 2017, with the ADOC agreeing to implement an internal classification system to protect prisoners and staff by identifying risks and needs, rather than randomly assigning people to beds; create an incident management system that would allow the prison to prevent, track, and respond to violent incidents; replace faulty locks and install surveillance cameras; and create a transitional unit for prisoners released from segregation, among other things. E.g., Equal Justice Initiative, *Alabama Department of Corrections Agrees to Reforms at St. Clair Prison in Response to EJI Lawsuit* (Nov. 8, 2017), available at https://eji.org/news/alabama-settles-eji-lawsuit-on-st-clair-prison/. EJI attorneys were designated as monitors to the settlement agreement.

163. The Defendant ADOC Supervisors and Defendant St. Clair Facility Supervisors—Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, and Estelle—were on notice of the settlement agreement in *Duke*.

164. However, the Defendant ADOC Supervisors and Defendant St. Clair Facility Supervisors—Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, and Estelle—failed to take meaningful corrective actions to reduce the substantial risk of serious harm facing prisoners at St. Clair in response.

165. In June 2018, EJI communicated to Defendant ADOC Supervisors including Defendant Dunn that ADOC had failed to implement the necessary reforms and comply with the settlement agreement. Indeed, throughout 2018, EJI continued to communicate concerns with ADOC's lack of compliance with the 2017 Agreement and with ongoing violence at St. Clair. These communications included numerous emails and letters, presentations, and monitoring

reports that set out issues of noncompliance with the settlement and other issues of concern at St. Clair, as well as multiple PREA Audit reports that set out the ADOC's failures to comply with the requirements of PREA and adequately prevent, respond, and address sexual abuse at St. Clair. Specifically, Defendant Dunn received the EJI First Monitoring Report from May 31, 2018, the EJI Second Monitoring Report from July 2018, the Expert St. Clair Security Renovation Project Inspection from October 15, 2018, the Melinda Allen PREA Audit Report from April 26, 2018, and the Dave Cotton PREA Audit Report from September 24, 2018. The contents of EJI's communications were shared with ADOC Supervisors Dunn, Culliver, Williams, Daniels, Ellington, and Vincent, and Defendant Jones.

166.    However, at the time of D.S.'s assault at St. Clair, the majority (if not all) of the unconstitutional policies and practices identified through the *Duke* litigation continued unabated at St. Clair despite the *Duke* litigation and settlement. The lawsuit has since been reinstated.

167.    In a letter dated September 6, 2018, just four months before the January 2019 assault on D.S. at St. Clair, EJI notified Defendant Dunn of a rise of a "concerning increase in serious incidents of violence" at St. Clair.

168.    EJI warned in its letter specifically about the dangers of St. Clair's "'hot bay' dorm management policy that houses individuals with behavior problems together in a single housing unit in general population where they lack programming opportunities and any regular security staff presence" and that "the last two homicides [of Travis Wilson and Terry Pettiway] are a manifestation of the safety problems this kind of management technique creates."

169.    EJI also warned Defendant Dunn in its letter that "weapons contraband continues to saturate the prison and continues to contribute to serious incidents of violence at St. Clair," and that "contraband searches continue to be sporadic and ineffectual."

170.    EJI further noted in its letter: "Nationally recognized experts who have reviewed operations at St. Clair have recommended specific, detailed steps that are necessary to the detection and elimination of contraband at the facility," including "to completely lock-down the facility 'for several days' and 'conduct a thorough unannounced shake down of all areas including living areas and administrative or program areas before releasing inmates,'" as the "first step in creating a 'sterile' environment," to be followed by a "'regular, routine and effective practice of searching the prison.'"

171.    The contents of EJI's letter were shared with ADOC Supervisors Dunn, Culliver, Williams, Daniels, Ellington, and Vincent, and Defendant Jones.

172.    However, Defendants Dunn, Culliver, Williams, Daniels, Ellington, Vincent, and Jones took no meaningful corrective actions to reduce the substantial risk of serious harm facing prisoners at St. Clair following receipt of the September 6, 2018 letter.

173.    The violence at St. Clair continued unabated.

174.    Prisoners filed individual complaints alleging rapes and assaults at St. Clair detailing the dangerous conditions at St. Clair, the prevalence of stabbings and sexual violence, and the failures such as inadequate supervision, monitoring, contraband searches, and sexual assault policies at the prison, against Defendants Dunn, Culliver, Sanders, Malone, Gordy, Estelle, Ary, Brooks, Graham, Jones, White, and McMillian.  Three illustrative examples are: Complaint, Dkt. 1, *McGregor v. Thomas, et al.*, Case 4:17-cv-00593 (N.D. Ala. Apr. 12, 2017); Amended Complaint, Dkt. 11, *Miller v. Dunn, et al.*, Case 4:17-cv-00180 (N.D. Ala. Mar. 28, 2017); and Complaint, Dkt. 1, *Townsel v. Thomas, et al.*, Case 4:17-cv-00516 (N.D. Ala. Mar. 31, 2017). Defendants Dunn, Culliver, Sanders, Malone, Gordy, Estelle, and Ary were named as Defendants in *McGregor*, *Miller*, and *Townsel*; served with the lawsuits; and provided with notice of the

allegations therein, in which they were accused of having failed to protect prisoners from physical and sexual violence at St. Clair in 2014/2015. Defendants Dunn, Sanders, Malone, Gordy, Ary, and Estelle were each deposed in the *Miller*, *McGregor*, and *Townsel* cases, and confronted with evidence of systematic failures at St. Clair to protect prisoners from prisoner-on-prisoner beatings, stabbings, and sexual violence. Defendant Dunn's deposition occurred in November 2018, just months before D.S.'s assault.

175.    Nonetheless, the Defendant ADOC Supervisors and Defendant St. Clair Facility Supervisors—Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, and Estelle—did not take any meaningful corrective actions to reduce the substantial risk of serious harm facing prisoners such as D.S. at St. Clair even after having been sued individually for failing to protect prisoners from assaults at St. Clair.

176.    Following its investigation beginning in 2016, the DOJ issued extensive Notice Letters to the ADOC in April 2019 and July 2020 outlining the ADOC's failures with regard to protection of prisoners. The April 2019 Notice Letter was based on data—including documents, site visits, staff and prison interviews—from the 2015-2018 timeframe. The July 2020 Notice Letter was based on data—including documents, site visits, staff and prison interviews—from the 2015-2019 timeframe.

177.    The April 2019 Notice Letter, for example, notified Defendants Dunn, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, and Estelle that ADOC was violating the Eighth Amendment rights of prisoners by failing to prevent prisoner-on-prisoner violence and sexual abuse and failing to provide safe conditions.

178.     The April 2019 Notice Letter went on to conclude that the constitutional "violations are severe, systematic, and exacerbated by serious deficiencies" including those in "ineffective housing and classification protocols"; "inadequate incident reporting"; "inability to control the flow of contraband into and within the prisons, including illegal drugs and weapons"; "ineffective prison management and training"; "the use of segregation and solitary confinement to both punish and protect victims of violence and/or sexual abuse"; and "a high level of violence that is too common, cruel, of an unusual nature, and pervasive." And further, the DOJ found that "an excessive amount of violence, sexual abuse, and prisoner deaths occur within Alabama's prisons on a regular basis."

179.     The violence at St. Clair continued unabated, and the DOJ filed a lawsuit on December 9, 2020, and an amended complaint on May 19, 2021.

180.     Despite having notice of the substantial risk of serious harm facing prisoners at St. Clair in the time leading up to D.S.'s assault at St. Clair, Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, and Estelle failed to take reasonable steps to address and reduce the risk of violence to prisoners such as D.S. at St. Clair.

**Defendants' Failure to Provide Adequate Supervision and Monitoring
in the P/Q Blocks at St. Clair**

181.     Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, and Estelle, through their acts and omissions, failed to provide adequate supervision and monitoring of prisoners housed within St. Clair—particularly in the P/Q blocks—to prevent violence.

182.     As set forth above, at the time of Plaintiff's assault at St. Clair in January 2019, the P/Q blocks at St. Clair had long been subject to staggering levels of prisoner-on-prisoner violence.

183.    A large proportion of the prisoners housed in the P/Q blocks had disciplinary problems and histories of violence while in ADOC custody.

184.    Contraband, including knives and prisoner-made weapons, was common in the P/Q blocks.

185.    Despite this, the supervision in this area was virtually non-existent.

186.    The P/Q blocks were generally left unsecured, so that prisoners could roam freely and without supervision or interference in and out of the blocks and throughout the prison.

187.    For example, at least some of D.S.'s attackers were not assigned to the P/Q blocks yet moved freely, without any monitoring or intervention by staff, in and out of P/Q blocks in order to carry out the attack against D.S.  Many other assaults at St. Clair in the two years leading to D.S.'s assault also involved assailants who had traveled freely throughout general population to commit assaults, as described in, for example, paragraphs 19f and 121d.

188.    Most of the time, a single cube officer was the only officer monitoring the entire area of the P/Q blocks.

189.    The cube officers generally did not leave their cubicles.

190.    Oftentimes, the cube officers had not even undergone basic correctional officer training.

191.    The officers in the cube were, at times, absent, asleep, on the telephone, or otherwise not paying attention to the prisoners they were charged with monitoring.

192.    Random patrols of the P/Q blocks by additional officers occurred extremely infrequently.

193.    Due to lax supervision and discipline, security staff at St. Clair often failed to observe violent incidents and only discovered the victim after the violence and/or injuries had occurred.

194.    Due to lax supervision and discipline, security staff at St. Clair often watched violent or troubling incidents unfold without intervening, such as those illustrative incidents discussed above at paragraphs 113d, 121d, 123c, 126, 133, 138i, 140a, and 140c.

195.    The P/Q blocks also lacked adequate surveillance cameras to monitor the housing units.

196.    Blind spots on the units, in concert with inadequate staff presence, officer inattentiveness, and the lack of surveillance equipment, created a further substantial risk of serious harm to prisoners such as D.S. and had contributed to numerous violent incidents in the years leading up to the assault of D.S.

197.    Exacerbating these problems was the absence of emergency call buttons in the cells to summon assistance from staff.

198.    The St. Clair Defendants were aware of the particular dangerousness of the P/Q blocks, the high proportion of prisoners housed there with disciplinary problems and histories of violence while in ADOC custody, the lack of adequate monitoring of prisoners in the P/Q blocks, that prisoners were permitted to move freely between the housing blocks including to and from the P/Q blocks, the acute inattentiveness of officers stationed there, and the proliferation of contraband weapons, lack of cameras, and the existence of blind spots in the P/Q blocks at St. Clair.

199.    The St. Clair Defendants were also aware that when prisoners were in a cell, they had no emergency call buttons or any way of contacting a security officer other than banging on

their cell doors or shouting—wholly ineffective means for getting help because security officers were frequently asleep, inattentive, absent, or otherwise out of earshot.

200. The St. Clair Defendants were likewise aware that the resulting inadequate supervision and monitoring of prisoners created a substantial risk of serious harm that facilitated and encouraged homicides and assaults such as the beating, stabbing, and rape of D.S.

201. In addition, the Defendant ADOC Supervisors and Defendant St. Clair Facility Supervisors—Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, and Estelle—knew that a lack of programming opportunities in the P/Q blocks left prisoners there idle and that idleness, along with inadequate supervision and monitoring, increased the likelihood of violence in those blocks.

202. Despite this, Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, and Estelle failed to improve supervision and monitoring in the P/Q blocks.

203. These Defendants did not provide any additional staffing to the P/Q block or improve supervision and monitoring of existing staff in the P/Q blocks.

204. These Defendants took no meaningful steps to address the substantial risk of serious harm to prisoners in the P/Q blocks such as D.S., prior to his assault.

205. These Defendants acted with deliberate indifference and their misconduct placed vulnerable prisoners such as D.S. at substantial risk of serious harm and caused his injuries.

**Defendants' Failure to Address the Widespread
Proliferation of Contraband Weapons at St. Clair**

206. Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, and Graham, through their acts and omissions, permitted contraband weapons to proliferate at St. Clair and failed to effectively control the introduction, manufacture,

and use of contraband weapons by prisoners at St. Clair, exhibiting deliberate indifference to the substantial risk of serious harm that such weapons created to prisoners such as D.S.

207.    As set forth above, both the widespread availability of weapons at St. Clair and the resulting stabbings and other violent incidents at St. Clair were brought to the attention of the St. Clair Defendants through, for example, incident reports, the *Duke* lawsuit, EJI's September 6, 2018 letter, and individual prisoner lawsuits.

208.    The widespread proliferation of contraband weapons within St. Clair contributed to the high rate of violence, sexual abuse, and death and created a substantial risk of serious harm to prisoners such as D.S.

209.    By the time of D.S.'s assault at St. Clair, it was a matter of common knowledge among St. Clair staff that the prisoner population at St. Clair was heavily armed.

210.    Prisoners believed they needed to arm themselves at St. Clair for protection because of the endemic violence at the facility.

211.    Stab wounds were seen on a weekly, if not daily, basis.

212.    Large machete-type knives have been reported at St. Clair.

213.    At least one knife found at St. Clair was over 2 feet long.

214.    In the words of St. Clair Correctional Officer Jonathan Truitt, a single 24-person cell block at St. Clair could contain "30 to 40" contraband knives; contraband was "out of control"; and prisoners were being "being assaulted in every way imaginable." Cam Ward, Alabama Correctional Officer Numbers Down 20%, Montgomery Advertiser, Jan. 8, 2017.

215.    Staff at St. Clair frequently responded with deliberate indifference when prisoners were observed with contraband weapons and failed to discipline prisoners found with contraband weapons.

216. The failure to discipline prisoners in possession of contraband weapons created a dangerous culture whereby prisoners knew they could possess such weapons with impunity and felt emboldened to use such weapons without fear of incurring any disciplinary action.

217. As set forth above, knives, box cutters, and other contraband weapons were commonly used in assaults at St. Clair. Illustrative examples are set forth in paragraphs 105-149.

218. Despite this, Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, and Graham permitted contraband weapons to proliferate at St. Clair and took no meaningful action to curtail the widespread availability of contraband weapons at St. Clair, exhibiting deliberate indifference to prisoners such as D.S. who were likely to be victimized by such weapons.

219. In the months leading up to the attack on D.S., contraband searches continued to be ineffective and sporadic.

220. Defendant Culliver has admitted that the contraband search protocols at St. Clair were inadequate.

221. As of January 2019, Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, and Graham had made no meaningful changes to increase and improve contraband searches at St. Clair.

222. As of January 2019, Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, and Graham had made no meaningful changes to improve discipline for prisoners found with contraband weapons at St. Clair.

223. These Defendants acted with deliberate indifference and their misconduct placed vulnerable prisoners such as D.S. at substantial risk of serious harm and caused his injuries.

**Defendants' Failure to Protect Vulnerable Prisoners from Enemies**

224. Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, Estelle and Ary had an unreasonable and longstanding policy and practice of failing to protect prisoners who had been subject to victimization while in ADOC custody such as D.S., and failing to separate prisoners such as D.S. from known enemies and other predatory and violent prisoners.

225. These Defendants maintained these policies and practices even though they knew that the commingling of enemies in housing units results in foreseeable violence, and the failure to adequately protect vulnerable prisoners, separate prisoners known to be enemies, and segregate predatory prisoners had contributed to many violent incidents in the past, such as those described in paragraphs 117b, 132c, 113b, 137, 141, 113e, 121b, 124, 128a, 133, 136, 135.

226. These Defendants, through their acts and omissions, failed to implement effective classification and housing policies, thereby resulting in violence caused by commingling prisoners who should have been kept separate.

227. For example, D.S. was known to be vulnerable, having been victimized both at Holman and Donaldson.

228. D.S. was also known to have enemies related to his assaults at Holman and Donaldson.

229. D.S. was also specifically identified as a likely PREA victim prior to his assault at St. Clair because of his history of victimization.

230. Nonetheless, D.S. was housed along with his enemies in general population, in a poorly-supervised housing block at St. Clair.

231. Defendants Dunn, Culliver, Daniels, Williams, Ellington, Vincent, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Gordy, Ragsdale, Estelle, and Ary acted with deliberate indifference and their misconduct placed vulnerable prisoners such as D.S. at substantial risk of serious harm and caused his injuries.

**Defendants' Failure to Adequately Respond to and
Discipline Instances of Prisoner Misconduct**

232. Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, and Estelle, through their acts and omissions, failed to properly respond to and discipline prior instances of prisoner misconduct in the time period leading up to Plaintiff's assault at St. Clair.

233. ADOC staff failed to properly investigate and discipline acts of violence by prisoners at St. Clair, emboldening violent prisoners such as D.S.'s assailants. Illustrative examples of these failures are described in paragraphs 113d, 123c, 121d, 126, 133, 136, 138i, and 140c.

234. ADOC staff routinely discouraged victims from reporting incidents of violence or threats of violence at St. Clair, such as in the illustrative incidents described in paragraphs 136, 133, and 96.

235. ADOC staff routinely retaliated against prisoners who reported violence and threats of violence by subjecting such prisoners to discipline in conjunction with the prisoners' reports of violence and threats of violence. This retaliation had the effect of deterring prisoners from reporting violence and threats of violence.

236. In many cases, prisoners were subjected to discipline for refusing to name the individuals who they feared might harm them, such as in the illustrative incident described at paragraph 149.

237.    St. Clair did not have an established grievance system, substantially limiting prisoners' ability to report threats of violence or sexual abuse.

238.    ADOC staff responded with deliberate indifference when prisoners were extorted by other prisoners at St. Clair, resulting in serious physical injuries and sexual abuse.

239.    These failures created a dangerous culture of violence at St. Clair, which, in turn, posed a substantial risk of serious harm to prisoners such as D.S.

240.    Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, and Estelle were on notice of these failures, as well as the substantial risk of serious harm that resulted for prisoners such as D.S.

241.    Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, and Estelle were put on notice of the culture of violence at St. Clair through their roles at St. Clair and ADOC, internal ADOC reports, communications with staff and prisoners, lawsuits, and media coverage.

242.    Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, and Estelle were also put on notice of the culture of violence at St. Clair through EJI's *Duke* Complaint, which described in detail the existence of the culture of abuse and excessive force and the resulting risks to prisoners such as D.S.

243.    The Defendant ADOC Supervisors and Defendant St. Clair Facility Supervisors fostered the culture of violence at St. Clair through their acts and omissions.

244.    For example, Defendants Dunn, Culliver, Daniels, Williams, Ellington, Vincent, and Jones failed to act provide an established grievance system at St. Clair.

245. Defendants Jones, Givens, Brooks, Sanders, Malone, White, and Graham, through their acts and omissions, discouraged victims from reporting incidents of violence or threats of violence at St. Clair.

246. Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, and Ragsdale, through their acts and omissions, failed to ensure proper investigation and discipline of violence by prisoners, emboldening violent prisoners such as D.S.'s assailants.

247. Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, and Ragsdale, through their acts and omissions, also failed to prevent prisoners from extorting other prisoners, resulting in serious physical injuries and sexual abuse and presenting a substantial risk of serious harm to prisoners at St. Clair.

248. Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, and Estelle acted with deliberate indifference and their misconduct placed vulnerable prisoners such as D.S. at substantial risk of serious harm and caused his injuries.

### Defendants' Failure to Adequately Prevent, Detect, and Respond to Prior Instances of Sexual Abuse at St. Clair

249. Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, Estelle, and Ary also failed, through their acts and omissions, to protect prisoners at St. Clair such as D.S. from sexual abuse.

250. Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, Estelle, and Ary, through their acts and omissions, allowed for widespread prisoner-on-prisoner sexual abuse to occur at St. Clair without taking reasonable measures to keep prisoners such as D.S. safe from such abuse.

251.    At the time of D.S.'s rape, all of the St. Clair Defendants, including Defendants Vincent, Gordy, Jones, Ragsdale, Estelle, and Ary, were aware of the high rate of incidents of sexual violence at St. Clair, including the sexual assaults at St. Clair identified above, which all took place between January 2017 and January 2019.

252.    All of the St. Clair Defendants were also aware that numerous sexual assaults at St. Clair had gone unreported.

253.    Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, Estelle, and Ary likewise knew at the time of D.S.'s rape that St. Clair's policies and procedures, including inadequate supervision and monitoring in dangerous housing units, the proliferation of weapons contraband, the failure to protect vulnerable prisoners from enemies and predatory prisoners, the failure to discipline instances of prisoner misconduct, and the creation and encouragement of a culture of violence and abuse, all created a substantial risk of serious harm from sexual violence to vulnerable prisoners.

254.    EJI's *Duke* lawsuit and individual prisoner lawsuits further put Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, Estelle, and Ary on notice of the prevalence of prisoner-on-prisoner sexual violence at St. Clair, as well as the inadequacies of the policies and practices at St. Clair related to the detection, prevention, and response to incidents of sexual violence.

255.    Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, Estelle, and Ary were also well aware of their obligations to address sexual abuse at St. Clair and to reduce the substantial risk of serious harm to prisoners such as D.S.

256.    In 2003, Congress passed the Prison Rape Elimination Act of 2003, cautioning that "[s]tates that do not take basic steps to abate prison rape" demonstrate deliberate indifference to prisoners' constitutional rights. 42 U.S.C. § 15601(13).

257.    PREA, in turn, established a body known as the National Prison Rape Elimination Commission ("NPREC") to investigate prison rape. NPREC's 2009 report found that: "Sexual abuse is not an inevitable feature of incarceration. Leadership matters because corrections administrators can create a culture within facilities that promotes safety instead of one that tolerates abuse." National Prison Rape Elimination Commission Report, June 2009, at 5 (available at https://www.ncjrs.gov/pdffiles1/226680.pdf). The NPREC report, too, issued findings on the importance of proper classification, supervision, staffing, and responses to complaints of rape. *Id.* at 5-8.

258.    PREA also resulted in the 2011 promulgation of the National PREA Standards, which imposed requirements on correctional facilities in such areas as supervision and monitoring, screening for risk of victimization and abusiveness, proper official responses following an inmate report of sexual assault, and disciplinary sanctions for perpetrators. *See* 28 C.F.R. § 115.11 - 115.18 (standards for adult prisons and jails).

259.    As Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, Estelle, and Ary were aware, PREA, the PREA National Standards, and ADOC's 2014 PREA policy required Defendants to fulfill their obligation to protect prisoners in ADOC custody from sexual assault.

260.    Nonetheless, these Defendants were deliberately indifferent to the substantial risk of serious harm that sexual violence posed to prisoners such as D.S.

261.     Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, Estelle, and Ary continued and maintained general policies and practices that heightened the risk of sexual assault, including inadequate supervision, deficient security, inadequate search procedures to eliminate weapons contraband, failure to safely house prisoners who express fear, and encouragement of violence.

262.     Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, Estelle, and Ary also fostered a longstanding and unreasonable policy and practice pursuant to which St. Clair staff failed to identify and segregate known or likely perpetrators of sexual violence to ensure the safety of other prisoners at St. Clair.

263.     Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, Estelle, and Ary failed to adequately and effectively segregate predatory prisoners even though they knew that the failure to do so had contributed to violence in the past.

264.     Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, Estelle, and Ary likewise did not protect victims from retaliation, including by providing sight and sound separation between the victims and their assailants and by protecting victims from gang associates of their assailants.

265.     For those prisoners courageous enough to report rapes at St. Clair, retaliation frequently followed from their assailants or associates of their assailants, and Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, Estelle, and Ary took no meaningful steps to prevent or address this retaliation.

266.     Furthermore, Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, Estelle, and Ary engaged in a longstanding practice of placing prisoners who report sexual abuse in isolation cells in segregation which discouraged prisoner reports of sexual abuse, and, in turn, increased the risk of sexual assault and undermined the ability of staff to detect and prevent sexual abuse.

267.     Furthermore, when prisoners reported sexual assaults, the Defendant ADOC Supervisors and Defendant St. Clair Facility Supervisors such as Defendants Dunn and Jones failed to ensure that thorough investigations were completed of those sexual assault complaints, victims were notified of the results of investigations, and perpetrators were disciplined.

268.     St. Clair Defendants including Vincent, Gordy, and Ragsdale also regularly declined to ensure that sexual assault victims were provided with mental health treatment, proper forensic medical examinations, adequate post-incident medical care, and/or testing for sexually transmitted infections.

269.     The failure of Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, Estelle, and Ary to properly prevent or respond to incidents of sexual assault emboldened perpetrators and heightened the risk of sexual violence to prisoners such as D.S.

270.     Despite the prevalence of sexual assault at St. Clair prior to D.S.'s rape, and their knowledge of the same, Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, Estelle, and Ary failed to implement any corrective action to reduce the substantial risk of serious harm to prisoners such as D.S., exhibiting deliberate indifference to their safety.

271.    These Defendants acted with deliberate indifference and their misconduct placed vulnerable prisoners such as D.S. at substantial risk of serious harm and caused his injuries.

**Defendants' Failure to Respond to and Discipline**
**Excessive Force at St. Clair**

272.    Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, McMillian, and McLemore also fueled a culture of abuse at St. Clair by tolerating and condoning excessive uses of force by staff members, and in the case of Defendants Malone, McMillian, and McLemore, engaging in excessive force and abusive tactics themselves.

273.    These Defendants' acts and omissions created a culture of abuse at St. Clair in which staff used excessive force against prisoners with impunity.

274.    For example:

a.    In March 2017, Officer Howard and other officers assaulted a prisoner with severe mental health needs after he told them he thought his skin was falling off. The officers sprayed the prisoner with mace, beat him with handcuffs, and left him in his cell for three days rather than taking him to the infirmary. He was subsequently rushed to the hospital because his esophagus closed up. Defendant Malone was present during the assault.

b.    In June 2017, a prisoner was sprayed with a large volume of mace in his cell at the direction of Defendant Malone after officers discovered a broken window in his cell. He was left alone in the cell with mace for approximately one hour despite having asthma.

c.  In August 2017, guards assaulted an 84-year-old prisoner who was confined to a wheelchair. He had to be taken to an outside hospital due to the severity of his injuries.

d.  In November 2017, an officer slapped a prisoner without provocation in front of a large group of officers and incarcerated men before a meeting of the segregation board. The officer had previously been encouraged by other officers to "slap [prisoners] upside the head" whenever they "talk crazy."

e.  In November 2017, a handcuffed prisoner was beaten by officers in the segregation yard.

f.  In December 2017, Defendant McMillian and Defendant McLemore assaulted a handcuffed prisoner in D block. The prisoner had requested to be taken to a suicide cell, and the officers punched him in the face, head, and body for multiple minutes.

g.  In January 2018, Sergeant Weaver and other officers assaulted a prisoner after he reported fearing for his life and requesting to be placed in segregation. Sgt. Weaver and the officers dragged the prisoner by his feet from the shift office, struck him in the head, and sprayed him with mace. Officer Walker witnessed the event and did nothing to intervene.

h.  In March 2018, Defendant McLemore and others handcuffed a prisoner in the infirmary, sprayed him with a large volume of Sabre Red chemical agent so that he could not see clearly, and then proceeded to punch and kick his entire body for over 10 minutes, using particularly violence against his head, face, and testicles. The prisoner has experienced ongoing injuries, including difficulty with his vision.

i. Also in March 2018, a prisoner was assaulted by Officer Chapman at a meeting of the segregation board. The prisoner reportedly made a statement about an officer during his segregation board hearing, and Officer Chapman interjected that he was lying and slammed him forcefully into the doorframe while other officers watched. The prisoner's nose was broken in the incident, and he was then disciplined for failure to obey a direct order for leaving the place prisoners are forced to stand during their segregation board hearings.

j. In May 2018, a prisoner was assaulted by officers after he cut his wrists in segregation, where he had been placed after suffering a sexual assault several days earlier. He was struck in the face while handcuffed by Sgt. Dent and then had his head slammed into a brick wall by Officer Jones.

k. Also in May 2018, Sgt. Dent assaulted a prisoner in B block, breaking his jaw.

l. In August 2018, Sgt. Dent, Officer Kendrick, and Defendant McMillian assaulted a prisoner in B block after he asked to be moved from the top tier to the lower tier.

m. In September 2018, a prisoner made a comment that an officer interpreted as disrespectful, so the officer tried to have his cell assignment changed so he would be next to a prisoner who had previously stabbed him. When the prisoner refused to go, Defendant Malone sprayed him with Sabre Red chemical agent and wrote a false report that the prisoner had threatened to kill an officer and charged at him.

n. In October 2018, Sgt. Dent, Officer Burns, and Officer Kendrick attacked a prisoner who had been beating on his cell door trying to get help after smoking a cigarette that had been laced with methamphetamine without his knowledge. The officer sprayed him with mace, picked him up by the handcuffs and ankle cuffs, scraped

him on the concrete, and beat on him while he was on the ground. He was taken to an outside hospital for treatment.

o. In December 2018, Sgt. Dent sprayed a prisoner in the face with mace and then forced the prisoner to go outside with his hands and feet shackled, while it was sleeting and the prisoner was wearing only boxer shorts.

p. In early January 2019, Defendant McLemore sprayed a prisoner in B block, left him for more than 30 minutes without decontaminating him, then told him to cuff up forcing him to remove the splint he wore for carpal tunnel syndrome. As the prisoner walked out of the cell in cuffs, Defendant McLemore jumped him from behind, busting his head open and injuring his arm. Defendant Malone had Defendant McLemore take photos of the prisoner after the assault. The prisoner was then written up for disorderly conduct and disobeying a direct order.

275. Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, McMillian, and McLemore were on notice of the culture of abuse, as well as the incidents identified above, through internal sources including direct observation, internal communications, use-of-force reports, incident reports, duty officer reports, and medical reports, and external sources such as the *Duke* Complaint.

276. The failure to discipline officers for excessive force and other misconduct signaled to the correctional officers at St. Clair that they could abuse, or fail to protect, prisoners without fear of any adverse consequences.

277. The culture of impunity regarding officer uses of force and pervasive excessive force incidents by officers signaled to prisoners at St. Clair that they could abuse other prisoners without fear of any adverse consequences.

278. Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, McMillian, and McLemore were on notice of the culture of abuse at St. Clair through their roles at St. Clair and ADOC, internal ADOC reports, communications with staff and prisoners, prisoner lawsuits, and media coverage.

279. Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, and Graham were also on notice of this culture of abuse through EJI's *Duke* Complaint, which described in detail the ways in which Defendants fostered and encouraged a culture of abuse at St. Clair and the resulting risks to prisoners.

280. The failure to respond to and discipline excessive force conduct created a dangerous culture of violence at St. Clair, which, in turn, heightened the risk of prisoner assaults on vulnerable prisoners such as D.S.

281. Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, McMillian, and McLemore acted with deliberate indifference and their misconduct placed vulnerable prisoners such as D.S. at substantial risk of serious harm and caused his injuries.

## PLAINTIFF'S DAMAGES

282. As a result of the Defendants' wrongful actions described above, Plaintiff has suffered severe physical and emotional trauma and injuries.

## CLAIMS

### Count I - 42 U.S.C § 1983
### Eighth Amendment Failure to Protect
### Against Defendants Dunn, Culliver, Daniels, Williams, and Ellington
### Policy and Practice Liability Based on Deliberate Indifferent to Prisoners Including D.S.

283.     Pursuant to the Eighth Amendment of the United States Constitution, Plaintiff was entitled to be free from a substantial risk of serious harm while in the custody of the ADOC at St. Clair.

284.     Defendants Dunn, Culliver, Daniels, Williams, and Ellington knew of and consciously disregarded the substantial risk that D.S. would be seriously harmed while in custody and failed to protect D.S. from harm at St. Clair.

285.     D.S. faced a substantial risk of serious harm at St. Clair, as described in paragraphs 43-45, 50-51, 52-77, 78-97, 98-180, 182-201, 207-217, 219-220, 224-225, 232-247, 251-254, 261-270, and 272-280.

286.     Defendants Dunn, Culliver, Daniels, Williams, and Ellington were the highest-ranking supervisors at ADOC with the power and responsibility to shape and address the crisis of prisoner-on-prisoner violence at St. Clair. As set forth in more detail in paragraphs 16-21 and 23, each of these Defendants was responsible for identifying safety and security concerns within ADOC and at St. Clair, and making adjustments to the policies and training to address such concerns. Defendants Dunn, Culliver, Daniels, and Williams were responsible for ensuring that ADOC had in place and actually enforced adequate policies and training related to supervision and security, especially in the P/Q blocks of St. Clair; contraband control; classification and housing of prisoners; discipline for acts of violence by both staff and prisoners; and the prevention, detection, and response to sexual abuse.

287.    As set out in more detail in paragraph 21, Defendant Ellington was similarly responsible for setting and managing the implementation of these policies and training at St. Clair, as well conducting audits and assessments of the safety and security at St. Clair and managing and implementing corrective action plans to address risks identified by those audits and assessments.

288.    Defendants Dunn, Culliver, Daniels, Williams, and Ellington were each subjectively aware of the substantial risk of serious harm to prisoners such as D.S. at St. Clair, where violence was the norm and terror reigned, particularly in the P/Q blocks, as described in paragraphs 150-180, 75, and 98-149. Defendants Dunn, Culliver, Daniels, Williams, and Ellington were each also subjectively aware of the dangerous conditions fueling the horrific violence at St. Clair, as described in paragraphs 182-201, 207-217, 219-220, 224-225, 232-247, 250-254, 261-270, 272-280.

289.    Instead of protecting prisoners such as D.S., Defendants Dunn, Culliver, Daniels, Williams, and Ellington promulgated, implemented, ratified, promoted, and encouraged dangerous policies and customs that fueled St. Clair's violence; permitted their subordinates to do the same, without training or correction; and failed to take any meaningful corrective actions to remedy dangerous conditions or protect prisoners such as D.S. from the foreseeable violence that resulted, with respect to:

   a.  inadequate supervision and monitoring of prisoners, as described in paragraphs 181-205, 113d, 121d, 123c, 126, 133, 138i, 140a, and 140c;

   b.  the proliferation of contraband weapons, as described in paragraphs 206-223, 155, 169-70, 174, 178, 184, and 105-149;

   c.  housing of prisoners alongside their known and documented enemies and failing to ensure that prisoners who were likely to perpetrate violence were safely segregated

from likely victims, as described in paragraphs 224-231, 262-63, 117b, 113b, and 124;

    d.  a failure to ensure that prisoners were disciplined for acts of violence, as described in paragraphs 232-248;

    e.  failures to prevent, detect, and properly respond to sexual abuse and prevent retaliation against reporting victims, as described in paragraphs 249-271, 233-239, 108, 113b, 117a, 118, 119b, 119c, 120, 121a, 121c, 122, 124, 126, 128d, 130a, 132b, 133, 134b, 135, 136, 137, 139, 144a, and 149; and,

    f.  the promotion of a culture of violence and abuse, as described in paragraphs 272-281.

290.    Defendants Dunn, Culliver, Daniels, Williams, and Ellington also knew that their subordinates failed to properly monitor prisoners or intervene during assaults (as described in paragraphs 181-205, 113d, 121d, 123c, 126, 133, 138i, 140a, and 140c); failed to conduct contraband searches or discipline contraband possession (as described in paragraphs 206-23, 155, 169-70, 174, 178, 184, 105-49); failed to protect vulnerable prisoners from enemies (as described in paragraphs 224-31, 262-63, 117b, 113b, and 124); failed to properly respond to prisoner misconduct (as described in paragraphs 232-248); responded improperly to sexual violence, declined to discipline sexual violence, and retaliated against reporting victims (as described in paragraphs 249-71, 232-38, 113b, 120, 124, 126, 132b, 133, 135, 136, 137, 149, 78-97); and abused prisoners themselves, emboldening perpetrators (as described in paragraphs 272-81). Nonetheless, Defendants failed to correct their subordinates' conduct.

291.    The actions and omissions of Defendants Dunn, Culliver, Daniels, Williams, and Ellington described in this Count were undertaken with deliberate indifference, malice,

willfulness, and/or reckless indifference to the rights of prisoners such as D.S. and were objectively unreasonable.

292.    The actions and omissions of Defendants Dunn, Culliver, Daniels, Williams, and Ellington described in this Count directly and proximately caused D.S. to be subjected to a substantial risk of serious harm and to suffer horrific physical and emotional injuries.

**Count II - 42 U.S.C § 1983**
**Eighth Amendment Failure to Protect**
**Against Defendants Jones, Givens, Brooks, Sanders, Malone, White, Graham**
**Policy and Practice Liability Based on Deliberate Indifferent to Prisoners Including D.S.**

293.    Pursuant to the Eighth Amendment of the United States Constitution, Plaintiff was entitled to be free from a substantial risk of serious harm while in the custody of the ADOC at St. Clair.

294.    Defendants Jones, Givens, Brooks, Sanders, Malone, White, and Graham knew of and consciously disregarded the substantial risk that D.S. would be seriously harmed while in custody and failed to protect D.S. from harm at St. Clair.

295.    D.S. faced a substantial risk of serious harm at St. Clair, as described in paragraphs 43-45, 50-51, 52-77, 78-97, 98-180, 182-201, 207-217, 219-220, 224-225, 232-247, 251-254, 261-270, and 272-280.

296.    Defendants Jones, Givens, Brooks, Sanders, Malone, White, and Graham were the highest-ranking on-the-ground supervisors at St. Clair with the power and responsibility to shape and address the crisis of prisoner-on-prisoner violence at St. Clair.

297.    As described in more detail in paragraph 25, as Warden III, Defendant Jones was responsible for setting St. Clair policy and implementing and enforcing both ADOC and St. Clair policy and training at the facility related to supervision and security, especially in the P/Q blocks;

contraband control; classification and housing of prisoners; discipline for acts of violence by both staff and prisoners; and the prevention, detection, and response to sexual abuse.

298. As described in more detail in paragraph 26, as Warden II, Defendant Givens was responsible for the day-to-day implementation and enforcement of these policies by subordinate staff and enforcing the policies when they were not followed; reviewing all reclassification recommendations for St. Clair prisoners; managing and carrying out adequate contraband searches; and conducting inspections to identify safety and security issues.

299. As described in more detail in paragraph 27, as Warden I, Defendant Brooks was responsible for writing, implementing, and enforcing policies at St. Clair related to supervision and security, especially in the P/Q blocks; contraband control; classification and housing of prisoners; discipline for acts of violence by both staff and prisoners; and the prevention, detection, and response to sexual abuse. He was also responsible for conducting inspections to identify safety and security issues at the facility and ensuring that prisoners were safely housed.

300. As described in more detail in paragraphs 28-31, as captains, Defendants Sanders, Malone, White, and Graham were responsible for the safety and security of all prisoners at St. Clair, including implementing ADOC and St. Clair policy and ensuring that subordinate staff were carrying out all their responsibilities under ADOC and St. Clair policy and procedure, including related to contraband searches and confiscation; safe classification and housing of prisoners; discipline of acts of violence; supervision of the facility including the housing units; and the prevention, identification, and response to sexual abuse at the facility.

301. Defendants Jones, Givens, Brooks, Sanders, Malone, White, and Graham were each subjectively aware of the substantial risk of serious harm to prisoners such as D.S. at St. Clair, where violence was the norm and terror reigned, particularly in the P/Q blocks, as described in

paragraphs 75 and 98-180. Defendants Jones, Givens, Brooks, Sanders, Malone, White, and Graham were each also subjectively aware of the dangerous conditions fueling the horrific violence, as described in paragraphs 182-201, 207-217, 219-220, 224-225, 232-247, 250-254, 261-270, 272-280.

302. Instead of protecting prisoners such as D.S., Defendants Jones, Givens, Brooks, promulgated, implemented, ratified, promoted, and encouraged dangerous policies and customs that fueled St. Clair's violence; permitted their subordinates to do the same, without training or correction; and failed to take any meaningful corrective actions to remedy dangerous conditions or protect prisoners such as D.S. from the foreseeable violence that resulted, with respect to:

    a. inadequate supervision and monitoring of prisoners, as described in paragraphs 181-205, 113d, 121d, 123c, 126, 133, 138i, 140a, and 140c;

    b. the proliferation of contraband weapons, as described in paragraphs 206-223, 155, 169-70, 174, 178, 184, and 105-149;

    c. housing of prisoners alongside their known and documented enemies and failing to ensure that prisoners who were likely to perpetrate violence were safely segregated from likely victims, as described in paragraphs 224-31, 262-63, 117b, 113b, and 124;

    d. a failure to ensure that prisoners were disciplined for acts of violence, as described in paragraphs 232-248;

    e. failures to prevent, detect, and properly respond to sexual abuse and prevent retaliation against reporting victims, as described in paragraphs 249-271, 233-39, 108, 113b, 117a, 118, 119b, 119c, 120, 121a, 121c, 122, 124, 126, 128d, 130a, 132b, 133, 134b, 135, 136, 137, 139, 144a, and 149; and,

f. the promotion of a culture of violence and abuse, as described in paragraphs 272-81.

303. Instead of protecting prisoners such as D.S., Defendants Sanders, Malone, White, and Graham, implemented, promoted, and encouraged dangerous policies and customs that fueled St. Clair's violence; permitted their subordinates to do the same, without training or correction; and failed to take any meaningful corrective actions to remedy dangerous conditions or protect prisoners such as D.S. from the foreseeable violence that resulted, with respect to:

a. inadequate supervision and monitoring of prisoners, as described in paragraphs 181-205, 113d, 121d, 123c, 126, 133, 138i, 140a, and 140c;

b. the proliferation of contraband weapons, as described in paragraphs 206-223, 155, 169-70, 174, 178, 184, and 105-149;

c. housing of prisoners alongside their known and documented enemies and failing to ensure that prisoners who were likely to perpetrate violence were safely segregated from likely victims, as described in paragraphs 224-31, 262-63, 117b, 113b, and 124;

d. a failure to ensure that prisoners were disciplined for acts of violence, as described in paragraphs 232-248;

e. failures to prevent, detect, and properly respond to sexual abuse and prevent retaliation against reporting victims, as described in paragraphs 249-271, 233-39, 108, 113b, 117a, 118, 119b, 119c, 120, 121a, 121c, 122, 124, 126, 128d, 130a, 132b, 133, 134b, 135, 136, 137, 139, 144a, and 149; and,

f. the promotion of a culture of violence and abuse, as described in paragraphs 272-81.

304.     These Defendants also knew that their subordinates failed to properly monitor prisoners or intervene during assaults (as described in paragraphs 181-205, 113d, 121d, 123c, 126, 133, 138i, 140a, and 140c); failed to conduct contraband searches or discipline contraband possession (as described in paragraphs 206-23, 155, 169-70, 174, 178, 184, and 105-49); failed to protect vulnerable prisoners from enemies (as described in paragraphs 224-31, 262-63, 117b, 113b, and 124); failed to properly respond to prisoner misconduct (as described in paragraphs 232-248); responded improperly to sexual violence, declined to discipline sexual violence, and retaliated against reporting victims (as described in paragraphs 249-71, 232-38, 113b, 120, 124, 126, 132b, 133, 135, 136, 137, 149); and abused prisoners themselves, emboldening perpetrators (as described in paragraphs 272-81). Nonetheless, Defendants failed to correct their subordinates' conduct.

305.     The actions and omissions of Defendants Jones, Givens, Brooks, Sanders, Malone, White, and Graham described in this Count were undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of D.S. and were objectively unreasonable.

306.     The actions and omissions of Defendants Jones, Givens, Brooks, Sanders, Malone, White, and Graham described in this Count directly and proximately caused D.S. to be subjected to a substantial risk of serious harm and to suffer horrific physical and emotional injuries.

### Count III - 42 U.S.C § 1983
### Eighth Amendment Failure to Protect
### Against Defendants Jones, Givens, Brooks, Malone and White
### Liability Based on Deliberate Indifference to D.S.'s Individualized Risks

307.     Pursuant to the Eighth Amendment of the United States Constitution, Plaintiff was entitled to be free from a substantial risk of serious harm while in the custody of the ADOC at St. Clair.

308. D.S. faced a substantial risk of serious harm at St. Clair, as described in paragraphs 43-45, 50-51, 52-77, 78-97, 98-180, 182-201, 207-217, 219-220, 224-225, 232-247, 251-254, 261-270, and 272-280.

309. Defendants Jones, Givens, Brooks, Malone, and White knew of and consciously disregarded the substantial risk that D.S. in particular would be seriously harmed while in custody and failed to protect D.S. from harm at St. Clair.

310. Defendant Jones knew that D.S. was particularly vulnerable. Defendant Jones knew from D.S.'s file, transfer documents, and D.S. himself that he had a history of being victimized and violently assaulted while in ADOC custody, including at Holman and Donaldson, as set out in paragraphs 43-44, 52-54, 56-58, 60. Defendant Jones knew that D.S. had been classified as a PREA victim and had various known enemies, and Defendant Jones was told directly by D.S. that he had known enemies incarcerated with him at St. Clair, as set out in paragraphs 56, 62.

311. Defendant Givens also knew that D.S. was particularly vulnerable. Defendant Givens knew from D.S.'s file, transfer documents, and D.S. himself that he had a history of being victimized and violently assaulted while in ADOC custody, including at Holman and Donaldson, as set out in paragraphs 43-44, 52-54, 57-58, 60, 73. Defendant Givens knew that D.S. has been classified as a PREA victim and had various known enemies, and Defendant Givens was told directly by D.S. that he had known enemies incarcerated with him at St. Clair, as set out in paragraphs 62, 73.

312. Defendant Brooks also knew that D.S. was particularly vulnerable. Defendant Brooks knew from D.S.'s file, transfer documents, and D.S. himself that he had a history of being victimized and violently assaulted while in ADOC custody, including at Holman and Donaldson, as set out in paragraphs 43-44, 52-54, 56-58, 60. Defendant Brooks knew that D.S. had various

known enemies, and Defendant Brooks was told directly by D.S. that he had known enemies incarcerated with him at St. Clair, as set out in paragraphs 56.

313. Defendant White also knew that D.S. was particularly vulnerable. Defendant White knew from D.S.'s file, transfer documents, and D.S. himself that he had a history of being victimized and violently assaulted while in ADOC custody, including at Holman and Donaldson, as set out in paragraphs 43-44, 52-54, 56-58, 60. Defendant White knew that D.S. had various known enemies, and Defendant White was told directly by D.S. that he had known enemies incarcerated with him at St. Clair and that, once in general population, he was being threatened by his enemies and their associates, as set out in paragraphs 56, 69-70.

314. Defendant Malone also knew that D.S. was particularly vulnerable. Defendant Malone knew from D.S.'s file, transfer documents, and D.S. himself that he had a history of being victimized and violently assaulted while in ADOC custody, including at Holman and Donaldson, as set out in paragraphs 43-44, 52-54, 56-58, 60. Defendant Malone knew that D.S. had various known enemies, and Defendant Malone was told directly by D.S. that he had known enemies incarcerated with him at St. Clair, as set out in paragraphs 56, 66-70.

315. Defendants Jones, Givens, Brooks, Malone and White also knew that the risk of harm to D.S. was heightened by the dangerous conditions at St. Clair, in general population and most acutely in the "hot bay" P/Q unit, as described in paragraphs 75, 98-205. They further knew that the risk was especially significant that he would suffer additional assaults, including from his enemies and associates, in such conditions given his particular vulnerabilities.

316. Despite their knowledge of the risks posed to D.S. specifically, Defendants Jones, Givens, Brooks, Malone, and White failed to take any action to protect him from an assault, including from his enemies and their associates. Instead, these Defendants authorized D.S.'s

release to general population or sent D.S. to general population, where they knew he was at serious risk of severe harm, as set out in paragraphs 63-64, 76-77.

317.     The actions and omissions of Defendants Jones, Givens, Brooks, Malone, and White described in this Count were undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of D.S. and were objectively unreasonable.

318.     The actions and omissions of Defendants Jones, Givens, Brooks, Malone, and White described in this Count directly and proximately caused D.S. to be subjected to a substantial risk of serious harm and to suffer horrific physical and emotional injuries.

**Count IV – 42 U.S.C. § 1983**
**Eighth Amendment Failure to Protect**
**Against Defendants Vincent, Gordy, and Ragsdale**
**Policy and Practice Liability Based on Deliberate Indifferent to Prisoners Including D.S.**

319.     Pursuant to the Eighth Amendment of the United States Constitution, Plaintiff was entitled to be free from a substantial risk of serious harm while in the custody of the ADOC at St. Clair.

320.     Defendants Vincent, Gordy, and Ragsdale knew of and consciously disregarded the substantial risk that D.S. would be seriously harmed while in custody and failed to protect D.S. from harm at St. Clair.

321.     D.S. faced a substantial risk of serious harm at St. Clair, as described in paragraphs 43-45, 50-51, 52-77, 78-97, 98-180, 182-201, 207-217, 219-220, 224-225, 232-247, 251-254, 261-270, and 272-280.

322.     Defendants Vincent, Gordy, and Ragsdale were the ADOC PREA Director, the St. Clair Institutional PREA Compliance Manager, and the St. Clair Backup Institutional PREA Compliance Manager, respectively, with the power and responsibility to shape and address the crisis of sexual violence at St. Clair, as described in paragraphs 22, 32-33, 35-36.

323.    Specifically and as set out in more detail in paragraph 22, Defendant Vincent was responsible for managing the ADOC's implementation of PREA and its requirements at all ADOC facilities, including St. Clair, and for setting, implementing and enforcing policies that ensured that prisoners at St. Clair were adequately protected from incidents of sexual abuse; that when sexual abuse occurred, those incidents were properly addressed and prisoners were protected from further victimization and retaliation; and that staffing at St. Clair was sufficient to prevent and respond to incidents of sexual abuse.

324.    As set out in more detail in paragraphs 32-33, Defendants Gordy and Ragsdale were similarly responsible for ensuring that PREA's requirements were adequately implemented and enforced at St. Clair and for implementing and enforcing policies that ensured that likely victims of sexual abuse were separated from likely perpetrators, and that incidents of sexual abuse were properly addressed and prisoners were protected from further victimization and retaliation.

325.    Defendants Vincent, Gordy, and Ragsdale were each subjectively aware of the substantial risk of serious harm to prisoners such as D.S. at St. Clair from widespread violence and sexual assault at St. Clair (as described in paragraphs 75, 98-180, 249-54, 260-69, and 211-214) and of the dangerous conditions fueling the horrific violence (as described in paragraphs 182-201, 207-217, 219-220, 224-225, 232-247, 250-254, 261-270, 272-280).

326.    Instead of protecting prisoners such as D.S., Defendant Vincent promulgated, implemented, ratified, promoted, and encouraged dangerous policies and customs that fueled St. Clair's violence; permitted her subordinates to do the same, without training or correction; and failed to take any meaningful corrective actions to remedy dangerous conditions or protect prisoners such as D.S. from the foreseeable violence that resulted, with respect to:

a. the failure to prevent, detect, and properly respond to sexual abuse and prevent retaliation against reporting victims, as described in paragraphs 249-271, 233-39, 108, 113b, 117a, 118, 119b, 119c, 120, 121a, 121c, 122, 124, 126, 128d, 130a, 132b, 133, 134b, 135, 136, 137, 139, 144a, and 149;

b. the failure to protect prisoners who had been subject to victimization while in ADOC custody and housing vulnerable prisoners and documented likely PREA victims alongside their known enemies and other predatory and violent prisoners, as described in paragraphs 224-31, 262-63, 117b, 113b, and 124;

c. the failure to ensure that prisoners were disciplined and segregated for acts of violence, as described in paragraphs 232-248; and,

d. inadequate supervision and monitoring of prisoners, as described in paragraphs 181-205, 113d, 121d, 123c, 126, 133, 138i, 140a, and 140c.

327. Instead of protecting prisoners such as D.S., Defendants Gordy and Ragsdale implemented, promoted, and encouraged dangerous policies and customs that fueled St. Clair's violence; permitted their subordinates to do the same, without training or correction; and failed to take any meaningful corrective actions to remedy dangerous conditions or protect prisoners such as D.S. from the foreseeable violence that resulted, with respect to:

a. the failure to prevent, detect, and properly respond to sexual abuse and prevent retaliation against reporting victims, as described in paragraphs 249-271, 233-39, 108, 113b, 117a, 118, 119b, 119c, 120, 121a, 121c, 122, 124, 126, 128d, 130a, 132b, 133, 134b, 135, 136, 137, 139, 144a, and 149;

b. the failure to protect prisoners who had been subject to victimization while in ADOC custody and housing vulnerable prisoners and documented likely PREA

victims alongside their known enemies and other predatory and violent prisoners, as described in paragraphs 224-31, 262-63, 117b, 113b, and 124;

c.  the failure to ensure that prisoners were disciplined and segregated for acts of violence, as described in paragraphs 232-248; and,

d.  inadequate supervision and monitoring of prisoners, as described in paragraphs 181-205, 113d, 121d, 123c, 126, 133, 138i, 140a, and 140c.

328.  These Defendants also knew that their subordinates responded improperly to sexual assault, failed to discipline sexual violence, and retaliated against victims (as described in paragraphs 249-71, 232-38, 113b, 120, 124, 126, 132b, 133, 135, 136, 137, 149); failed to properly monitor prisoners or intervene during assaults (as described in paragraphs 181-205, 113d, 121d, 123c, 126, 133, 138i, 140a, and 140c); failed to protect vulnerable prisoners from enemies and separate likely perpetrators of violence from likely victims (as described in paragraphs 224-31, 262-63, 117b, 113b, and 124); and failed to properly respond to prisoner misconduct (as described in paragraphs 232-248). Nonetheless, these Defendants failed to correct their subordinates' conduct.

329.  The actions and omissions of Defendants Vincent, Gordy, and Ragsdale described in this Count were undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of D.S. and were objectively unreasonable.

330.  The actions and omissions of Defendants Vincent, Gordy, and Ragsdale described in this Count directly and proximately caused D.S. to be subjected to a substantial risk of serious harm and to suffer horrific physical and emotional injuries.

**Count V**
**Eighth Amendment Failure to Protect**
**Against Defendants Gordy and Ragsdale**
**Liability Based on Deliberate Indifference to D.S.'s Individualized Risks**

331.    Pursuant to the Eighth Amendment of the United States Constitution, Plaintiff was entitled to be free from a substantial risk of serious harm while in the custody of the ADOC at St. Clair.

332.    D.S. faced a substantial risk of serious harm at St. Clair, as described in paragraphs 43-45, 50-51, 52-77, 78-97, 98-180, 182-201, 207-217, 219-220, 224-225, 232-247, 251-254, 261-270, and 272-280.

333.    Defendants Gordy and Ragsdale knew of and consciously disregarded the substantial risk that D.S. would be seriously harmed while in custody and failed to protect D.S. from harm at St. Clair.

334.    Defendant Gordy knew, through D.S.'s file and directly from D.S. himself, that D.S. was particularly vulnerable; that he had a history of being victimized and violently assaulted while in ADOC custody including at Holman and Donaldson; that he had known enemies  and their associates at St. Clair related to the Holman and Donaldson assaults; that he had been designated as a PREA victim; and therefore, that he was at a high risk of suffering additional assaults, as set out in paragraphs 57-58, 60, 62, 71-72.

335.    Defendant Ragsdale also knew, through D.S.'s file and transfer reports, that D.S. was particularly vulnerable; that he had a history of being victimized and violently assaulted while in ADOC custody including at Holman and Donaldson; that he had known enemies and their associates at St. Clair related to the Holman and Donaldson assaults; and that he had been designated as a PREA victim; and, therefore, that he was at a high risk of suffering additional assaults, as set out in paragraphs 57-58, 60, 62.

336. Nonetheless, Gordy and Ragsdale caused the vulnerable D.S. to be housed in general population alongside enemies and their associates likely to commit violence against him, as described in paragraphs 62-64, 74-77.

337. After the assault and rape of D.S. at St. Clair, Defendant Gordy caused Plaintiff to yet *again* be housed alongside his enemies and their associates, where he was subject to additional harm, as described in paragraphs 90-97.

338. The actions and omissions of Defendants Gordy and Ragsdale described in this Count were undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of D.S. and were objectively unreasonable.

339. The actions and omissions of Defendants Gordy and Ragsdale described in this Count directly and proximately caused D.S. to be subjected to a substantial risk of serious harm and to suffer horrific physical and emotional injuries.

**Count VI**
**Eighth Amendment Failure to Protect**
**Against Defendant Estelle**
**Policy and Practice Liability Based on Deliberate Indifferent to Prisoners Including D.S.**

340. Pursuant to the Eighth Amendment of the United States Constitution, Plaintiff was entitled to be free from a substantial risk of serious harm while in the custody of the ADOC at St. Clair.

341. Defendant Estelle knew of and consciously disregarded the substantial risk that D.S. would be seriously harmed while in custody and failed to protect D.S. from harm at St. Clair.

342. D.S. faced a substantial risk of serious harm at St. Clair, as described in paragraphs 43-45, 50-51, 52-77, 78-97, 98-180, 182-201, 207-217, 219-220, 224-225, 232-247, 251-254, 261-270, and 272-280.

343.     As set out in greater detail in paragraph 34, Defendants Estelle was the Head of Classification at St. Clair, and she was responsible for setting, implementing and enforcing policies with regard to the safe classification and housing of prisoners at St. Clair, reviewing and adjusting the classification and housing assignments of prisoners at the facility, and ensuring that subordinate classification staff were following policy and safely classifying and housing prisoners at St. Clair.

344.     Defendant Estelle was subjectively aware of the substantial risk of serious harm to prisoners such as D.S. at St. Clair from widespread violence at St. Clair (as described in paragraphs 75, 98-180, 249-54, 260-69), and of the dangerous conditions fueling the horrific violence (as described at paragraphs 182-201, 207-217, 219-220, 224-225, 232-247, 250-254, 261-270, 272-280), including that the commingling of enemies leads to foreseeable violence and had caused many violent incidents in the past (as described in paragraphs 224-26, 253, and 262-63).

345.     Instead of protecting prisoners such as D.S., Defendant Estelle promulgated, implemented, ratified, promoted, and encouraged dangerous policies and customs that fueled St. Clair's violence; permitted her subordinates to do the same, without training or correction; and failed to take any meaningful corrective actions to remedy dangerous conditions or protect prisoners such as D.S. from the foreseeable violence that resulted, with respect to:

   a. housing of prisoners alongside their known and documented enemies, failing to ensure that prisoners who were likely to perpetrate violence were safely segregated from likely victims, and failing to protect prisoners who reported safety concerns, as described in paragraphs 224-31, 262-63, 117b, 113b, and 124, 253;

   b. failing to ensure that prisoners were disciplined and segregated for acts of violence, as described in paragraphs 232-248; and,

c. failing to prevent, detect, and properly respond to sexual abuse and prevent retaliation against reporting victims, as described in paragraphs 249-271, 233-39, 108, 113b, 117a, 118, 119b, 119c, 120, 121a, 121c, 122, 124, 126, 128d, 130a, 132b, 133, 134b, 135, 136, 137, 139, 144a, and 149.

346.     Defendant Estelle also knew that her subordinates failed to protect vulnerable prisoners from enemies (as described in paragraphs 224-31, 262-71, 117b, 113b, and 124); to properly respond to prisoner misconduct (as described in paragraphs 232-248); and to properly respond to and discipline sexual violence and protect reporting victims from retaliation (as described in paragraphs 249-71, 232-38, 113b, 120, 124, 126, 132b, 133, 135, 136, 137, 149). Nonetheless, Defendant Estelle failed to correct her subordinates' conduct.

347.     The actions and omissions of Defendant Estelle described in this Count were undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of D.S. and were objectively unreasonable.

348.     The actions and omissions of Defendant Estelle described in this Count directly and proximately caused D.S. to be subjected to a substantial risk of serious harm and to suffer horrific physical and emotional injuries.

**Count VII - 42 U.S.C § 1983**
**Eighth Amendment Failure to Protect**
**Against Defendants Estelle, Ary, and Bonner**
**Liability Based on Deliberate Indifference to D.S.'s Individualized Risks**

349.    Pursuant to the Eighth Amendment of the United States Constitution, Plaintiff was entitled to be free from a substantial risk of serious harm while in the custody of the ADOC at St. Clair.

350.    D.S. faced a substantial risk of serious harm at St. Clair, as described in paragraphs 43-45, 50-51, 52-77, 78-97, 98-180, 182-201, 207-217, 219-220, 224-225, 232-247, 251-254, 261-270, and 272-280.

351.    Defendants Estelle and Ary knew of and consciously disregarded the substantial risk that D.S. would be seriously harmed while in custody and failed to protect D.S. from harm at St. Clair.

352.    As set out in greater detail in paragraphs 34 and 37, Defendants Estelle and Ary were a classification supervisor and officer, respectively, in charge of the classification of D.S. Specifically, Defendants Estelle and Ary were responsible for reviewing D.S.'s file and reports related to D.S., identifying risks to his safety and security including through the identification of enemies, classifying D.S. and assigning him to a housing unit, and ensuring that he was safely housed while in ADOC custody despite having been designated a PREA victim.

353.    Defendants Estelle and Ary were each subjectively aware of the substantial risk of serious harm to prisoners such as D.S. at St. Clair from widespread violence at St. Clair (as described in paragraphs 75, 98-180, 249-54, 260-69), and of the dangerous conditions fueling the horrific violence (as described at paragraphs 182-201, 207-217, 219-220, 224-225, 232-247, 250-254, 261-270, 272-280), including that the commingling of enemies leads to

foreseeable violence and had caused many violent incidents in the past (as described in paragraphs 224-26, 253, and 262-63).

354. In addition, D.S. informed Estelle that he had enemies and their associates in population, as set out in paragraph 56. Through D.S.'s file, Defendants Ary and Estelle also knew of D.S.'s vulnerability, past assaults, and dangerous enemies and their associates at St. Clair and that D.S. had been identified as a PREA victim, as set out in paragraphs 57-60, 62-63.

355. Despite knowing that D.S. was at a high risk of suffering additional assaults, Defendants Estelle and Ary caused D.S. to be moved out of segregation into general population with his enemies and their associates, leading to his foreseeable assault there, as described in paragraphs 64, 74-77.

356. After the assault and rape of D.S. at St. Clair, Defendants Estelle and Ary caused Plaintiff to yet *again* be housed alongside his enemies, where he was subject to additional harm, as described in paragraphs 90-97.

357. The actions and omissions of Defendants Estelle and Ary described in this Count were undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of D.S. and were objectively unreasonable.

358. The actions and omissions of Defendants Estelle and Ary described in this Count directly and proximately caused D.S. to be subjected to a substantial risk of serious harm and to suffer horrific physical and emotional injuries.

359. In the alternative, Defendant Bonner knew of and consciously disregarded the substantial risk that D.S. would be seriously harmed while in custody and failed to protect D.S. from harm at St. Clair.

360.     Defendant Bonner was a classification officer at Donaldson with the power and responsibility to safely classify and house D.S. Specifically, Defendant Bonner was responsible for reviewing D.S.'s file and reports related to D.S., identifying risks to his safety and security including through the identification of enemies, ensuring that he was safely housed while in ADOC custody, and informing staff at facilities to which D.S. was transferred of known risks to D.S. so that he would be safely housed and not subjected to further violence at transfer facilities.

361.     Defendant Bonner failed to inform Defendants Estelle and Ary or other staff at St. Clair about known risks, including identified enemies, to D.S, as set out in paragraphs 48-53, 61, thereby causing him to be housed with his enemies and their associates and subjecting him to a serious risk of violence and causing his foreseeable assault.

362.     The actions and omissions of Defendant Bonner described in this Count were undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of D.S. and were objectively unreasonable.

363.     The actions and omissions of Defendant Bonner described in this Count directly and proximately caused D.S. to be subjected to a substantial risk of serious harm and to suffer horrific physical and emotional injuries.

### Count VIII- 42 U.S.C § 1983
### Eighth Amendment Failure to Protect
### Against Defendants McMillian, Boyd, and McLemore
### Liability Based on Deliberate Indifference to D.S.'s Individualized Risks

364.     Pursuant to the Eighth Amendment of the United States Constitution, Plaintiff was entitled to be free from a substantial risk of serious harm while in the custody of the ADOC at St. Clair.

365.     D.S. faced a substantial risk of serious harm at St. Clair, as described in paragraphs 43-45, 50-51, 52-77, 78-97, 98-180, 182-201, 207-217, 219-220, 224-225, 232-247, 251-254, 261-270, and 272-280.

366.     Defendants McMillian, Boyd, and McLemore knew of and consciously disregarded the substantial risk that D.S. would be seriously harmed while in custody and failed to protect D.S. from harm at St. Clair.

367.     Defendants McMillian and Boyd, who were an officer and a lieutenant, respectively, at St. Clair (see paragraphs 38 and 40), were each subjectively aware of the substantial risk of serious harm to prisoners such as D.S. at St. Clair, where violence was the norm and terror reigned, particularly in the P/Q blocks, as described in paragraphs 98-180 and 75. Defendants McMillian and Boyd were each also subjectively aware of the dangerous conditions fueling the horrific violence, as described at paragraphs 182-201, 207-217, 219-220, 224-225, 232-247, 250-254, 261-270, 272-280.

368.     In addition, D.S. informed Boyd and McMillian prior to his assault that he had enemies and their associates incarcerated with him at St. Clair, and they knew that he was particularly vulnerable, that he had a history of victimization involving enemies now at St. Clair, and that he was therefore at a high risk of additional assaults given the dangerousness of St. Clair.

369.     Nonetheless, Defendants Boyd and McMillian caused the vulnerable D.S. to be released into general population in the dangerous and unsecured St. Clair, alongside enemies and their associates likely to assault him, as set forth in paragraphs 63-64, 74-77.

370.     Defendants McLemore and McMillian witnessed the assault on D.S. at St. Clair, but did not take steps to protect D.S., as set out in paragraph 84.

371.     The actions and omissions of Defendants McMillian, Boyd, and McLemore described in this Count were undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of D.S. and were objectively unreasonable.

372.     The actions and omissions of Defendants McMillian, Boyd, and McLemore described in this Count directly and proximately caused D.S. to be subjected to a substantial risk of serious harm and to suffer horrific physical and emotional injuries.

### Count IX - 42 U.S.C § 1983
### First, Eighth, and Fourteenth Amendment Unlawful Retaliation
### Against Defendants Estelle, Ary, Gordy

373.     Defendants Estelle, Ary, and Gordy, violated Plaintiff's First, Eighth, and Fourteenth Amendments rights by subjecting Plaintiff to retaliation at St. Clair for exercising his constitutional right to report a personal grievance to prison authorities.

374.     These Defendants subjected Plaintiff to isolation in the segregation unit at St. Clair, alongside his enemies, where he was subjected to foreseeable abuse, to retaliate against him for reporting his sexual assault, as set forth in paragraphs 90-97 and 232-248.

375.     In addition, as set forth in paragraphs 249-71, 232-38, 113b, 120, 124, 126, 132b, 133, 135, 136, 137, 149, 78-97, it was the policy and custom at St. Clair to discourage victims from reporting assaults and rapes and to retaliate against prisoners who reported assaults and rapes by subjecting them to segregation and discipline and housing them alongside their assailants, and Defendants Estelle and Gordy were aware of these policies and customs, furthered and perpetuated these policies and customs, and failed to take any corrective action in the face of these policies and customs, even though it was their responsibility to do so, as described in paragraphs 32, 34-36.

376.     Defendants Estelle and Gordy further knew that their subordinates discouraged victims from reporting assaults and rapes and retaliated against prisoners who reported assaults and rapes by subjecting them to segregation and discipline and housing them alongside their assailants, as described in paragraphs 249-71, 232-38, 113b, 120, 124, 126, 132b, 133, 135, 136, 137, 149, 78-97. Nonetheless, Estelle and Gordy allowed the retaliation to continue and failed to train or correct their subordinates' behavior, even though it was their responsibility to do so, as described in paragraphs 32, 34-36.

377.     The retaliatory conduct of Defendants Estelle, Gordy, and Ary would likely deter a person of ordinary firmness from the exercise of First Amendment rights.

378.     A causal connection existed between the retaliatory actions of Defendants Estelle, Gordy, and Ary, and the Plaintiff's protected speech and acts.

379.     As a direct and proximate result of the retaliatory actions of Defendants Estelle, Gordy, and Ary, Plaintiff suffered damages, including emotional and physical pain and suffering.

### Count X - 42 U.S.C § 1983
### Civil Conspiracy
### Against All St. Clair Defendants

380.     Plaintiff incorporates as if set forth herein paragraphs 15-41, 43-44, 50, 52-60, 62-97, 98-180, and 181-281 of his Complaint.

381.     Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, Estelle, Ary, McMillian, Boyd, and McLemore, and other co-conspirators not yet known to Plaintiff acted in concert with one another to accomplish an unlawful purpose by unlawful means.

382.     These Defendants and other co-conspirators not yet known to Plaintiff reached an agreement among themselves to deprive Plaintiff of his right to be free from

unreasonable harm, subject him to unlawful retaliation, and fail to intervene to prevent harm from occurring to Plaintiff, in violation of Plaintiff's constitutional rights, with regard to the assault of Plaintiff at St. Clair.

383.     Specifically, these Defendants were aware of the substantial risk of serious harm presented by the conditions at St. Clair and by D.S.'s enemies in particular, as set forth in paragraphs 43-45, 50-51, 52-77, 78-97, 98-180, 182-201, 207-217, 219-220, 224-225, 232-247, 251-254, 261-270, and 272-280, and agreed to act to maintain and perpetuate those conditions and expose D.S. and other prisoners to a substantial risk of serious harm.

384.     In furtherance of this conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

385.     For example, Defendants Malone, White, Jones, Brooks, Estelle, Gordy, Givens, Boyd, McMillian, Ary, and Estelle caused the vulnerable D.S. to be housed in general population alongside enemies likely to commit violence against him, as set forth in paragraphs 63-64, 66-77.

386.     Defendants McLemore and McMillian were present when D.S. was assaulted and allowed the assault of D.S. to continue without interference, as set out in paragraph 84.

387.     Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, and Estelle left the housing units at St. Clair, especially the P/Q blocks, largely unmonitored and unsupervised and failed to take steps to ensure that prisoners in the P/Q blocks at St. Clair such as D.S. and his assailants were adequately supervised and monitored, as set out in paragraphs 181-205.

388.     Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, and Graham facilitated, permitted, and encouraged the proliferation of contraband weapons among prisoners at St. Clair such as D.S.'s assailants, as set out in paragraphs 206-23.

389.     Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, Estelle and Ary housed prisoners such as D.S. alongside their known and documented enemies and failed to ensure that prisoners who were likely to perpetrate violence were safely segregated from their likely victims, as set out in paragraphs 224-31.

390.     Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, and Estelle created a culture of violence amongst prisoners by failing to ensure that prisoners were disciplined for acts of violence, as set out in paragraphs 232-248.

391.     Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, Estelle, and Ary created a culture of sexual abuse at St. Clair, emboldening perpetrators, and failed to adequately prevent, detect, and respond to prior instances of sexual abuse at St. Clair, as set out in paragraphs 249-71.

392.     Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, McMillian, and McLemore created a culture of violence at St. Clair in which prisoners felt they could act with impunity by participating in, and/or failing to adequately respond to and discipline, excessive force by officers at St. Clair, as set out in paragraphs 272-81.

393.     Finally, even after the assault and rape of D.S. at St. Clair, Defendants Estelle, Gordy, and Ary continued to cause Plaintiff to be housed alongside his enemies, where he was subject to additional harm, as set forth in paragraphs 52-60, 62-97.

394.     As a direct and proximate result of the illicit agreement referenced above, Plaintiff's rights were violated and he suffered damages.

### Count XI - 42 U.S.C § 1983
### Failure to Intervene
**Against Defendants McLemore, McMillian, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Dunn, Culliver, Daniels, Williams, and Ellington**

395.     As set forth in more detail in paragraphs 15-41, 43-44, 50, 52-60, 62-97, 98-180, and 181-281, Defendants McLemore, McMillian, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Dunn, Culliver, Daniels, Williams, and Ellington each knew that Plaintiff's rights were being violated at St. Clair, and had a realistic opportunity to intervene to prevent or stop the unconstitutional misconduct alleged above, but failed to do so.

396.     More specifically, Defendants McLemore and McMillian walked by D.S.'s cell at St. Clair at various points while he was tied up, and saw that D.S. was being assaulted, but did nothing to intervene in or end the prolonged and violent assault even thought they could have intervened or sought assistance to end the assault, as described in paragraph 84.

397.     Defendants Jones, Givens, Brooks, Sanders, Malone, White, Graham, Dunn, Culliver, Daniels, Williams, and Ellington perpetuated and promoted policies and customs of failure to monitor prisoners and intervene during assaults and took no corrective measures to address those policies and customs, as described in paragraphs 181-205, 113d, 121d, 123c, 126, 133, 138i, 140a, and 140c.

398.     Defendants Jones, Givens, Brooks, Sanders, Malone, White, Graham, Dunn, Culliver, Williams, Daniels, and Ellington, knew that their subordinates failed to

properly monitor prisoners and intervene during assaults but took no action to correct their subordinates' behavior, as described in paragraphs 181-205, 113d, 121d, 123c, 126, 133, 138i, 140a, and 140c.

399.     Even after the assault and rape of D.S. at St. Clair by his enemies, Defendants Estelle, Gordy, and Ary continued to cause Plaintiff to be housed alongside his enemies, and failed to intervene to prevent his enemies' foreseeable continued abuse, as described in paragraphs 90-97.

400.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

401.     As a result of the misconduct described in this Count, Plaintiff's constitutional rights were violated and he suffered damages.

**Count XII – State Law**
**Intentional Infliction of Emotional Distress**
**Against All Defendants**

402.     Plaintiff incorporates as if restated here paragraphs 15-41, 43-44, 50, 52-60, 62-97, 98-180, and 181-281 of his Complaint.

403.     Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, Estelle, Ary, Bonner; McMillian, Boyd, and McLemore, intentionally inflicted emotional distress upon Plaintiff at St. Clair.

404.     The acts of the Defendants were both extreme and outrageous.

405.     These Defendants intended to cause, or acted in reckless disregard of the probability that they would cause, severe emotional distress to Plaintiff.

406.     More specifically, as set out in paragraphs 43-45, 50-51, 52-77, 78-97, 98-180, 182-201, 207-217, 219-220, 224-225, 232-247, 251-254, 261-270, and 272-280, all Defendants were aware of a substantial risk of serious harm to Plaintiff at St. Clair.

407.     Nonetheless, Defendants Malone, White, Jones, Brooks, Estelle, Gordy, Givens, Boyd, McMillian, Ary, Bonner, and Estelle caused the vulnerable D.S. to be housed in general population alongside enemies and their associates likely to commit violence against him, as set forth in more detail in paragraphs 52-97.

408.     Defendants McLemore and McMillian were present when D.S. was assaulted, but did not take steps to intervene or otherwise protect D.S., as set out in paragraph 84.

409.     Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, and Estelle failed to take steps to ensure that prisoners at the P/Q blocks at St. Clair such as D.S. and his assailants were adequately supervised and monitored, as set out in paragraphs 181-205.

410.     Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, and Graham failed to ensure that prisoners were disciplined for possession of contraband weapons, and failed to ensure that adequate contraband weapons searches were carried out and that contraband weapons were confiscated, allowing contraband weapons to pose a substantial risk of serious harm to prisoners such as D.S, as set out in paragraphs 206-223.

411.     Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, Estelle, Bonner, and Ary housed prisoners such as D.S. alongside their known and documented enemies and failed to

ensure that prisoners who were likely to perpetrate violence were safely segregated from their likely victims, creating a substantial risk of serious harm to prisoners such as D.S., as set out in paragraphs 224-31.

412. Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, and Estelle failed to ensure that prisoners were disciplined for acts of violence, creating a substantial risk of serious harm to prisoners such as D.S., as set out in paragraphs 232-248.

413. Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, Estelle, and Ary failed to adequately prevent, detect, and respond to prior instances of sexual abuse at St. Clair, emboldening perpetrators and creating a substantial risk of serious harm to prisoners such as D.S., as set out in paragraphs 249-71.

414. Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, McMillian, and McLemore engaged in, and/or failed to adequately respond to and discipline, excessive force at St. Clair, creating a culture of violence and substantial risk of serious harm to prisoners such as D.S., as set out in paragraphs 272-81.

415. Finally, even after the assault and rape of D.S. at St. Clair, Defendants Estelle, Gordy, and Ary continued to cause Plaintiff to be housed alongside his enemies, where he was subject to additional harm, as set forth in paragraphs 90-97.

416. The misconduct described above was undertaken with malice, willfulness, bad faith, and reckless indifference to Plaintiff's rights and was beyond Defendants' authority.

417.     As a direct and proximate result of the misconduct described in this Count, Plaintiff's rights were violated and he suffered severe emotional distress and damages.

**Count XIII – State Law**
**Negligence**
**Against All Defendants**

418.     Plaintiff incorporates as if restated here paragraphs 15-41, 43-44, 50, 52-60, 62-97, 98-180, and 181-281 of his Complaint.

419.     The Defendants had a duty of care to Plaintiff, because they had custodial responsibilities over both D.S. and his assailants (as described in paragraphs 15-42 and 47-96); he was in their custody (as described in paragraphs 1, 11, 44, 48, 52-55, 58, 90); the Defendant ADOC Supervisors and Defendant St. Clair Facility Supervisors had a duty to correct the dangerous conditions and policies and practices occurring on their watch given the tide of violence, stabbings, rapes, and deaths at St. Clair; and all Defendants knew that D.S. was at a substantial risk of serious harm, as set out in paragraphs 43-45, 50-51, 52-77, 78-97, 98-180, 182-201, 207-217, 219-220, 224-225, 232-247, 251-254, 261-270, and 272-280.

420.     Each of the Defendants breached that duty of care, as set forth in paragraphs 52-97, 180-281, and 16-42.

421.     More specifically, Defendants Malone, White, Jones, Brooks, Estelle, Gordy, Givens, Boyd, McMillian, Ary, Bonner, and Estelle caused the vulnerable D.S. to be housed in general population alongside enemies and their associates likely to commit violence against him, as set forth in more detail in paragraphs 52-85.

422.     Defendants McLemore and McMillian were present when D.S. was assaulted, but did not take steps to intervene or otherwise protect D.S., as set out in paragraph 84.

423.     Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, and Estelle failed to take steps to ensure that prisoners at the P/Q blocks at St. Clair such as D.S. and his assailants were adequately supervised and monitored, as set out in paragraphs 181-205.

424.     Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, and Graham failed to ensure that prisoners were disciplined for possession of contraband weapons, and failed to ensure that adequate contraband weapons searches were carried out and that contraband weapons were confiscated, as set out in paragraphs 206-223.

425.     Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, Estelle, Bonner, and Ary housed prisoners such as D.S. alongside their known and documented enemies and failed to ensure that prisoners who were likely to perpetrate violence were safely segregated from their likely victims, as set out in paragraphs 224-31.

426.     Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, and Estelle failed to ensure that prisoners were disciplined for acts of violence, as set out in paragraphs 232-248.

427.     Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, Vincent, Gordy, Ragsdale, Estelle, and Ary failed to adequately prevent, detect, and respond to prior instances of sexual abuse at St. Clair, as set out in paragraphs 249-71.

428.     Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, McMillian, and McLemore engaged in, and/or

failed to adequately respond to and discipline, excessive force at St. Clair, creating a culture of violence and abuse, as set out in paragraphs 272-81.

429.　　　Finally, even after the assault and rape of D.S. at St. Clair, Defendants Estelle, Gordy, and Ary continued to cause Plaintiff to be housed alongside his enemies, where he was subject to additional harm, as set forth in paragraphs 52-97.

430.　　　In doing so, these Defendants acted willfully, maliciously, fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of the law.

431.　　　The St. Clair Defendants' breaches of their duty of care to Plaintiff described in this Count directly and proximately caused Plaintiff to suffer damages, including physical and emotional pain and suffering.

WHEREFORE, Plaintiff D.S. respectfully requests that this Court enter a judgment in his favor and against all Defendants, awarding compensatory damages, punitive damages, nominal damages, interest and attorneys' fees and costs against each Defendant, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

**D.S.**

BY**:** /s/ Megan Pierce
    *One of Plaintiff's Attorneys*

BY**:** /s/ Anil Mujumdar
    *Local Counsel*

*Ruth Z. Brown (pro hac vice application forthcoming)
Megan Pierce (pro hac vice application forthcoming)
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
T: 312-243-5900
F: 312-243-5902
E: ruth@loevy.com, megan@loevy.com
*Counsel of Record

Anil A. Mujumdar (ASB-2004-L65M)
Dagney Johnson Law Group
2170 Highland Avenue, Suite 250
Birmingham, AL 35205
T: 205.590.6986
F: 205.809.7899
E: anil@dagneylaw.com

## CERTIFICATE OF SERVICE

I, Megan Pierce, hereby certify that on December 1, 2021, I caused the foregoing to be filed using the Court's CM/ECF system, serving all counsel of record.

/s/ Megan Pierce
*One of Plaintiff's Attorneys*