# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| D.S., | ) | |
| | ) | |
| Plaintiff, | ) | Honorable Judge R. David Proctor |
| | ) | |
| v. | ) | Case No.: 2:20-cv-02012-RDP |
| | ) | |
| | ) | |
| | ) | |
| JEFFERSON DUNN, et al., | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |
| | ) | |
| | ) | |

## PLAINTIFF D.S.'S CONSOLIDATED RESPONSE TO
## DEFENDANTS' MOTIONS TO DISMISS (Docs. 139-142)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ......................................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 2

LEGAL STANDARD ................................................................................................... 4

ARGUMENTS AND AUTHORITIES .......................................................................... 5

I.      State law remedies are immaterial to Eighth Amendment claims ....................... 5

II.     D.S. states failure to protect claims (Counts I to VIII) ...................................... 6

        A.      D.S. states failure to protect claims in Counts I and II against the high-ranking
                ADOC administrators and wardens for their policies, practices, and omissions .... 7

        B.      D.S. states failure to protect claims in Count IV against PREA officials Vincent,
                Gordy, and Ragsdale for their policies, practices, and omissions ........................ 21

        C.      D.S. states failure to protect claims in Count VI against classification supervisor
                Estelle for her policies, practices, and omissions ................................................. 23

        D.      D.S. states claims in Counts III and V against Defendants Malone, White, Gordy,
                and Ragsdale for deliberate indifference to D.S ................................................... 25

        E.      D.S. states claims in Count VII against classification personnel Estelle, Ary, and
                Bonner for deliberate indifference to D.S. ............................................................ 29

        F.      D.S. states failure to protect claims in Count VIII against Defendants McMillian,
                McLemore, and Boyd for deliberate indifference to D.S. .................................... 31

III.    Defendants are not entitled to qualified immunity on D.S.'s failure to protect claims. .... 32

        A.      Defendant ADOC administrators and wardens' qualified immunity challenge .... 33

        B.      Defendant Bonner's qualified immunity challenge ............................................... 39

IV.     Plaintiff states a retaliation claim (Count IX) .................................................. 39

        A.      Plaintiff states a retaliation claim ........................................................................ 39

        B.      Defendants are not entitled to qualified immunity ............................................... 41

V.      Defendants are not entitled to immunity on D.S.'s state law claims ................................41

VI.     D.S. states intentional infliction of emotional distress ("IIED") claims (Count XII)........45

VII.    D.S. states negligence claims (Count XIII) ......................................................................46

VIII.   Any dismissal should be without prejudice and with leave to amend .............................47

# TABLE OF AUTHORITIES

## CASES

*Ala. Dep't of Corrections v. Thompson*, 855 So.2d 1016 (Ala. 2003) ...............................47

*Almond v. Randolph Cty., Alabama*, No. 3:19-CV-175-RAH, 2020 WL 3052223, (M.D. Ala. June 8, 2020) .......................................................................................44, 45

*Am. Fed'n of Labor & Cong. of Indus. v. City of Miami*, 637 F.3d 1178 (11th Cir. 2011)...........................................................................................................5

*Archie v. Covington Cty.*, No. 2:19CV508-MHT, 2021 WL 1182370 (M.D. Ala. Mar. 29, 2021)...............................................................................................44

*Barnhart v. Ingalls*, 275 So. 3d 1112 (Ala. 2018)………………………………………...43, 44, 45

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .............................................................5, 6

*Bennett v. Hendrix*, 423 F.3d 1247 (11th Cir. 2005) .........................................................40

*Bridges v. Poe*, 487 F. Supp. 3d 1250 (N.D. Ala. 2020)....................................................12

*Brooks v. Warden*, 800 F.3d 1295 (11th Cir. 2015)...........................................................39

*Brown v. Crawford*, 906 F.2d 667 (11th Cir. 1990)...........................................................16

*Bryant v. Dupree*, 252 F.3d 1161 (11th Cir. 2001)............................................................47

*Busby v. Truswal Sys. Corp.*, 551 So. 2d 322 (Ala. 1989)................................................46

*Caldwell v. Reese, et al.*, No. 1:09-cv-02210-TMP (N.D. Ala.)............................13, 27, 32

*Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014)..............38, 39

*Cantu v. City of Dothan*, 974 F.3d 1217 (11th Cir. 2020) .................................................42

*Carter v. Galloway*, 352 F.3d 1346 (11th Cir. 2003) ........................................................37

*Coffin v. Brandau*, 642 F.3d 999 (11th Cir. 2011)............................................................36

*Corbitt v. Vickers*, 929 F.3d 1304 (11th Cir. 2019) ..........................................................33

*Cottone v. Jenne*, 326 F.3d 1352 (11th Cir. 2003)............................................................37

*Cox v. Nobles*, --F.4th--, 2021 WL 4839607 (11th Cir. Oct. 18, 2021)………….15, 16, 27, 28, 29

*Daniels v. Felton*, 823 F. App'x 787 (11th Cir. 2020).......................................................16

iv

*Dickinson v. Cochran*, 833 F. App'x 268 (11th Cir. 2020) ........................................ *passim*

*Dunn v. Dunn*, 219 F. Supp. 3d 1100 (M.D. Ala. 2016)........................................14, 16

*Dusek v. JP Morgan Chase & Co.*, 832 F.3d 1243 (11th Cir. 2016)................................5

*Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000) ..........................................42, 43

*Ex parte Dangerfield*, 49 So. 3d 675 (Ala. 2010) ..............................................42

*Ex parte Gilland*, 274 So. 3d 976 (Ala. 2018) ..............................................43

*Farmer v. Brennan*, 511 U.S. 825 (1994) ....................................................... *passim*

*Finley v. Patterson*, 705 So. 2d 826 (Ala. 1997) ..............................................47

*Foster v. Maloney*, 785 F. App'x 810 (11th Cir. 2019) ........................................42

*Franklin v. Curry*, 738 F.3d 1246 (11th Cir. 2013) ..........................................20

*Gates v. Collier,* 501 F.2d 1291 (5th Cir. 1974) ..............................................35

*Goebert v. Lee Cty.*, 510 F.3d 1312 (11th Cir. 2007) ....................................13, 17

*Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003)........................................32

*Green v. Hooks*, No. 6:13-CV-17, 2013 WL 4647493
(S.D. Ga. Aug. 29, 2013) ..............................................27, 32, 38, 39

*Grider v. City of Auburn*, 618 F.3d 1240 (11th Cir. 2010)........................................2

*Hale v. Tallapoosa Cty.*, 50 F.3d 1579 (11th Cir. 1995) ....................................... *passim*

*Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316 (11th Cir. 2012) ............45, 46

*Harper v. Admin. Lieutenant*, 857 F. App'x 551 (11th Cir. 2021) ................................40

*Harper v. Lawrence Cnty., Ala.*, 592 F.3d 1227 (11th Cir. 2010)................................17

*Harrison v. Culliver*, 746 F.3d 1288, 1300 (11th Cir. 2014)................................16, 20, 37

*Hawkins v. City of Greenfield*, 101 F. Supp. 2d 1356 (M.D. Ala. 2000)........................42

*Hicks v. Ferrero*, 241 F. App'x 595 (11th Cir. 2007) ....................................40, 41

*Hill v. Cundiff*, 797 F.3d 948 (11th Cir. 2015)........................................46

*Hope v. Pelzer*, 536 U.S. 730 (2002) ....................................................32, 33

*Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984) ...............................................33

*Huffman v. Dunn, et al.*, No. 4:20-CV 01293-CLM, 2021 WL 2533024
(N.D. Ala. June 21, 2021)...................................................................14, 15, 42, 47

*Hunter v. City of Leeds*, 941 F.3d 1265 (11th Cir. 2019) ...............................42

*Int'l Woodworkers v. Champion Int'l*, 790 F.2d 1174 (5th Cir. 1986) ...........35

*Johnson v. Boyd*, 701 Fed. App'x 841 (11th Cir. 2017) .................................31

*Jones v. Diamond*, 636 F.2d 1364 (5th Cir. Jan. 29, 1981) (en banc) ...............35, 42

*Keating v. City of Miami*, 598 F.3d 753 (11th Cir. 2010)...........................40, 41

*LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993)......................12, 14, 16, 35

*Lamm v. State St. Bank*, 749 F.3d 938 (11th Cir. 2014) ..................................4

*Lane v. Philbin*, 835 F.3d 1302 (11th Cir. 2016)...........................................35

*Mann v. Darden*, 630 F. Supp. 2d 1305 (M.D. Ala. 2009)............................42

*Marbury v. Warden*, 936 F.3d 1227 (11th Cir. 2019)............................... *passim*

*Marsh v. Butler Cty., Ala.*, 268 F.3d 1014 (11th Cir. 2001) (en banc) ......... *passim*

*Monroe v. Pape*, 365 U.S. 167 (1961) ............................................................5

*Murphy v. Turpin*, 159 F. App'x 945 (11th Cir. 2005)..................................28

*Ogletree v. Colbert Cty., Alabama*, No. 3:18-CV-01218-HNJ, 2021 WL 4477630
(N.D. Ala. Sept. 30, 2021) ..............................................................22, 24, 35

*Owens v. Sec'y of Fla. Dep't of Corr.*, 812 F. App'x 861 (11th Cir. 2020).......16

*Patel v. Lanier Cty. Georgia*, 969 F.3d 1173 (11th Cir. 2020)........................38

*Patton v. Thompson*, 958 So. 2d 303 (Ala. 2006).........................................47

*Pearson v. Callahan*, 555 U.S. 223 (2009).....................................................36

*Purcell ex rel. Estate of Morgan v. Toombs Cty.*, 400 F.3d 1313
(11th Cir. 2005)...................................................................................16, 35, 36

*Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010) ...........................................32

*Renfroe v. Nationstar Mortg.*, 822 F.3d 1241 (11th Cir. 2016)........................5

vi

*Rivas v. The Bank of New York Mellon*, 676 F. App'x 926 (11th Cir. 2017) ....................................47

*Robinson v. Montgomery Cty. Bd. of Educ.*, No. 2:15-CV-924-WKW, 2021 WL 3200988 (M.D. Ala. July 28, 2021) ........................................................................................... 44, 45

*Sheth v. Webster*, 145 F.3d 1231 (11th Cir. 1998)........................................................42

*Shook v. Dunn*, 2:18CV1048-MHT, 2020 WL 1492841 (M.D. Ala. Mar. 25, 2020)..................20, 43

*Smith v. Governor for Ala.*, 562 F. App'x 806 (11th Cir. 2014)....................................40

*Smith v. Mosley*, 532 F.3d 1270 (11th Cir. 2008) ..........................................…..41

*Staley v. Owens*, 367 F. App'x 102 (11th Cir. 2010)....................................................13, 20

*Sun Life Assurance Co. of Canada v. Imperial Premium Fin., LLC*, 904 F.3d 1197 (11th Cir. 2018)........................................................................................................12

*Taylor v. Hale*, 909 F. Supp. 2d 1320 (N.D. Ala. 2012)................................................47

*Taylor v. Hughes*, 920 F.3d 729 (11th Cir. 2019)........................................................42

*Taylor v. Riojas*, 141 S. Ct. 52 (2020)........................................................................38

*Thompson v. City of Birmingham*, 5 F. Supp. 3d 1304 (N.D. Ala. 2014).........................46

*U.S. Steel Corp. v. Astrue*, 495 F.3d 1272 (11th Cir. 2007) ......................................45, 46

*Valdes v. Crosby*, 450 F.3d 1231 (11th Cir. 2006) ............................................. *passim*

*Washington v. Warden*, 847 F. App'x 734 (11th Cir. 2021)........................................16, 20

*Wildberger v. Bracknell*, 869 F.2d 1467 (11th Cir. 1989)............................................41

*Williams v. Edwards,* 547 F.2d 1206 (5th Cir. 1977) ..................................................35

*Zinermon v. Burch*, 494 U.S. 113 (1990).......................................................................5

## RULES

Federal Rule of Civil Procedure 15(a)(2) ....................................................................47

Federal Rule of Civil Procedure 9(b)..............................................................12, 40, 43

# INTRODUCTION

Plaintiff D.S. brings this action after suffering three horrific assaults at the hands of documented enemies over the course of just a single year while in Defendants' custody in the Alabama Department of Corrections: a stabbing at Holman Correctional Facility in February 2018; a stabbing at Donaldson Correctional Facility in December 2018; and a beating, stabbing, and rape at St. Clair Correctional Facility in January 2019. This devastating pattern of assaults was sadly just one manifestation of a shocking and widespread epidemic of violence at St. Clair.

Instead of attempting to curb the obvious and devastating outbreak of violence on their watch, the Defendants—high-ranking ADOC and St. Clair supervisors; Prison Rape Elimination Act ("PREA") officials; classification personnel; and corrections staff—did nothing to protect prisoners such as D.S. from brutal stabbings and rapes. Instead, they perpetrated policies and practices that fueled the violence; permitted their subordinates to do the same; failed to protect D.S. from repeated assaults at the hands of his known enemies and their associates even after having knowledge of his vulnerability and the risks posed by his enemies; and failed to protect him even while observing the brutal assault that he endured. The supervisory defendants' dangerous policies and practices included allowing prisoners to carry contraband weapons and perpetrate violence with impunity; turning the P/Q blocks at St. Clair into a "hot bay" by clustering together prisoners with histories of violence and disciplinary issues without supervision; failing to provide meaningful monitoring; allowing prisoners to move freely through the prison; and failing to respond properly to sexual assaults. D.S.'s injuries flowed directly from these policies and practices, and Defendants' inaction in the face of staggering levels of violence.

At the Court's direction, Plaintiff has already significantly streamlined his claims,

focusing on the St. Clair assault, and culling the list of defendants for each remaining claim.[1] Defendants nonetheless still seek dismissal of nearly all claims against them, seeking to evade liability for their egregious derelictions of duty. Yet with a detailed, 87-page complaint, there is no question that Defendants have fair notice of Plaintiff's claims. Defendants' motions to dismiss overstate the pleading standards and substantive requirements for liability, relying on materially different cases that concern the quantum of evidence required to prevail at summary judgment— not the allegations required to state a claim prior to discovery. Defendants also sidestep most of Plaintiff's allegations, rather than taking them as true and drawing inferences in Plaintiff's favor.

When the correct law is applied to Plaintiff's complete allegations, D.S. sufficiently states failure to protect, unlawful retaliation, intentional infliction of emotional distress, and negligence claims. Certain Defendants acknowledge that D.S. states claims in Count III against them, and thus the case will go forward in discovery. D.S. asks this Court to deny the partial motions to dismiss and allow him to expose the full range of Defendants' misconduct.

## STATEMENT OF FACTS

D.S. has been repeatedly and brutally assaulted while in ADOC custody. On or about February 2018, he was stabbed over 20 times by a group of prisoners with contraband weapons while incarcerated at Holman. Doc. 134 ¶43. Plaintiff was then transferred to Donaldson prison, where he was housed alongside known enemies from the Holman stabbing and predictably, suffered another brutal attack—a second stabbing. *Id.* ¶¶44-51. D.S. was then transferred to St.

---

[1] Plaintiff also acknowledges that his conspiracy claim (Count X) must be dismissed pursuant to the intra-corporate conspiracy doctrine based on *Grider v. City of Auburn*, 618 F.3d 1240, 1261 (11th Cir. 2010), pleading the claim only to preserve it given circuit discord regarding the doctrine's application to Section 1983 claims. To further streamline his complaint, Plaintiff also voluntarily withdraws his failure to intervene claim (Count XI) and asks the Court to dismiss that claim without prejudice.

Clair, where beatings, stabbings, and rapes were endemic and much of the prisoner population possessed contraband weapons. *Id.* ¶¶4, 52, 98-149. Despite D.S.'s requests for safe housing, no steps were taken to protect D.S. at St. Clair, and he was not placed in protective custody; instead, Plaintiff was again housed alongside his enemies and their associates and was placed in the acutely dangerous P block despite his known vulnerabilities, history of suffering brutal attacks, and status as a documented PREA victim. *Id.* ¶¶52-77. Predictably and tragically, D.S. was attacked by his enemies again—this time, in a prolonged assault in which he was tied up, stabbed, beaten, and raped. *Id.* ¶¶5, 78-85. After reporting the assault, D.S. was discouraged from securing medical care and redress against his assailants and punished with segregation, *yet again* alongside his enemies, who subjected him to more abuse. *Id.* ¶¶86-97.

D.S.'s horrific assault at St. Clair was but one incident in a widespread epidemic of prisoner-on-prisoner violence at the prison. In 2018, Alabama's prisons for men had the highest prison homicide rate in the nation. *Id.* ¶99. At St. Clair, beatings, stabbings, and rapes were endemic, violence and terror reigned, and the threat of assault was constant. *Id.* ¶98. Prisoner-on-prisoner assaults at St. Clair grew <u>sevenfold</u> between 2010 and 2018, with nearly <u>three hundred</u> reported assaults taking place in the two years leading up to the assault of D.S.—in addition to those assaults that went unreported. *Id.* ¶103; *id.* ¶¶105-149 (detailing over 100 examples, most of which involved weapons and all of which involved serious injury or death); *id.* ¶¶250-51.

The risk of harm was particularly acute in the P/Q blocks, which certain defendants had turned into an explosive "hot bay" by grouping together a large number of prisoners with histories of violence and disciplinary issues; failing to provide any meaningful monitoring or surveillance; and allowing prisoners to carry contraband weapons and perpetrate violence with impunity. *Id.* ¶¶75, 98, 181-205, 167-68, 100, 104-49. In the months leading up to the assault of

D.S., at least <u>four</u> men were killed in the P/Q blocks. *Id.* ¶100, 167-68.

As set forth in Counts I, II, IV, and VI, the supervisory Defendants caused D.S.'s injuries through their policies, practices, and inaction. These defendants were aware of the widespread violence and dangerous conditions that led to Plaintiff's torturous assault at St. Clair, were responsible for fueling those conditions and allowing their subordinates to do the same, and failed to protect prisoners such as D.S. from the foreseeable violence that resulted. Doc. 134 ¶¶283-306, 319-330, 340-48.

As set forth in Counts III, V, VII, and VIII, certain Defendants also had notice of the specific risks facing D.S. at St. Clair, due to his particular vulnerability, history of prior assaults, and status as a PREA victim and the dangerousness of his enemies and their associates—a risk that was heightened by the unsupervised and dangerous conditions at St. Clair. Nonetheless, these Defendants allowed the vulnerable D.S. to be housed in the acutely dangerous P/Q unit, alongside enemies likely to commit violence against him, and took no steps to protect him. *Id.* ¶¶307-18, 331-39, 349-72. Also in Count VIII, Plaintiff alleges that two Defendants walked by D.S.'s cell at various points during the prolonged and violent attack, and saw that D.S. was being assaulted, but did nothing to protect him, even though they could have intervened or sought assistance to end the assault. *Id.* ¶¶364-72.

In addition to his failure to protect claims, Plaintiff also brings First Amendment retaliation claims in Counts IX; a state law intentional infliction of emotional distress claim in Count XII; and a negligence claim in Count XIII. *Id.* ¶¶ 373-79, 402-31.

## LEGAL STANDARD

In reviewing a motion to dismiss, a court must accept "the factual allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff." *Lamm v. State*

4

*St. Bank*, 749 F.3d 938, 942 (11th Cir. 2014). "The motion is granted only when the movant demonstrates that the complaint has failed to include "enough facts to state a claim to relief that is plausible on its face." *Dusek v. JP Morgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The complaint must raise aright to relief above the speculative level, but it need not contain detailed factual allegations." *Renfroe v. Nationstar Mortg.*, 822 F.3d 1241, 1244 (11th Cir. 2016). If the pleading "contain[s] enough information regarding the material elements of a cause of action to support recovery under some 'viable legal theory,'" it satisfies the notice pleading standard. *Am. Fed'n of Labor &Cong. of Indus. v. City of Miami*, 637 F.3d 1178, 1186 (11th Cir. 2011) (quotation omitted).

## ARGUMENTS AND AUTHORITIES

**I.      State law remedies are immaterial to Eighth Amendment claims.**

Defendants' discussion of sovereign immunity is entirely superfluous. Doc. 140 at 3; Doc. 142 at 6-7. As Defendants themselves acknowledge (Doc. 142 at 6), D.S. has not sued any state entities or brought any official capacity claims, and asserts only individual capacity claims alleging each Defendant's personal participation in constitutional violations. Doc. 134 ¶12. Thus, Defendants have no basis to accuse Plaintiff of seeking to invade sovereign immunity.

In a transparent attempt to sway this Court, Defendants also assert that Plaintiff has recourse under state law, and therefore imply that this Court need not enforce the federal constitutional protections that it has been entrusted to safeguard. Doc. 140 at 3; Doc. 142 at 6-7. Defendants' discussion of remedies before the Alabama Board of Adjustment is legally irrelevant, because the existence of state law remedies has no bearing on the existence of an Eighth Amendment claim, and Defendants do not claim otherwise. *Zinermon v. Burch*, 494 U.S. 113, 125-26 (1990); *Monroe v. Pape*, 365 U.S. 167 (1961). Defendants do not cite any basis that

allows this Court to consider supposed state law remedies in its federal constitutional analysis. Nor do Defendants provide any authority in support of their insinuation that the protection the Eighth Amendment affords Plaintiff from individual capacity violations of his federal rights should be watered down on the basis of supposed state law remedies.

## II.        Plaintiff states failure to protect claims (Counts I to VIII).

Contrary to Defendants' argument, D.S. states failure to protect claims. *See* Doc. 142 at 7-13; Doc. 140 at 5-18. "'It is well settled that prison officials must take reasonable measures to guarantee the safety of the inmates, and a prison official violates the Eighth Amendment[] . . . if the official is deliberately indifferent to a substantial risk of serious harm to an inmate who suffers injury.'" *Dickinson v. Cochran*, 833 F. App'x 268, 271-72(11th Cir. 2020) (quoting *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019)). To state a claim:

> A plaintiff must first allege an objectively substantial risk of serious harm to prisoners. Next, the plaintiff must allege that the [corrections] official was deliberately indifferent, which requires the following: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence.

*Id.* at 272. A plaintiff must also allege that the constitutional violation "caused his injuries." *Marsh v. Butler Cty., Ala.*, 268 F.3d 1014, 1028-29 (11th Cir. 2001) (en banc), abrogated on other grounds by *Twombly*, 550 U.S. at 561-63. A plaintiff states the causation element against a supervisor by alleging that he or she "participated directly in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation." *Dickinson*, 833 F. App'x at 272 (quotation omitted). Contrary to Defendants' arguments, D.S. states each element of the claim against each Defendant: D.S. faced a substantial risk of serious harm; Defendants were subjectively aware of that risk; and they are liable either as direct participants and/or as supervisors for their role in causing D.S.'s injuries.

### A. D.S. states failure to protect claims in Counts I and II against the ADOC administrators and wardens for their policies, practices, and omissions.

ADOC administrators Dunn, Culliver, Williams, Daniels, and Ellington; St. Clair wardens Jones, Givens, and Brooks; and St. Clair captains Sanders, Malone, White, and Graham—the senior leadership of ADOC and St. Clair— are liable for their roles in failing to protect D.S. from a substantial risk of serious harm at the hands of other prisoners at St. Clair. These defendants were the highest-ranking ADOC and St. Clair supervisors with the power and responsibility to shape and address the crisis of prisoner-on-prisoner violence. They were aware of the widespread violence and dangerous conditions that led to Plaintiff's torturous assault at St. Clair, were responsible for fueling those conditions and allowing their subordinates to do the same, and yet failed to protect prisoners such as D.S. from the foreseeable violence that resulted. *E.g.*, Doc. 134 ¶¶283-92, 293-306.

These Defendants challenge Plaintiff's failure to protect allegations in Counts I and II on two grounds: first, they contend that Plaintiff fails to allege their subjective knowledge of a substantial risk of harm to prisoners including D.S. (Doc. 142 at 11-13); and second, they argue that Plaintiff fails to allege their misconduct constituting deliberate indifference (Doc. 142 at 9-11; Doc. 140 at 11-13). Both challenges fail.

As set forth in Plaintiff's complaint, in the timeframe leading up to the assault of D.S., Defendant Dunn was the ADOC Commissioner, "responsible for the direction, supervision, and control of the Department of Corrections and its employees." Doc. 134 ¶17. Defendant Culliver was the Associate Commissioner for Operations and Institutional Security—"the point person on the ADOC administrative team regarding security issues and prisoner-on-prisoner violence at Holman, Donaldson and St. Clair"—who oversaw institutional security, staffing, facility security audits, corrective action plans, the Classification Review Board, the Training Division, and the

Transfer Division. *Id.* ¶18. Defendants Williams and Daniels, too, served in the Associate Commissioner for Operations and Institutional Security role (*id.* ¶¶19-20). Defendant Ellington was the ADOC Institutional Coordinator responsible for planning, monitoring, and reviewing the day-to-day operations of St. Clair; supervising St. Clair's wardens; directing and shakedowns and contraband searches; identifying safety problems at the facility; implementing security and operational policies; and leading external security audits, including overseeing and following up on corrective action plans created in response to audits. *Id.* ¶21.

Defendant Jones was St. Clair's warden, with responsibilities that included ensuring adequate supervision, monitoring, classification, and housing of prisoners; maintaining appropriate discipline and deterrence of prisoner and staff misconduct; adherence by staff to PREA requirements and contraband search protocols; and implementing internal security audits. *Id.* ¶¶25, 297. As Warden II, Givens's responsibilities included day-to-day security operations, supervision of security personnel, contraband weapons searches, segregation, and housing unit inspections. *Id.* ¶26, 298. As Warden I, Brooks's responsibilities included day-to-day security operations, safe prisoner housing assignments, institutional policies and procedures, and facility inspections. *Id.* ¶27, 299. Finally, captains Sanders, Malone, White, and Graham were responsible for ensuring that prisoners were safely housed and that subordinate staff were implementing contraband searches, monitoring housing units, and conducting security checks. *Id.* ¶¶28-31, 300. Each captain had the authority to adjust prisoner housing assignments. *Id.*

These defendants perpetrated policies and practices that, in isolation and collectively, posed a substantial risk of serious harm to prisoners such as D.S. *Id.* ¶¶ 289-90, 302-04.

- They permitted contraband weapons to saturate St. Clair and failed to effectively control their use, declining to conduct searches to eradicate such weapons or discipline prisoners for their possession. *Id.* ¶¶206-223, 155, 168-69, 174, 178, 184, 105-49.

- They left the housing units at St. Clair—including the P/Q blocks—essentially unsupervised, even though the P/Q blocks housed a disproportionate share of dangerous prisoners with histories of violence, were saturated with contraband weapons, lacked surveillance cameras and emergency call buttons, and had myriad blind spots. *Id.* ¶¶181-205. Supervision was often left to a single untrained and inattentive cube officer (*id.* ¶¶188-92); prisoners were permitted to move freely in and out of the P/Q blocks and other housing units (*id.* ¶186-87); and officers were not disciplined for failing to intervene during assaults, which occurred regularly. *Id.*; *see also id.* ¶¶113d, 121d, 123c, 126, 133, 138i, 140a, 140c.

- They failed to house prisoners away from their enemies or to segregate likely perpetrators away from their likely victims. *Id.* ¶¶224-31, 262-63, 117b, 113b, 124.

- They declined to adequately prevent, detect, and respond to sexual abuse, emboldening perpetrators. *Id.* ¶¶249-71, 233-39, 108, 113b, 117a, 118, 119b, 119c, 120, 121a, 121c,122, 124, 126, 128d, 130a, 132b, 133, 134b, 135-37, 139, 144a, 149; *id.* ¶136 ("[A] prisoner was sexually assaulted in P block. When he reported the rape to Defendant Jones, she told him that she did not care.").

- They created and encouraged a culture of violence, impunity, and abuse by failing to ensure that prisoners were disciplined for in-custody violence (*id.* ¶¶232-48).

These Defendants were each subjectively aware (*id.* ¶¶150-180) of the dangerous conditions described above that resulted from their policies and practices (*id.* ¶¶182-201, 207-217, 219-220, 224-225, 232-247, 251-254, 261-270, 272-280), and the complete breakdown of security, particularly in the P/Q blocks that followed (*id.* ¶75, 98-149). They received notice of the violence and dangerous conditions in myriad ways, including from incident reports for hundreds of reported instances of assaults, monthly and annual ADOC reports, security audits, their own observations in their roles at St. Clair, and internal communications about the obvious crisis there. *Id.* ¶¶150-80, 98-149, 209-214; *see also id.* ¶¶17-21, 25-31. In 2014, the Equal Justice Initiative ("EJI") brought a class action on behalf of St. Clair's prisoners against Dunn, Culliver, Sanders, Malone, and others, describing the outbreak of violence and the policies and practices fueling it, including failure to address the proliferation of contraband weapons, inadequate supervision and monitoring, creation of a dangerous culture of violence, and failure to

respond appropriately to violence. *Id.* ¶¶154-57, 162-64. The class action initially settled in 2017, with the ADOC agreeing to make changes that the high-ranking Defendants knew about but did not implement. *Id.* ¶¶162-64.

Individual lawsuits further put these high-ranking Defendants on notice of the constant violence, as well as the systemic failures undergirding it, such as inadequate contraband searches, supervision, and monitoring. *Id.* ¶¶174-75. For example, Plaintiff provided examples of three complaints filed against Dunn, Culliver, Sanders, Malone, and others, which described the same dangerous policies and customs fueling the violence and sought redress for 2014 and 2015 rapes and knifepoint assaults at St. Clair. *Id.* ¶174. The high-ranking defendants also received – just months before the assault of D.S. – a letter from advocates warning them about the acute conditions in the "hot bay" P/Q blocks and the necessity for immediate action, such as contraband searches, given the alarming spate of murders there. *Id.* ¶¶167-72.

Nonetheless, the high-ranking Defendants failed to act to address the violence. *Id.* ¶¶150-80. Instead, they left the dangerous P/Q blocks virtually unsupervised (*id.* ¶¶181-205); continued to allow contraband weapons proliferation (*id.* ¶¶206-23); and encouraged a culture of violence, impunity, and abuse by permitting prisoners to be housed alongside their documented enemies (*id.* ¶¶224-231); failing to segregate prisoners likely to perpetrate violence from their likely victims (*id.* ¶¶224-231); failing to ensure that prisoners were disciplined for violence (*id.* ¶¶232-248); and failing to adequately prevent, detect, and respond to sexual abuse, emboldening perpetrators (*id.* ¶¶249-271, 136).

These Defendants also knew that their subordinate line officers failed to properly monitor prisoners or intervene during assaults; failed to conduct contraband searches or discipline contraband possession; failed to protect vulnerable prisoners from enemies; failed to properly

respond to prisoner misconduct; responded improperly to sexual violence, declined to discipline sexual violence, retaliated against reporting victims; and abused prisoners themselves, creating a culture of violence. *Id.* ¶¶290, 304. Nonetheless, they failed to correct their subordinates' conduct (*id.*), further perpetuating the dangerous conditions that caused the rape and assault of D.S.—in which their subordinate staff failed to, for example, separate D.S. from his known enemies, eradicate the contraband weapons used to assault D.S., monitor the area in the P block in which he was assaulted, and intervene during the prolonged assault (*id.* ¶¶52-97).

**Substantial risk of serious harm.** Defendants do not dispute that D.S. properly alleges that he faced an objectively substantial risk of serious harm at St. Clair from prisoner-on-prisoner assault. As described above, Plaintiff has alleged both a history of widespread violence and systemic conditions that posed a substantial risk. He alleges in detail a devastating security crisis at St. Clair in which prison beatings, stabbings, and rapes were endemic (most acutely, in the P/Q blocks), violence and terror reigned, and the threat of assault was constant, having grown sevenfold between 2010 and 2018. In addition, Plaintiff alleges the conditions, both in isolation and collectively, that fueled the violence and posed a substantial risk to prisoners such as D.S., such as the allowance of contraband weapons to saturate St. Clair, inadequate supervision and monitoring, and the failure to segregate dangerous prisoners from their vulnerable enemies.

The Eleventh Circuit recently held, in a case on all fours with this one, that analogous allegations suffice to allege a substantial risk of serious harm. In *Dickinson*, 833 F. App'x at 271-72, the court reaffirmed that allegations of a "history of widespread inmate-on-inmate abuse" and of deficient policies and customs such as allowance of contraband weapons, inadequate supervision, and failures to separate violent prisoners from non-violent ones suffice to plead a qualifying risk. Indeed, allegations of a "history" of "widespread" prisoner-on-prisoner violence

*alone* satisfy the requirement to plead a substantial risk of serious harm. 833 F. App'x at 272.[2]

Likewise, allegations of dangerous conditions satisfy the pleading requirement even absent allegations of widespread violence. *Marsh*, 268 F.3d at 1029 (conditions including a failure to segregate nonviolent prisoners from violent ones, to control prisoner movement, and to discipline prisoners who assaulted others; the availability of contraband weapons; and inadequate supervision); *Dickinson*, 833 F. App'x at 271-72. Plaintiff's allegations suffice.

**<u>Defendants' subjective knowledge of the risk of harm.</u>** The Defendant ADOC administrators and wardens, alone, challenge whether Plaintiff pleads their subjective knowledge of the risk of harm facing prisoners such as D.S. in Counts I and II. *See* Doc. 142 at 11-13. A prison official has subjective knowledge of a substantial risk of serious harm if he or she has knowledge of specific facts from which an inference of the risk could be drawn and draws that inference. *Farmer v. Brennan*, 511 U.S. 825, 838 (1994); *Marsh*, 268 F.3d at 1029. At the pleading stage, "knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); *Sun Life Assurance Co. v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1215 (11th Cir. 2018). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence.'" *Hale*, 50 F.3d at 1583 (quoting *Farmer*, 511 U.S. at 842).

Plaintiffs may allege defendants' subjective knowledge of risks from prisoner-on-

---

[2] Courts have held that a prisoner overcomes summary judgment by presenting evidence that violence occurs regularly and is severe enough to require, on occasion, medical attention and even hospitalization. *See Hale v. Tallapoosa Cty.*, 50 F.3d 1579, 1583 (11th Cir. 1995); *see also LaMarca*, 995 F.2d at 1535 (at trial, "evidence . . . of an unjustified constant and unreasonable exposure to violence . . . clearly satisfies this standard"); *Valdes v. Crosby*, 450 F.3d 1231, 1244 (11th Cir. 2006); *Bridges v. Poe*, 487 F. Supp. 3d 1250, 1258 (N.D. Ala. 2020). *Cf. Marbury*, 936 F.3d at 1234 (at summary judgment, evidence of only "occasional, isolated attacks by one prisoner on another," such as "2.5 stabbings per year" does not suffice). Because such evidence is sufficient at summary judgment, it necessarily follows that allegations of the same clear the pleading hurdle.

prisoner violence in myriad ways. First, such allegations may be pleaded directly. *E.g.*, *Dickinson*, 833 F. App'x at 273 (sheriff received letter from advocates); Exh. A, *Caldwell v. Reese, et al.*, No. 1:09-cv-02210-TMP (N.D. Ala.), Dkt. 14 at 4-5 (plaintiff reported risk from another prisoner who had previously engaged in dangerous behavior that threatened the plaintiff) & Dkt. 18 (adopting report and recommendation). Second, inferences of subjective knowledge may be drawn from allegations of specific conditions "of a facility or its population rendering it particularly violent." *Id.* at 275 (citing, e.g., *Hale*, 50 F.3d at 1583-84; *Marsh*, 268 F.3d at 1029). Thus, the plaintiff in *Dickinson* "alleged overcrowding, failure to identify and segregate violent inmates, failure to properly search inmates, failure to limit contraband, and failure to adequately supervise inmates"—conditions analogous to those here—which sufficed to raise an inference of knowledge. *Id.* at 275. Third, plaintiff may "allege[] only a generalized risk," without pointing to specific conditions, if the plaintiff also alleges that "serious inmate-on-inmate violence was the norm or something close to it.'" *Id.* at 275.  Finally, "'a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Id.* (quoting *Farmer*, 511 U.S. at 842). "A party that willfully blinds itself to a fact . . . can be charged with constructive knowledge." *Goebert v. Lee Cty.*, 510 F.3d 1312, 1328 (11th Cir. 2007).

When a substantial risk of serious harm has been alleged, "it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer*, 511 U.S. at 843; *see also Staley v. Owens*, 367 F. App'x 102, 107 (11th Cir. 2010). A defendant may not "escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who

eventually committed the assault." *Farmer*, 511 U.S. at 843.

Here, Plaintiff has alleged the high-ranking Defendants' direct knowledge of the substantial risk facing prisoners such as D.S. through, for example, reports of the nearly <u>three hundred</u> reported prisoner-on-prisoner assaults in the two years leading to the assault of D.S. and the <u>four murders</u> taking place in the "hot bay" P/Q blocks in the months leading to D.S.'s assault; other reports, such as disciplinary records and medical records; Defendants' own observations and communications; the EJI class action lawsuit, settlement of that lawsuit, and expert audits and reports created during the litigation; lawsuits by individual prisoners assaulted at St. Clair; a Department of Justice ("DOJ") investigation; and a letter from EJI warning about the dangerous conditions in the P/Q blocks and the necessity for immediate action given the recent spate of murders there. *Supra* at 9-10. Plaintiff also alleges dangerous conditions of which these high-ranking Defendants were aware and that prisoner-on-prisoner violence was the norm or close to it, as well as obvious to prison officials responsible for safety at St. Clair. *Supra* at 3-4, 8-10.

In *Dickinson*, the Eleventh Circuit held that a plaintiff stated a claim based on far less: allegations of "specific features of a facility or its population rendering it particularly violent" and also that "the sheriff had received '[a] letter from prisoner-rights advocates' saying 'that the [j]ail conditions posed an immediate and serious threat to the safety of the inmates'" but "took 'no measures to improve conditions at the jail.'" *Dickinson*, 833 F. App'x at 273 (alterations omitted).[3] *Dickinson*, and the authority upon which it relies, dictate the result in this case.

---

[3] Other cases are in accord. *E.g.*, *Valdes*, 450 F.3d 1231 (supervisors on notice based on complaints and forms); *Dunn v. Dunn*, 219 F. Supp. 3d 1100, 1149-50 (M.D. Ala. 2016) ("communications and reports"); *LaMarca*, 995 F.2d at 1536 (incident reports, internal and external reports); *Huffman v. Dunn, et al.*, No. 4:20-CV-01293-CLM, 2021 WL 2533024, at *7 (N.D. Ala. June 21, 2021) ("at the Rule 12 stage, the court must assume that Defendants knew about all the pre-attack incidents and statistics that Huffman pleads").

Defendants' attempt to distinguish *Dickinson* based on Plaintiff's supposed failure to "provide any facts" (Doc. 142 at 12) is defeated by Plaintiff's extensive allegations.

Defendants' contrary case citations are both factually and procedurally inapposite, as they involve cases that survived at the pleading stage and merely failed to muster sufficient evidence to survive summary judgment under different factual circumstances. Doc. 142 at 11-13. *Marbury* considered the quantum of evidence required at summary judgment to establish knowledge of a substantial risk from generalized violence. 936 F.3d at 1234-35. The plaintiff, who had proceeded *pro se* in the district court, had not amassed sufficient evidence to present a triable claim based on a generalized threat of violence:

> The only allegation Marbury makes about inmate-on-inmate violence is his statement that he personally witnessed fifteen inmate-on-inmate stabbings during his time at St. Clair. There is no evidence in the record of the total prison population or the sections of the prison in which the attacks occurred that would place Marbury's statement in context. Also, it is not precisely clear from the record over what period of time these incidents occurred. But we can tell from the record that Marbury was at St. Clair between 2002 and 2007, went to a different correctional facility, and then returned in 2015. So, the fifteen stabbings may have occurred over the course of 6 years, for a rate of 2.5 per year.

*Id.* The *Marbury* plaintiff also attempted to satisfy the subjective knowledge element through evidence of a specific threat, but that evidence failed because, while the "question is a close one," at summary judgment, evidence that the plaintiff stated that "he had heard from a friend that an unnamed prisoner intended to hurt him, and that he was afraid" does not suffice "without any further details." *Id.* at 1236. And in *Cox*, policy and practice theories of deliberate indifference were entirely absent, as the plaintiff's barebones complaint, which had only eleven paragraphs on liability, did not allege that Defendants were aware of any unsafe conditions at all, let alone widespread violence or dangerous policies or customs that posed a risk to prisoners such as the plaintiff. *Cox v. Nobles*, No. 20- 11425, 2021 WL 4839607, --F.4th-- (11th Cir. Oct.

18, 2021); *see also* Exh. B, Complaint in *Cox*, Doc. 16 in Case. No. 20-11425 (11th Cir.).[4]

The ADOC Officials' remaining arguments fail (Doc. 142 at 12-13), because they omit nearly all of Plaintiff's allegations, such as EJI's letter highlighting the need for urgent action in the "hot bay" P/Q blocks due to the murders there (Doc. 134 ¶¶167-72). Defendants do not provide any authority permitting this Court to disregard Plaintiff's allegations of notice from individual and class action lawsuits merely because such notice did not take the form of facts adjudicated in court.[5] Nor would such an argument be tenable, as such a requirement does not exist even at summary judgment. *E.g.*, *Dickinson*, 833 F. App'x at 273 (letter from advocates); *Valdes*, 450 F.3d at 1244 (prisoner complaints and use-of-force forms); *LaMarca v. Turner*, 995 F.2d 1526, 1536 (11th Cir. 1993) (incident reports, internal and external reports); *Dunn v. Dunn*, 219 F. Supp. 3d 1100, 1149-50 (M.D. Ala. 2016) ("communications and reports"). Defendants also ignore that they were aware that the EJI class action initially settled, with commitments to

---

[4] *Cf, e.g.*, *Daniels v. Felton*, 823 F. App'x 787, 790 (11th Cir. 2020) (at summary judgment, pro se plaintiff's "reference to a single prior altercation between gangs . . . is not enough."); *Purcell ex rel. Estate of Morgan v. Toombs Cty.*, 400 F.3d 1313, 1322 n.21 (11th Cir. 2005) (at summary judgment, "evidence of two to three pretty serious inmate fights over a period of nine months and of not very many other fights over a four-year span" is insufficient); *Harrison*, 746 F.3d at 1300 (at summary judgment, claim of risk of serious harm arising from failure to monitor a back hallway failed because of "[t]he limited number of inmate-on-inmate assaults on the back hallway."); *Owens v. Sec'y of Fla. Dep't of Corr.*, 812 F. App'x 861, 868 (11th Cir. 2020) (at summary judgment, pro se plaintiff failed to provide evidence that defendant knew of any risk in sending a prisoner to the yard withcanteen items); *Brown v. Crawford*, 906 F.2d 667 (11th Cir. 1990) (at summary judgment, unrebutted evidence that no prisoners, including the plaintiff, had notified the defendant of any problem with the water, and absence of "widespread history of dirty drinking water" defeated notice); *Washington v. Warden*, 847 F. App'x 734, 738 (11th Cir. 2021) (at summary judgment, evidence that plaintiff reported arisk from prisoners a month earlier based only on their general reputation for violence, and did not know them and had not been threatened by them, did not suffice).

[5] *Grayson v. Warden, Comm'r*, 869 F.3d 1204, 1225-1226 (11th Cir. 2017), considered the inapposite matter of whether the Court may take statements from litigation as indisputable adjudicative facts at summary judgment. Doc. 142 at 12.

make changes that were not implemented. Doc. 134 ¶¶162-66. As for the DOJ materials, the DOJ took the rare step in 2016 of commencing an investigation into unconstitutional levels of violence at ADOC, long before D.S.'s assault. *See Goebert*, 510 F.3d at 1328 (willful blindness constitutes constructive knowledge). Defendants' insinuation that they somehow lacked notice of the problems identified during the investigation and in the DOJ's subsequent notice letters and lawsuit impermissibly takes inferences in their favor.

**Defendants' unconstitutional conduct/causation.** Plaintiff also sufficiently alleges unconstitutional conduct and causation to support claims against the high-ranking ADOC officials, wardens, and captains named in Counts I and II. *See* Doc. 134 ¶¶283-306, 319-330. To allege liability against a supervisor, a plaintiff may plead either that the supervisor "personally participate[d]" in the unconstitutional conduct or a "causal connection" between the supervisor's actions and the constitutional deprivation. *Harper v. Lawrence Cnty., Ala.*, 592 F.3d 1227, 1236 (11th Cir. 2010). A causal connection between a supervisor's actions and the deprivation is well-plead based on allegations that: (1) a "history of widespread abuse" put the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she failed to do so; (2) a supervisor's custom or policy resulted in deliberate indifference to constitutional rights; or (3) the supervisor . . . knew that subordinates would act unlawfully and failed to stop them from doing so." *Dickinson*, 833 Fed. App'x at 272; *Harper*, 592 F.3d at 1227. Allegations of conduct that is unreasonable under the circumstances suffice to state a claim. *Marsh*, 268 F.3d at 1029 (plaintiff states a claim by alleging that sheriff "did absolutely nothing to alleviate the conditions at the Jail, despite repeated warnings and recommendations").

The Defendant ADOC administrators and wardens fault Plaintiff for purportedly relying solely on their "job responsibilities." Doc. 142 at 9, 13. To be sure, Plaintiff does describe these

officials' different job responsibilities with specificity, including their involvement in setting and implementing policy, contraband searches, security audits, supervising staff, and addressing prisoner-on-prisoner violence. *Id.* at ¶¶16-31, 286-87, 296-300. Yet Plaintiff also details Defendants' acts and omissions that caused Plaintiff's injuries. In allegations that Defendants ignore, Plaintiff alleges that the high-ranking Defendants took no action in the face of widespread, obvious, and shocking levels of violence and repeated warnings about the violence despite having the responsibility to address prisoner-on-prisoner assaults at St. Clair. *Supra* at 8-11. These Defendants instead persisted in policies and customs that facilitated constitutional deprivations of the kind experienced by D.S., such as allowing prisoners to carry contraband weapons and perpetrate violence with impunity; turning the P/Q blocks into a "hot bay" by grouping prisoners with histories of violence and disciplinary issues alongside vulnerable prisoners and enemies, without meaningful supervision; and failing to prevent, detect, or respond appropriately to sexual assault, emboldening perpetrators. *Id.* They also knew that their subordinates did not properly supervise or monitor prisoners and failed to intervene during assaults; failed to conduct contraband searches; failed to properly respond to and discipline misconduct; failed to properly respond to and discipline sexual violence; retaliated against victims; and abused prisoners themselves, creating a culture of violence. *Id.* Nonetheless, these Defendants failed to address their subordinates' misconduct, further perpetuating the dangerous conditions that caused the rape and assault of D.S.—in which the correctional staff failed to eradicate the contraband weapons used to assault D.S., monitor the area in which he was assaulted, and intervene when they saw the assault occurring. *Id.*

The Eleventh Circuit has already held that analogous allegations state a claim. *See Dickinson*, 833 Fed. App'x at 272-75 (affirming denial of motion to dismiss brought against

supervisory defendants where a plaintiff alleged that officials failed to protect him and other inmates from violence, to properly staff the jail, and to properly train and supervise officers); *see also Marsh*, 268 F.3d at 1029 (plaintiff stated a claim by alleging that sheriff "did absolutely nothing to alleviate the conditions at the Jail, despite repeated warnings and recommendations for how conditions could be improved."); *Valdes*, 450 F.3d at 1244. Plaintiff's allegations are more detailed than the allegations that were held to have passed muster in *Dickinson*, *Marsh*, and *Valdes*. Defendants point to no authority indicating Plaintiff need to have alleged more.

For their part, the Defendant captains (Sanders, Malone, White, and Graham) challenge Plaintiff's allegations only of causation/conduct element of Counts I and II, conceding that the remaining elements are well-pleaded. Doc. 140 at 11-13. Yet D.S.'s allegations of misconduct suffice. He has detailed how Sanders, Malone, White and Graham were responsible for implementing contraband searches and ensuring that subordinate staff were conducting those searches, monitoring housing units, conducting security checks, and appropriately responding to allegations of sexual violence, among other responsibilities. Doc. 134 ¶¶28-31, 300. Even though aware of the dangerous conditions at St. Clair, these captains took no action to address the danger to prisoners such as D.S. and instead promoted dangerous policies and practices such as, for example, allowing contraband weapons to proliferate (as described in Doc. 134 ¶¶ 303-304, 206-223, 155, 169-70, 174, 178, 184, and 105-149), and permitting a culture of lax supervision and monitoring of prisoners in the housing units (as described in Doc. 134 ¶¶ 303-304, 181-205, 113d, 121d, 123c, 126, 133, 138i, 140a, and 140c). These Defendants failed to correct their subordinates' conduct (*id.* ¶304), further perpetuating the dangerous conditions that caused the rape and assault of D.S.—in which their subordinate correctional staff failed to, for example, eradicate the contraband weapons used to assault D.S., monitor the area in the P block in which

he was assaulted, and intervene during the prolonged assault (*id.* ¶¶52-97).

These Defendants cannot evade liability by citation to factually inapposite authority in which the policy and practice allegations were either nonexistent or truly conclusory. Doc. 140 at 11-13. In *Franklin v. Curry*, 738 F.3d 1246 (11th Cir. 2013), the plaintiff did "not describe any of the policies that were in place" or "should have been in place." *Id.* at 1251. In *Shook v. Dunn*, 2:18CV1048-MHT, 2020 WL 1492841 (M.D. Ala. Mar. 25, 2020), a policy and custom allegation was deemed conclusory because it consisted of a skeletal and conclusory list of policies with no additional information (*id.* at *7), and review of the pertinent paragraph in *Shook* confirms that its reasoning does not apply to Plaintiff's materially different complaint. *See Shook*, Case No. 2:18-cv-1048-MHT (M.D. Ala.), Dkt. 36 at ¶86. In *Washington*, 847 F. App'x 734, the deficiency was that the plaintiff did not allege subjective knowledge of a substantial risk of harm from any policy. *Id.* at 738. *Staley* is an inapposite summary judgment decision in which the plaintiff presented insufficient evidence. 367 F. App'x 102 at 108. Likewise, in *Harrison v. Culliver*, 746 F.3d 1288 (11th Cir. 2014), a claim of risk of serious harm arising from the failure to monitor a back hallway failed at summary judgment because of "[t]he limited number of inmate-on-inmate assaults on the back hallway." *Id.* at 1300.

Nor do Defendants cite any authority requiring that D.S. be able to identify, prior to discovery, the names of every subordinate of these captains that contributed to the practice of weapons proliferation or lax monitoring that resulted in D.S.'s assault. And regardless of the conduct of their subordinates, Sanders, Malone, White, and Graham are themselves directly liable for their conduct allowing contraband weapons to saturate St. Clair, facilitating D.S.'s stabbing with a contraband weapon. Counts I and II must be upheld in their entirety.

**B.    D.S. states failure to protect claims in Count IV against PREA officials Vincent, Gordy, and Ragsdale for their policies, practices, and omissions.**

Pursuant to a similar analysis, Plaintiff also states failure to protect claims against PREA officials Vincent, Gordy, and Ragsdale for their policies, practices, and omissions. Doc. 134 ¶¶319-330. At the relevant times, Defendants Vincent, Gordy, and Ragsdale were, respectively, the ADOC PREA Director, the St. Clair Institutional PREA Compliance Manager, and the St. Clair Backup Institutional PREA Compliance Manager, with the authority and duty to address the crisis of sexual violence at St. Clair. *Id.* ¶¶ 322-24, 22, 32-33, 35.

Prior to the assault on D.S., these Defendants were aware of the staggeringly high levels of violence and sexual assault at St. Clair, particularly in the P/Q blocks. *Id.* ¶¶325, 249-270. They were aware of this crisis through, for example, the deluge of assaults and accompanying incident reports (*id.* ¶¶325, 150-80, 98-149, 209-214); the contents of the *Duke* litigation and initial settlement (*id.* ¶¶154-57, 162-64); a DOJ investigation (*id.* ¶¶159-161, 176-179); a letter from EJI (*id.* ¶¶ 167-72); and individual lawsuits such as three illustrative lawsuits arising from earlier sexual assaults at St. Clair brought against Gordy and other defendants (*id.* ¶174). They were also aware of the dangerous conditions fueling the horrific violence at St. Clair. *Id.* ¶¶325.

Nonetheless, these Defendants took no action to stem the tide of sexual violence and instead promoted policies and customs that facilitated sexual violence and caused D.S.'s injuries. *Id.* ¶¶326-29. As but a few examples, they housed PREA victims, who had been subject to victimization while in ADOC custody and were at risk for additional assaults, alongside their known enemies and predatory and violent prisoners, directly contrary to PREA's mandates (*id.* ¶¶ 326(b), 327(b), 224-31, 262-63, 117b, 113b, and 124); allowed inadequate prevention, detection, and responses to sexual abuse, including the failure to protect reporting victims from retaliation, emboldening perpetrators and creating a culture of sexual assault (*id.* ¶¶ 326(a),

327(a), 249-271, 233-39, 108, 113b, 117-122, 124, 126, 128d, 130a, 132-137, 139, 144a, 149); and failed to ensure that perpetrators were disciplined for and segregated after in-custody sexual violence, further endangering likely victims. *Id.* ¶¶326(c), 327(c), 232-48. These Defendants also knew that their subordinates engaged in the same practices (*id.* ¶¶326, 328), but failed to correct their subordinates' conduct even though they were tasked with ensuring St. Clair's compliance to PREA's mandates, further perpetuating the conditions that caused D.S.'s injuries. *Id.*

Defendant Vincent does not discuss the allegations against her, nor point to any infirmity therein, forfeiting any argument for dismissal. Doc. 142 at 9-13 (discussing only other ADOC officials and wardens). Regardless, D.S.'s allegations against her suffice under settled authority. *Dickinson*, 833 Fed. App'x at 272-75; *Marsh*, 268 F.3d at 1029; *Valdes*, 450 F.3d at 1244.

For their part, Defendants Gordy and Ragsdale seek dismissal on the basis that, as they contend, Plaintiff blames them for "broad criticisms of St. Clair's operations as a whole." Doc. 140 at 7. Not so; Plaintiff alleges that these two St. Clair PREA officials were specifically responsible for implementing and enforcing the separation of likely victims from likely perpetrators of sexual violence at St. Clair, as required by PREA, and for ensuring that incidents of sexual violence were appropriately addressed and prisoners were protected from further victimization and retaliation (*id.* ¶¶324), but promoted policies and practices directly to the contrary, establishing their liability. *See Ogletree v. Colbert Cty., Alabama*, 2021 WL 4477630, at *24-25 (N.D. Ala. Sept. 30, 2021). They also failed to ensure that St. Clair's line staff followed PREA's requirements, resulting in a culture of sexual violence. Doc. 134 ¶¶326-328.

Gordy and Ragsdale ask this Court to require Plaintiff to plead more facts, yet Plaintiff sufficiently details the dangerous conditions of unchecked sexual violence that Gordy and Ragsdale failed to address (*id.* ¶¶326-328, 249-71), and provides numerous facts in support,

including from prior litigation over sexual violence at St. Clair (*id.* ¶¶154-55, 165, 174-75, 177-78). Plaintiff also specifies 23 additional illustrative reported sexual assaults, many of which took place in the unsafe P/Q units in which Gordy and Ragsdale housed documented PREA victims such as D.S. (*id.* ¶¶108, 113(b), 117(a), 118, 119(b), 120, 121(a), 121(c), 122, 124, 126, 128(d), 130(a), 131, 132(b), 133, 134(b), 136, 137, 139, 144(a)); illustrative instances in which vulnerable prisoners were housed in general population or alongside enemies, where they were again assaulted (*id.* ¶¶ 137, 126, 113(b), 141, 117(b), 149); and illustrative instances in which predatory prisoners were allowed to commit repeated acts of violence (*id.* ¶124, 126, 128(a)).

D.S. also sufficiently pleads that Gordy and Ragsdale's deliberate indifference caused D.S.'s injuries. Pursuant to Gordy and Ragsdale's problematic practices at St. Clair, D.S. was housed in general population, in the most violent and unsupervised "hot bay" P/Q unit, alongside enemies and likely PREA perpetrators, who were emboldened by the lax policies disciplining sexual assault – even though he had been classified as a PREA victim who needed to be housed separately from potential predators. *Id.* ¶¶226-230, 58, 62. Count IV states a claim.

### C.    D.S. states failure to protect claims in Count VI against classification supervisor Estelle for her policies, practices, and omissions.

Plaintiff likewise states a claim in Count VI against St. Clair's head of classification, Defendant Estelle, for her policies, practices, and omissions. Doc. 34 ¶¶340-48. Plaintiff's complaint makes clear that Estelle's responsibilities at St. Clair included ensuring safe housing assignments for prisoners such as D.S. and his assailants; conducting initial screenings; transferring prisoners to protective custody; and supervising classification staff (*id.* ¶¶34, 35, 343), and he alleges misconduct by her in her classification role (*id.* ¶¶343).

Estelle was on notice of the widespread violence at St. Clair, as well as the dangerous conditions that fueled it. *Id.* ¶¶341-42, 344, 75, 98-180, 194-211, 297-17, 219-20, 224-25, 232-

47, 250-54, 261-70, 272-80. Nonetheless, she continued to fuel the violence at St. Clair by failing to house potential predators and past assailants away from likely victims and in segregation; housing prisoners alongside their known and documented enemies; and failing to protect prisoners who reported safety concerns by placing them in safe housing (*id.* ¶¶345, 224-31, 262-71, 253, 117b, 113b, and 124), creating a substantial risk of serious harm to prisoners such as D.S. She also failed to train subordinate classification staff who perpetrated those same policies and practices (*id.* ¶¶343, 346), further giving rise to the conditions that injured D.S.

Estelle's summary of the allegations against her is materially incomplete, and she makes no effort to take Plaintiff's allegations as true and make inferences in Plaintiff's favor. Doc. 140 at 10-11. Rather, she resorts to feigning ignorance that Plaintiff alleges direct misconduct by her with respect to her classification and housing policies and practices, such as allowing documented PREA victims to be housed in general population (and even in the unsafe P/Q blocks) alongside documented enemies and associates, rather than in protective custody. *See Ogletree*, 2021 WL 4477630, at *24-25.

Estelle cites no authority requiring Plaintiff to allege more examples of violence than he already has. Moreover, Plaintiff has specifically alleged that Estelle knew that the commingling of enemies in housing units results in foreseeable violence, and that the failure to adequately protect vulnerable prisoners, separate prisoners known to be enemies, and segregate predatory prisoners had contributed to many violent incidents in the past. *Id.* ¶¶224-26, 253, 262-63, 117b, 137, 113b, 132c, 141, 113e, 121b, 124, 128a, 133, 136, 135. D.S. further alleges that Estelle had previously been sued at least three different times for her role in enabling sexual assaults through her dangerous classification policies and practices (*id.* ¶¶174). His allegations suffice.

**D.** **D.S. states claims in Counts III and V against Defendants Malone, White, Gordy, and Ragsdale for deliberate indifference to D.S.**

D.S. also states claims in Counts III and V against Malone, White, Gordy, Ragsdale for their deliberate indifference to the individualized risk of harm faced by D.S., in particular. Doc. 134 ¶¶307-318, 331-35. Plaintiff has detailed the substantial risk of serious harm that he faced due to his vulnerability and the risk posed by his enemies; Defendant's subjective knowledge of that risk; and their deliberate indifference. Defendants' contrary arguments omit allegations, take inferences in *their* favor, and overstate the pleading requirements. Doc. 140 at 13-15, 16-18.

First, with respect to Count III, Malone and White challenge Count III's allegations (Doc. 140 at 13-15), even while Jones, Givens, and Brooks concede that the parallel and equivalent allegations against them in Count III state a claim (Doc. 142 at 13 n.2). Plaintiff's complaint ably sets forth how Defendants Malone and White knew that D.S. was particularly vulnerable, had a history of being victimized and violently assaulted while in ADOC custody including at Holman and Donaldson, and had known enemies and their associates at St. Clair related to the Holman and Donaldson assaults. *Id.* ¶¶ 309-315, 55-60, 62-74. These captains also knew that the commingling of enemies leads to foreseeable violence and had caused many violent incidents in the past (*id.* ¶¶224-26, 117b, 132c, 113b, 137, 141, 113e, 121b, 124, 128a, 133, 136, 135, 253, 262-63); that the proliferation of contraband weapons, lack of supervision, and other dangerous conditions at St. Clair facilitated violence between enemies (*id.* ¶¶182-201, 207-217, 219-220, 224-225, 232-247, 251-54, 261-270, 272- 279); that prisoners in the P/Q blocks were particularly at risk (*id.* ¶¶181-205); and thus that D.S.was at a high risk of suffering additional assaults from his enemies. Nonetheless, these Defendants took no steps to protect the vulnerable D.S. and allowed him to be housed in general population alongside enemies likely to commit violence against him, where, as Malone and White knew, prisoners were permitted to move freely into the

P/Q blocks, and to commit violence with impunity. *Id.* ¶¶302-04, 310-316, 63-70, 73-77, 224-31, 150-80, 186-87. Malone and White brushed D.S. off when he raised concerns about being housed with his enemies, even though they knew of the dangers at St. Clair and had the authority to change his housing status, exhibiting deliberate indifference to the risks he faced. *Id.* ¶¶66-70, 29-30. When D.S. began to receive threats from associates of his enemies and was told that one of his enemies had put out an order to stab D.S., White told D.S. to go back to the dorm and not worry about it (*id.* ¶87), despite knowledge of the dangerousness of D.S.'s enemies and their associates and the acutely dangerous conditions at St. Clair (*id.* ¶ 87, 98-180). Indeed, White even tried to send D.S. back to the dorm with his assailants as he fled from the rape. *Id.* ¶¶85-88.

Likewise, Plaintiff states claims against PREA coordinators Gordy and Ragsdale in Count V. Doc. 134 ¶¶331-39. Gordy knew, through D.S.'s file and directly from concerns raised by D.S. himself, that D.S. was particularly vulnerable; that he had a history of being victimized and violently assaulted while in ADOC custody including at Holman and Donaldson; that he had known enemies and their associates at St. Clair related to the Holman and Donaldson assaults; that he had been designated as a PREA victim; and therefore, that he was at a high risk of additional assaults. Doc. 134 ¶¶ 334, 57-58, 60, 62, 71-72. Nonetheless, Gordy—the PREA coordinator responsible for separating likely victims from likely perpetrators of sexual violence as required by PREA (*id.* ¶32), did nothing to house D.S. safely, such as in protective custody (*id.* ¶¶334, 57-58, 60, 62-64, 72, 74-77), and left D.S. in general population, where he was at risk from his enemies and their associates due to prisoners' free movement at the facility (*id.* ¶¶186-87); even though she knew that the commingling of enemies had caused many assaults in the past (*id.* ¶¶224-26, 253, 262-63); that vulnerable prisoners had been repeatedly assaulted at St. Clair when housed in general population or alongside enemies (*id.* ¶¶ 137, 126, 113(b), 141, 117(b),

149); that the P/Q blocks were acutely unsafe (*id.* 181-201); and that St. Clair (and the P/Q blocks in particular) had experienced a crisis of sexual violence in recent months (e.g., *id.* ¶¶249-71, 105, 108, 113(b), 117(a), 118, 119(b), 120, 121(a), 121(c), 122, 124, 126, 128(d), 130(a), 131, 132(b), 133, 134(b), 136, 137, 139, 144(a)). After D.S. reported his rape, Gordy—who was responsible for appropriate treatment of sexual assault victims—then housed this sexual assault victim in the punitive segregation unit, *again* placing him with his enemies and their associates, including one who foreseeably retaliated against D.S. *Id.* ¶¶337, 374, 90-97. Plaintiff pleads nearly identical allegations against PREA assistant coordinator Ragsdale, who also failed to take any action to house D.S. safely, such as in protective custody. *Id.* ¶¶ 332-39.

These allegations suffice. *See Green*, 2013 WL 4647493, at *3 (plaintiff stated claim against three different officers who received different information about the risks of assault the plaintiff faced as a vulnerable transgender prisoner, because "[a] review of the pleadings indicates that it is at least plausible that Defendants had subjective knowledge of a serious risk of harm to Plaintiff" and acted with deliberate indifference); Exh. A, *Caldwell*, No. 1:09-cv-02210-TMP (N.D. Ala.), Dkt. 14 at 4-5 & Dkt. 18 (plaintiff stated a claim when he informed staff of a potential threat and they had reason to know from a prior incident that the risk was substantial; the defendants' alleged conduct of shrugging off the plaintiff's concerns, rather than attempting to investigate or assess the risk, rose to the requisite level of reckless disregard); *Cox*, 15 F.4th at 1359 (allegations that defendants were aware of threat of future violence, and had knowledge that violence had already taken place, pleaded requisite subjective knowledge).

Defendants next question whether Plaintiff has alleged that his enemies and their associates caused D.S.'s injuries. Doc. 140 at 14. Yet D.S. specifically alleges that he was assaulted at St. Clair by his enemies related to the prior Holman and Donaldson assaults, who

were known to Defendants. Doc. 134 ¶¶5, 55-60, 62-79; *id.* ¶68 ("But following his release into general population, D.S. began to receive threats from associates of his enemies and was told that one of his enemies had put out an order to stab D.S."); *id.* ¶79 ("One of his enemies initiated and organized the assault"). *Murphy v. Turpin*, 159 F. App'x 945 (11th Cir. 2005), is inapposite.

Moreover, as Defendants acknowledge, Plaintiff has also alleged that housing him, as a vulnerable PREA victim with a known history of experiencing repeated in-custody violence, in the most dangerous unit at St. Clair, given the dangerous prisoners, contraband weapons, and lack of supervision in that unit, was also sufficient to constitute deliberate indifference. Doc. 134 ¶62, 315-16, 334. And in support, D.S. has explained how Defendants knew not only of his prior assaults, but also that vulnerable prisoners had been repeatedly assaulted at St. Clair when housed in general population or alongside enemies (*id.* ¶¶ 137, 126, 113(b), 141, 117(b), 149); of the acute dangerousness of the P/Q blocks (*id.* 181-201); and of the deluge of reported sexual assaults in recent months, many of which took place in the P/Q blocks (e.g., *id.* ¶¶249-71, 105, 108, 113(b), 117(a), 118, 119(b), 120, 121, 122, 124, 126, 128(d), 130(a), 131, 132(b), 133, 134(b), 136, 137, 139, 144(a)). Defendants may not "escape liability for deliberate indifference by showing that, while he [or she] was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." *Farmer*, 511 U.S. at 843. *Cox* is not to the contrary, as that decision merely explained based on a barebones complaint (*see* Exh. B): "Although we have no doubt that PREA documents could put prison officials on notice of a substantial risk of serious harm to an inmate, in this case Cox failed to allege anything to help us discern what the PREA documents said." 15 F.4th at 1362. D.S. provides the context missing in *Cox*.

Defendants argue that D.S. must allege facts showing that he was at risk of being exposed

to his potential assailants. Doc. 134 ¶¶13-14. He has done exactly that, explaining that, as Malone and White knew, the P/Q blocks were generally left unsecured and unmonitored; prisoners could roam freely and without supervision or interference in and out of the blocks and throughout the prison, and that St. Clair was violent and dangerous, including because it had a proliferation of contraband weapons. *Id.* ¶¶186-87, 198, 181-205, 119(f), 121(d), 206-23. Thus, Plaintiff's allegations satisfy the pleading deficiency present in the bare-bones complaint in *Cox*, in which, unlike here, "there were no allegations to suggest" that the plaintiff and an assailant "would encounter each other in an unsupervised setting." *Cox*, 15 F.4th at 1360-61.

### E. D.S. states claims in Count VII against classification personnel Estelle, Ary, and Bonner for deliberate indifference to D.S.

Plaintiff also states claims in Count VII against classification personnel Estelle, Ary, and Bonner. Doc. 134 ¶¶ 349-363, 34, 37, 42. As set forth earlier, Estelle was St. Clair's head of classification at St. Clair, whose responsibilities included ensuring safe housing assignments for prisoners such as D.S. and his assailants; conducting initial screenings; transferring prisoners to protective custody; and supervising classification staff (*id.* ¶¶34, 35, 343). Ary was a classification officer at St. Clair whose responsibilities included identifying vulnerable prisoners, enemies, and prisoners with a history of violence, and ensuring that prisoners such as D.S. were housed safely. *Id.* ¶37. Both Estelle and Ary were aware of the widespread violence at St. Clair, as well as the dangerous conditions that fueled it (*id.* ¶¶353, 75, 98-180, 194-211, 297-17, 219-20, 224-25, 232-47, 250-54, 261-70, 272-80), and had been previously sued for deliberately indifferent classification practices resulting in rapes and knifepoint assaults at St. Clair (*id.* ¶174). Both Estelle and Ary were aware that D.S. had enemies and their associates at St. Clair and that he was a vulnerable prisoner who had been identified as a PREA victim and had a history of suffering in-custody assaults, and thus was at a high risk of additional assaults. *Id.*

¶¶354, 57-60, 62-63. D.S. directly informed Estelle of his enemies and their associates at St. Clair. *Id.* ¶¶56, 35. Nonetheless, Estelle and Ary did not house D.S. in protective custody and instead caused D.S. to be moved into general population where he was at risk from his enemies and their associates, leading to his foreseeable assault. *Id.* ¶¶355, 64, 74-77. After D.S.was raped, Estelle and Ary again housed D.S. alongside his enemies in segregation, where he was subject to retaliation. *Id.* ¶¶356, 90-97.

Plaintiff also pleads, in the alternative, liability against Defendant Bonner, a classification supervisor at Donaldson who was responsible for identifying vulnerable prisoners, enemies, and prisoners with a history of violence and ensuring that all prisoners, including D.S., had safe placements. *Id.* ¶42. She was responsible for notifying transferring institutions about a transferee's known enemies and vulnerabilities, including notifying St. Clair about D.S.'s known enemies, history, and vulnerabilities. *Id.* Plaintiff pleads (in the alternative), that Bonner was aware that D.S. had suffered violent attacks at Holman and Donaldson, had enemies from those attacks, was a vulnerable prisoner, and was at high risk of suffering another attack. *Id.* ¶¶359, 48-53, 62. Despite this, she failed to fulfill her responsibilities to provide notify staff at St. Clair about D.S.'s vulnerabilities and enemies in connection with his transfer to St. Clair, acting with deliberate indifference toward his foreseeable resulting assault. *Id.* ¶¶360-61, 48-53, 61.

Plaintiff has thus plead each element of a failure-to-protect claim against Estelle, Ary, and Bonner. Estelle and Ary's duplicative challenges to D.S.'s claims fail, for the reasons set forth above. *Supra* at 19-20, 23-24. Bonner's argument that she "worked at a completely different prison" (Doc. 140 at 14), ignores D.S.'s detailed allegations that she knew of his vulnerability to repeated assaults; that she was the person charged with informing St. Clair staff of D.S.'s two previous attacks by the same group of prisoners, as her job required; and that in

unreasonably failing to do so, she acted with deliberate indifference toward his foreseeable assault. Doc. 134 ¶¶360-61, 48-53, 61. These allegations suffice to state each element of a plausible failure to protect claim at the pleading stage, and Defendants cite no authority requiring more.

###### F.    D.S. states failure to protect claims in Count VIII against Defendants McMillian, McLemore, and Boyd for deliberate indifference to D.S.

Finally, Plaintiff states claims against Defendants McMillian, McLemore, and Boyd in Count VIII. Doc. 134 ¶¶364-72. At the relevant times, McMillian and McLemore were St. Clair correctional officers and Boyd was a St. Clair lieutenant. *Id.* ¶¶38-40. McMillian and Boyd were each aware of the lack of supervision, widespread violence, and weapons in the P block. *Id.* ¶367. McLemore and McMillian walked by D.S.'s cell at various points while he was tied up, and saw that D.S. was being assaulted, but did nothing to protect him during the prolonged and violent attack, even though they could have intervened or sought assistance to end the assault. *Id.* ¶¶370, 84. These allegations state a failure to protect claim (*e.g.*, *Johnson v. Boyd*, 701 Fed. App'x 841, 847 (11th Cir. 2017)), as McLemore and McMillian do not contest. *See* Doc. 140 at 6 & 13-16 (discussing dismissal of Count VIII only as to Defendant Boyd).

Plaintiff's allegations against Boyd are also well-pled. Plaintiff alleges that Boyd was aware of the substantial risk of serious harm facing prisoners such as D.S. at St. Clair— particularly, in the P/Q blocks—from commingling of enemies, contraband weapons, inadequate supervision and monitoring, widespread violence, and other dangerous conditions that resulted in foreseeable violence. Doc. 134 ¶¶365-69. Even though D.S. informed Boyd prior to his assault that he had enemies and their associates at St. Clair, and Boyd knew that D.S. was particularly vulnerable, that he had a history of victimization involving enemies now at St. Clair, that the commingling of enemies caused foreseeable violence, particularly given the dangerous

conditions at St. Clair, and that D.S. was therefore at a high risk of additional assaults, Boyd caused him to be released into general population alongside enemies likely to assault him. *Id.* ¶¶368, 63-64, 74-77. These allegations state a claim. *E.g.,* Exh. A, *Caldwell*, No. 1:09-cv-02210-TMP (N.D. Ala.), Dkt. 14 at 4-5 & Dkt. 18; *Green*, 2013 WL 4647493, at *3. Boyd's contrary arguments fail to take D.S.'s allegations as true and draw inferences in his favor. Doc. 140 at 16.

## II. Defendants are not entitled to qualified immunity on D.S.'s failure to protect claims.

Defendants are not entitled to qualified immunity on any of D.S.'s failure to protect claims. *See* Doc. 142 at 17-18; Doc. 140 at 5-18. Correctional officials are not immune when their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known.'' *Gonzalez v. Reno*, 325F.3d 1228, 1233 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). When reviewing a motion to dismiss on qualified immunity, the court must "accept as true the facts as set forth in the complaint and draw all reasonable inferences in the plaintiff's favor." *Id.* at 705. No heightened pleading standard applies. *Randall v. Scott*, 610 F.3d 701, 710 (11th Cir. 2010). Plaintiff has explained above how his complaint sets forth violations by each Defendant of his Eighth Amendment rights (*supra* at 7-32), satisfying the first prong of the qualified immunity analysis. He discusses the second, "clearly established" prong of qualified immunity here.

The Defendant ADOC administrators and wardens mount a conclusory argument regarding the clarity of the established law to support liability in Counts I, II, and IV, in which they are alleged to have acted with deliberate indifference to prisoners such as D.S. through inaction in the face of dangerous conditions, policies, practices, and failures to supervise. Doc. 142 at 17-18 & 2 n.1. The remaining Defendants, in turn, challenge the clarity of the law only as to Count VII against Defendant Bonner, and otherwise fail to discuss the clarity of the law. *See*

Doc. 140 at 5-18 (discussing challenges to Counts III-VIII and referencing the clarity of the law only as it relates to Bonner, at pages 17-18). Plaintiff addresses each argument in turn.

For a right to be clearly established, "[t]he 'salient question' is 'whether the state of the law' at the time of the official's conduct gave the official 'fair warning that their alleged treatment of [the plaintiff] was unconstitutional.'" *Dickinson*, 833 F. App'x at 273 (quoting *Hope*, 536 U.S. at 741). A plaintiff may show such fair warning in at least three ways:

> First, a plaintiff can 'show that a materially similar case has already been decided.' Second, a plaintiff can 'show that a broader, clearly established principle should control the novel facts' of a particular situation. Third, a plaintiff can show that his or her case 'fits within the exception of conduct which so obviously violates the constitution that prior case law is unnecessary.'

*Id.* at 273-74 (quoting *Corbitt v. Vickers*, 929 F.3d 1304, 1312 (11th Cir. 2019)). Qualified immunity is typically addressed at summary judgment (*id.* at 271) and may be granted at the pleading stage only if the allegations on their face, taken as true, show that plaintiff is barred from recovery as a matter of law. *Marsh*, 268 F.3d at 1022-23.

## A.     Defendant ADOC administrators and wardens' qualified immunity challenge

The Defendant ADOC administrators and wardens (and other supervisory defendants) had fair warning of the unconstitutionality of the pleaded conduct regarding their policies, practices, and inaction in all ways permitted under the caselaw: materially similar cases; broader, clearly established principles; and obviousness. *Dickinson*, 833 F. App'x at 273-74.

First, materially similar cases put these Defendants on notice of their obligation not to violate Plaintiff's Eighth Amendment rights. Prison officials "are under an obligation to take reasonable measures to guarantee the safety of the inmates." *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984). This obligation attaches when officials are aware of a general risk of assault to prisoners regardless of whether that risk comes from a specific assailant. *Farmer*, 511 U.S. at

843. "[I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Id.*

As the Eleventh Circuit recognized recently in *Dickinson*, it was clearly established as of January 2018 (long before the assaults on D.S.) based on materially similar cases that supervisory officials violate the Constitution where, as here, they fail to correct deficiencies such as inadequate supervision and monitoring of prisoners, management of contraband weapons, and classification/housing of prisoners, and those deficiencies have resulted in an "ongoing problem with inmate-on-inmate abuse." 833 F. App'x at 272-73 (discussing *Hale*, 50 F.3d at 1584-85; *Marsh*, 268 F.3d at 1034). *Dickinson* post-dates the misconduct here, but its analysis regarding *Hale*, *Marsh*, and the clarity of the law in January 2018 compels denial of immunity here.

*Dickinson* relies on *Marsh*, in which the Eleventh Circuit held, sitting *en banc*, that "it was clearly established in this Circuit [in 1996] that it is an unreasonable response for an official to do nothing when confronted with prison conditions that pose a risk of serious physical harm to inmates." 268 F.3d at 1034. The conditions in *Marsh* included—as alleged here—improper classification and segregation of dangerous prisoners, a proliferation of contraband weapons, a failure to discipline prisoners who assaulted other prisoners, inadequate supervision and monitoring, and other similar policies and customs promoting and facilitating violence. *Id.* at 1029. Even though the *Marsh* plaintiffs did not allege "a history of inmate assaults with serious injuries" (as Plaintiff here has alleged in detail) the Court explained that "that factual variance cannot make a difference." *Id.* at 1034. The Eleventh Circuit's decision in *Hale*, too, provided notice that—as alleged here—correctional supervisors violate the Constitution when they fail to act in the face of substantial risks arising from, for example, the failure to segregate dangerous

prisoners, inadequate supervision and monitoring, and regularly-occurring fights between prisoners that occasionally necessitate medical attention. *Hale*, 50 F.3d at 1581-84; *Marsh*, 268 F.3d at 1033 n.12.

By 2018, numerous other cases, too, had held—consistent with *Hale* and *Marsh*—that deliberate indifference to an "excessive risk of inmate-on-inmate violence" violates the Constitution. *E.g.*, *Lane v. Philbin*, 835 F.3d 1302, 1307-1308 (11th Cir. 2016) (inadequate supervision of prisoners, failures to segregate particularly dangerous prisoners, ready access to contraband weapons, and widespread prisoner-on-prisoner violence gives rise to a substantial risk of serious harm to which prison officials cannot constitutionally respond with deliberate indifference); *LaMarca,* 995 F.2d at 1536-38 (prison officials' deliberate indifference in the face of inadequate supervision and monitoring of prisonerswith known histories of prisoner-on-prisoner violence violates the Eighth Amendment); *Purcell*, 400 F.3d 1313, 1320 (recognizing that "excessive risk of inmate-on-inmate violence . . . creates a substantial risk of serious harm" based on *Hale* and *Marsh* and dismissing claims at summary judgment based only on a lack of evidence of such risk); *Williams v. Edwards,* 547 F.2d 1206, 1211 (5th Cir. 1977) (citing *Gates v. Collier,* 501 F.2d 1291 (5th Cir. 1974)); *Jones v. Diamond*, 636 F.2d 1364, 1374 (5th Cir. Jan. 29, 1981) (en banc) ("When prison officials have failed to control or separate prisonerswho endanger the physical safety of other prisoners and the level of violence has become so high . . . it constitutes cruel and unusual punishment"), overruled on other grounds, *Int'l Woodworkers v. Champion Int'l*, 790 F.2d 1174 (5th Cir. 1986). Defendants thus had fair notice that deliberate indifference in the face of an excessive risk of prisoner-on-prisoner violence, including violence arising from the dangerous conditions pleaded here, violates the Constitution. *See also Ogletree*, 2021 WL 4477630, at *32.

The ADOC Officials' citation to the appellate decision in *Marbury*, 936 F.3d 1227, does not compel a different result. Doc. 142 at 17-18. That decision post-dates the conduct here and could not have informed Defendants' understanding of the established law at the time of the misconduct. *Pearson v. Callahan*, 555 U.S. 223, 244 (2009). Nor does the district court's non-binding decision in *Marbury* bear on whether the right in question was clearly established. *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) (the Court should look "only to binding precedent—cases from the United States Supreme Court, the Eleventh Circuit, and the highest court of the state under which the claim arose—to determine whether the right in question was clearly established at the time of the violation.").

Defendants' overly expansive reading of *Marbury* was rejected by the Eleventh Circuit in *Dickinson*; *Marbury* reaffirms that inaction by correction officials in the face of a generalized risk of prisoner-on-prisoner violence violates the Constitution if the risk is sufficiently great, and merely holds that at summary judgment, evidence of only "occasional, isolated attacks by one prisoner on another," such as "2.5 stabbings per year" does not suffice. *Marbury* also reaffirms that "a generalized risk of violence from a prison population c[an] support a claim of deliberate indifference" when a plaintiff "points to specific features of a facility or its population rendering it particularly violent." 936 F.3d at 1235 & nn. 20-22. D.S. has alleged facts supporting both methods of proving a deliberate indifference claim, defeating qualified immunity. *E.g.*, *supra* at 11-12, 3-4.

The ADOC Officials' remaining case citations (Doc. 142 at 17) are factually and procedurally inapposite. *See Purcell*, 400 F.3d at 1320 (recognizing that "excessive risk of inmate-on-inmate violence . . . creates a substantial risk of serious harm" based on *Hale* and *Marsh* and dismissing claims at summary judgment based only on a lack of evidence of such

risk); *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (recognizing supervisory liability "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so" or when "a supervisor's custom or policy results in deliberate indifference to constitutional rights" or "knew that the subordinates would act unlawfully and failed to stop them from doing so," but dismissing supervisory liability claim because the plaintiff failed to allege facts for any of these theories, such as any affirmative custom or policy implemented by the supervisory defendants); *Harrison*, 746 F.3d at 1299-1300 (recognizing "an excessive risk of inmate-on-inmate violence at a jail creates a substantial risk of serious harm" and dismissing claim of risk arising from a failure to monitor a back hallway at summary judgment only because of "[t]he limited number of inmate-on-inmate assaults on the back hallway from 2005 until August 2008."); *Carter v. Galloway*, 352 F.3d 1346, 1350 (11th Cir. 2003) (reaffirming *Hale* and *Marsh*, and granting summary judgment in a case in which there were no allegations of failure to act in the face of a history of widespread abuse, policies or customs resulting in deliberate indifference, or knowledge of unlawful conduct by subordinates).

In addition to materially similar cases, broader, clearly established principles also provided Defendants with fair notice. Prison officials "are under an obligation to take reasonable measures to guarantee the safety of the inmates" and "have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 832-33 (quotation omitted). This obligation attaches when Defendants are aware of a general risk of attack to prisoners regardless of whether they knew of a risk from a specific attacker, or to a particular prisoner. *Id.* at 843. Having "stripped [prisoners] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Id.* at 833; *id.* at 834 ("Being violently assaulted in prison is simply not part of the

penalty that criminal offenders pay for their offenses against society.").

Defendants were thus on notice that "[a] prison official violates the Eighth Amendment when a substantial risk of serious harm, which the official is subjectively aware, exists and the official does not respond reasonably to the risk." *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) (emphasis removed). "This broad principle has put all law-enforcement officials on notice that if they actually know about a condition that poses a substantial risk of serious harm and yet do *nothing* to address it, they violate the Constitution." *Patel v. Lanier Cty. Georgia*, 969 F.3d 1173, 1190 (11th Cir. 2020) (emphasis in original); *see also Green*, 2013 WL 4647493, at *4 (denying qualified immunity at the motion to dismiss stage because by 2012, "it was clearly established that prison officials with subjective knowledge of a serious risk of harm to an inmate [from prisoner-on-prisoner violence] could not respond in an objectively unreasonable manner"). Likewise, Defendants were on notice that a "total failure to investigate—or to take any other action to mitigate—[a] substantial risk of serious harm" to a prisoner violates the Constitution. *Caldwell*, 748 F.3d at 1103. No reasonable correctional official would have thought that it was constitutionally permissible to do nothing in the face of the horrific violence and conditions leading up to D.S.'s assaults. *Supra* at 3-4, 8-11. Defendants are not entitled to qualified immunity at the pleading stage where Plaintiff alleges that they consistently failed to act despite knowing of, or being willfully blind to, a substantial risk of serious harm from prisoner-on-prisoner violence. *Farmer*, 511 U.S. at 833.

Finally, Defendants are likewise not entitled to qualified immunity at the pleading stage where Plaintiff alleges conduct that violated the Constitution due to the "obvious cruelty inherent" in permitting D.S. to be housed and kept under the "wantonly . . . dangerous situations" perpetrated and facilitated by Defendants and described *supra* at 3-4, 8-11. *Taylor v. Riojas*, 141

S. Ct. 52, 52-54 (2020). Any reasonable corrections official would have known that such conduct "was at war with" the Eighth Amendment. *Brooks v. Warden*, 800F.3d 1295, 1307 (11th Cir. 2015).

### B. Defendant Bonner's qualified immunity challenge

Defendant Bonner's qualified immunity challenges fails under the broader, general principles and obviousness exceptions. As set forth above in more detail, Bonner was aware that D.S. had suffered violent attacks at Holman and Donaldson, had enemies from those attacks who had already transferred prisons once, was a vulnerable prisoner, and was at high risk of suffering another attack. *Id.* ¶¶359, 48-53, 62. Despite this, she failed to fulfill her job responsibilities to notify St. Clair staff of D.S.'s previous attacks, vulnerability, and his enemies and their associates, acting with deliberate indifference toward his foreseeable assault. *Id.* ¶¶360-61, 48-53, 61. Broad, clearly established principles provided Bonner with fair notice that her conduct was unconstitutional. *See supra* at 37-38 (discussing *Farmer*, *Caldwell*, *Patel*, and *Green*). No reasonable correctional official with the information known to Bonner about D.S.'s past history of assaults, vulnerability, and enemies would have thought that it was constitutionally permissible to omit mention of that history in his transfer paperwork, even as her job required her to provide such notice to protect D.S. from further stabbings. *Supra* at 30.

## III. D.S. states a retaliation claim (Count IX) against Estelle, Ary, and Gordy.

### A. D.S. states a retaliation claim.

Contrary to the challenge by Defendants Estelle, Ary, and Gordy (Doc. 140 at 18-19), D.S. sufficiently alleges each element of a retaliation claim. Doc. 134 ¶¶373-79. To state a retaliation claim, a plaintiff must allege that his speech or act was constitutionally protected; defendants' retaliatory conduct adversely affected the protected speech, meaning that it would

likely deter a person of ordinary firmness from the exercise of First Amendment rights; and a causal connection between the retaliatory actions and the adverse effect on speech. *Bennett v. Hendrix*, 423 F.3d 1247, 1250-51 (11th Cir. 2005). The causal connection may be alleged by direct participation or supervisory liability. *E.g.*, *Keating v. City of Miami*, 598 F.3d 753, 767 (11th Cir. 2010); *Dickinson*, 833 Fed. App'x at 272; *Hicks v. Ferrero*, 241 F. App'x 595, 598 (11th Cir. 2007) (same). Plaintiff's allegations of unlawful retaliation suffice under both direct participation and supervisory liability theories.

First, Plaintiff has plead that Estelle, Ary, and Gordy intentionally retaliated against Plaintiff by placing him in isolation in the segregation unit alongside his enemies (rather than in protective custody), where he was subject to foreseeable abuse from his enemies rather than separated from them by sight and sound, as required by PREA. Doc. 134 ¶¶373-74, 90-97, 264-65. Contrary to Defendants' argument (Doc. 140 at 19), Plaintiff has alleged that they knew of his enemies at St. Clair and that his placement alongside them was intentional and retaliatory, to punish him for reporting his sexual assault—not "unconscious" (*id.*), and that they acted pursuant to a longstanding policy and practice of retaliation against reporting rape victims (*id.* ¶¶375-76, 249-71, 232-38, 113b, 120, 124, 126, 132b, 133, 135, 136, 137, 149, 78-97, 96).

Plaintiff's allegations of Defendants' intent suffice. Fed. R. Civ. P. 9(b). In addition, the intentional housing of a reporting rape victim in segregation and in close proximity to his enemies and their associates easily meets the standard of constituting a sufficient adverse action that would deter a person from engaging in protected speech. Defendants' contrary citations are factually inapposite. *See Harper v. Admin. Lieutenant*, 857 F. App'x 551, 554 (11th Cir. 2021); *Smith v. Governor for Ala.*, 562 F. App'x 806, 815 (11th Cir. 2014).

Defendants also ignore that Plaintiff has pled that Gordy and Estelle knowingly furthered

policies and practices of discouraging victims from reporting assaults and rapes and retaliating against reporting victims by subjecting them to segregation and discipline and housing them alongside their assailants. *Id.* ¶¶376, 249-71, 232-38, 113b, 120, 124, 126, 132b, 133, 135, 136, 137, 149, 78-97, 96. Gordy and Estelle also knew that their subordinates engaged in the same practices. *Id.* ¶¶376, 249-71, 232-38, 113b, 120, 124, 126, 132b, 133, 135, 136, 137, 149, 78-97. Nevertheless, Gordy and Estelle failed to counteract these policies and practices, allowed the retaliation to continue, and failed to correct their subordinates (*id.* ¶¶375-76, 32, 34-36), causing Plaintiff's injuries in segregation (*id.* ¶¶ 375-79). Defendants are thus liable as supervisors. *Keating*, 598 F.3d at 767; *Dickinson*, 833 Fed. App'x at 272; *Hicks*, 241 F. App'x 595.

**B.    Defendants are not entitled to qualified immunity.**

It has also long been clearly established that prison staff cannot retaliate against prisoners for raising grievances regarding their conditions of confinement. *Hicks*, 241 F. App'x at 598-99 (clearly established by 1989 that a prisoner's First Amendment free speech rights are violated when officials retaliate against the prisoner for raising a grievance); *Wildberger v. Bracknell*, 869 F.2d 1467, 1468 (11th Cir. 1989); *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008). Defendants sole contrary argument—that they acted unconsciously—contradicts Plaintiff's allegations and fails to take inferences in his favor, as is required.

**IV.    Defendants are not entitled to immunity on D.S.'s state law claims.**

Defendants seek an entitlement at the pleading stage to state-agent immunity from Plaintiff's state law claims. Doc. 140 at 23-24; Doc. 142 at 18-21. Defendants concede that Plaintiff's pleading contains allegations that could support exceptions to state-agent immunity (*e.g.*, Doc. 142 at 19), but ask this Court to disregard those allegations and adjudicate their as-yet-unpled immunity defense now. This Court should decline to do so.

First, Plaintiff's complaint is consistent with exceptions to state-agent immunity, defeating application of Defendants' affirmative defense at the pleading stage. *Huffman*, 2021 WL 2533024, at *7 ("the Alabama Supreme Court has stated that the determination of state-agent immunity is a fact-intensive question generally fit for the summary judgment stage; not the motion to dismiss stage") (collecting authority); *Hawkins v. City of Greenfield*, 101 F. Supp. 2d 1356, 1362 (M.D. Ala. 2000); *Mann v. Darden*, 630 F. Supp. 2d 1305 (M.D. Ala. 2009); *Ex parte Dangerfield*, 49 So. 3d 675, 682-83 (Ala. 2010). Defendants' argument is premature.

In addition, *Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000), sets forth two exceptions to state-agent immunity: when "(1) the Constitution or laws of the United States . . . require otherwise;" or "(2) the State agent act[ed] willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Id.* at 405. Plaintiff here alleges that Defendants violated the federal Constitution, and thus an exception to immunity is consistent with Plaintiff's allegations. *Taylor v. Hughes*, 920 F.3d 729, 734 (11th Cir. 2019); *Foster v. Maloney*, 785 F. App'x 810, 818-19 (11th Cir. 2019); *Hunter v. City of Leeds*, 941 F.3d 1265, 1284 (11th Cir. 2019); *Huffman*, 2021 WL 2533024, at *8. Plaintiff's complaint is also consistent with the defense to immunity that defendants who violate "clearly established law" have acted "beyond their authority." *Sheth v. Webster*, 145 F.3d 1231, 1239 (11th Cir. 1998); *Cantu v. City of Dothan*, 974 F.3d 1217, 1236 (11th Cir. 2020). Defendants do not discuss this exception, let alone meet their burden to establish an affirmative defense at the pleading stage.[6]

As an independent basis for denying immunity, Plaintiff alleges that Defendants acted willfully, maliciously, fraudulently, and/or in bad faith, consistent with the second *Cranman*

---

[6] Defendants Jones and Brooks concede that Plaintiff has stated a constitutional violation against them (Doc. 142 at 2 n.1), providing yet another reason why they, in particular, cannot establish an entitlement to state-agent immunity.

exception. Doc. 134 ¶¶403-405, 416, 430. Plaintiff's allegations of the requisite mental state are not impermissibly "conclusory"; pursuant to federal court pleading standards, "[m]alice . . . and other conditions of a person's mind may be alleged generally," Fed. R. Civ. P. 9(b). Even if specific allegations were required (which they are not), Plaintiff has alleged in detail how many Defendants acted callously as they perpetrated dangerous policies and procedures even as they received myriad warnings highlighting the need for urgent action, including over one hundred brutal stabbings, rapes, and murders (Doc. 134 ¶¶98-180); failed to protect D.S. in the face of notice of his devastating history of prior victimization (*e.g.*, *supra* at 2-3); and failed to protect D.S. even as some of them observed D.S. being assaulted (*e.g.*, Doc. 134 at ¶84).

  *Ex parte Gilland*, 274 So. 3d 976 (Ala. 2018), does not defeat D.S.'s invocation of the second *Cranman* exception. *See* Doc. 142 at 20-21. In that case—a "rare case . . . that would be properly disposed" at the pleading stage (274 So. 3d at 985)—the complaint indicated that, "at all pertinent times, [the defendant] was discharging the duties imposed on her by [statute] and that she was doing so in the manner prescribed therein," and that the defendant "acted *conscientiously*" and "did everything in her power, short of disobeying her supervisor's instructions." *Id.* at 983, 985 (emphasis in original). Thus, the allegations in *Gilland* supported an entitlement to immunity (*id.* at 985), rather than, as here, supporting an immunity defense. Nor does Plaintiff's complaint suffer from the infirmity in *Shook*, 2020 WL 1492841, in which policy and custom allegations were deemed conclusory because they consisted of a barebones list of policies with no additional information. *Id.* at *7. The pertinent paragraph in *Shook* bears no resemblance to D.S.'s allegations. Case No. 2:18-cv-1048-MHT (M.D. Ala.), Dkt. 36 at ¶86.

  The Defendant ADOC administrators and wardens, alone, also mount a conclusory argument that they are entitled to state immunity pursuant to Article 1, § 14 of the Alabama

Constitution (Doc. 142 at 18), relying on *Barnhart v. Ingalls*, 275 So. 3d 1112 (Ala. 2018), in which a class of employees filed a class action against state officers for failing to pay employees benefits as required by law. *Id.* at 1117-18. *Barnhart* held that, in an individual-capacity suit for breach of fiduciary duty or negligence, a state officer may be immune if the duty alleged to have been breached existed only because of the officer's official position. *Id.* at 1126-27; *see also Archie v. Covington Cty.*, 2021 WL 1182370, at *4 (M.D. Ala. Mar. 29, 2021); *Robinson v. Montgomery Cty. Bd. of Educ.*, 2021 WL 3200988, at *3 (M.D. Ala. July 28, 2021).

Defendants do not satisfy their heavy burden to establish an entitlement to the affirmative defense of state immunity at the pleading stage. *Almond v. Randolph Cty., Alabama*, 2020 WL 3052223, at *5 (M.D. Ala. June 8, 2020). Defendants' immunity challenge does not apply to Plaintiff's IIED claim, which does not include a breach of duty as an element of the claim, as required under *Barnhart*'s reasoning. *E.g.*, *Robinson*, 2021 WL 3200988, at *4; *Archie*, 2021 WL 1182370, at *4; *Barnhart*, 275 So. 3d at 1126. In addition, for state immunity to be potentially applicable, the "necessary" duty element of the individual-capacity claim must be satisfied "<u>only</u> because of the positions' held by the officers") (emphasis in original). 275 So. 3d at 1126 (explaining further that the immunity attached because "Commission officers had no discretion to avoid that [employee payment] requirement; obedience to the statute is mandatory"); *see also Archie*, 2021 WL 1182370, at *4; *Robinson*, 2021 WL 3200988, at *3. Thus, even as to Plaintiff's negligence claim, Defendants' duty to D.S. did not arise solely because of their state positions, and their positions did not mandate their conduct toward D.S., defeating immunity. *Robinson*, 2021 WL 3200988, at *3-4; *Archie*, 2021 WL 1182370, at *4. In addition, state immunity is inapplicable when, as here, the plaintiff alleges that the defendant acted "in bad faith" or "beyond [his] authority." *Archie*, 2021 WL 1182370, at *4 (defendant

withheld medical care and deliberately ignored the pleas of a dying prisoner in his custody);

*Almond*, 2020 WL 3052223, at *6.

Courts have declined to extend *Barnhart*'s reasoning to allegations analogous to those here. In *Robinson*, the court declined to extend *Barnhart* to a state official who took no action to prevent the plaintiff from being grabbed, dragged, and raped by a third party, explaining:

> [T]he nature of the plaintiffs' negligence/wantonness claim in *Barnhart*—seeking to hold State officials liable for failure to pay certain benefits—is fundamentally different from the nature Robinson's negligence/wantonness claim here—seeking to hold a school official liable for failing to intervene (or even follow up) after he allegedly witnessed the initial events that ultimately led to the rape…

*Id.* at *2-*3. State Immunity does not apply.

## V.    D.S. states intentional infliction of emotional distress ("IIED") claims (Count XII).

The Defendant ADOC administrators and wardens challenge Plaintiff's IIED allegations (Dkt. 142 at 21), but their argument, which fails to discuss Plaintiff's allegations or any authority apart from a generic listing of the claim's elements, is so conclusory as to have been forfeited. *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012); *U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007). Their contention that D.S.'s pleading is "completely devoid of specific allegations" is easily disposed of by noting that Plaintiff's IIED counts specifically describe and incorporate the portions of the complaint detailing Defendants' culpability. Doc. 134 ¶¶406-15.

Contrary to the challenge by the remaining Defendants (Doc. 140 at 24-25), Plaintiff has pleaded in detail the requisite extreme and outrageous conduct, including that the supervisory Defendants were explicitly and repeatedly warned of the violent conditions caused by their inaction, policies and practices; knew the foreseeable consequences of their conduct, as well as the specific risks and history of D.S. and his assailants; and yet chose not to alter their behavior

even as prisoners continued to be brutally assaulted, stabbed, raped, and/or killed by the dozens at St. Clair. *Id.* ¶¶406-15, 98-180; *see also, e.g.*, *id.* ¶¶56-60, 68-70, 83-87 (describing how White repeatedly rebuffed D.S.'s requests for safety); *id.* at ¶84 (describing how McLemore and McMillian walked by and saw D.S.'s prolonged rape and assault but took no steps to stop the assault); *id.* ¶90 (describing how, even after D.S.'s rape, rather than placing him in the infirmary or in protective custody, Estelle, Ary, and Gordy housed D.S. in the segregation unit, *again* placing him with his enemies). The tort of IIED is particularly applicable to conduct that, as here, results in sexual assault, and to abuses of authority by government actors sworn to protect those in their custody. *Thompson v. City of Birmingham*, 5 F. Supp. 3d 1304, 1329 (N.D. Ala. 2014); *see also Hill*, 797 F.3d at 984 (tortfeasors are responsible for the foreseeable emotional distress that results from their conduct).

*Busby v. Truswal Sys. Corp.*, 551 So. 2d 322 (Ala. 1989), does not compel a different result, as it addresses the inapposite matter of the evidence required to survive summary judgment on a claim asserting an employers' liability for the harassment of subordinates. In *Busby*, the employee's claim did not survive because of insufficient evidence that the employer knew enough about the extent of the harassment. *Id.* at 328.

## VI. D.S. states negligence claims (Count XIII).

The Defendant ADOC administrators and wardens, alone, mount a conclusory challenge to the duty element of Plaintiff's negligence claim. Dkt. 142 at 22. Again, this argument is so conclusory as to be forfeited, as Defendants do not discuss Plaintiff's allegations of duty nor any applicable authority. *Hamilton*, 680 F.3d at 1319; *U.S. Steel Corp.*, 495 F.3d at 1287 n.13.

Regardless, Plaintiff ably alleges this claim. Doc. 134 ¶¶418-31. "Prison officials have a duty to exercise ordinary and reasonable care for the protection of" prisoners, and a correctional

custodian "must exercise reasonable care for the protection of the inmate's life and health under the circumstances of the particular case." *Patton v. Thompson*, 958 So. 2d 303, 310 (Ala. 2006); *see also Taylor v. Hale*, 909 F. Supp. 2d 1320, 1333-34 (N.D. Ala. 2012); *Finley v. Patterson*, 705 So.2d 826, 828 (Ala. 1997) (duty arises when plaintiffs are "completely dependent upon the defendants for protection"); *Ala. Dep't of Corrections v. Thompson*, 855 So.2d 1016, 1025 (Ala. 2003); *Farmer*, 511 U.S. at 832-34 (duty arises because staff have "stripped [prisoners] of virtually every means of self-protection and foreclosed their access to outside aid").

Here, D.S. alleges a duty and facts in support (Doc. 134 ¶¶419), such as Defendants' custodial responsibilities over D.S. and his assailants, Defendants' knowledge that D.S. faced a substantial risk of serious harm, their enhancement of the risk that he faced due to dangerous policies and practices, and their duty to correct the dangerous conditions, policies, and practices occurring on their watch. Plaintiff likewise alleges each individual Defendant's breach of those duties. Doc. 134¶¶420-29. D.S.'s allegations thus comport with notice pleading (*see, e.g.*, *Huffman*, 2021 WL 2533024, at *6-7), and Defendants present no contrary authority.

## VII. Any dismissal should be without prejudice and with leave to amend.

To the extent the Court finds any aspect of Plaintiff's complaint deficient, Plaintiff respectfully asks that any dismissal be without prejudice pursuant to Rule 15(a)(2), which favors resolutions on the merits and directs courts to freely give leave to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2); *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001). No substantial reason exists here to deny leave, as is required, *Rivas v. The Bank of New York Mellon*, 676 F. App'x 926, 931 (11th Cir. 2017), and Plaintiff has not yet had an opportunity to amend with the benefit of this Court's express guidance.

WHEREFORE, Plaintiff requests that Defendants' motions to dismiss be denied.

Respectfully submitted,

**D.S.**

BY: /s/ Ruth Brown
    *Counsel of Record*

BY: /s/ Anil Mujumdar
    *Local Counsel*

*Ruth Z. Brown (pro hac vice) (IL No.
6299187)Megan Pierce (pro hac vice) (CA
No. 314044) Attorneys for Plaintiff
LOEVY & LOEVY
311 N. Aberdeen, 3rd
FloorChicago, IL
60607 Telephone:
312s-243-5900 Fax:
312-243-5902
Email: ruth@loevy.com, megan@loevy.com
*Counsel of Record

Anil A. Mujumdar (ASB-2004-
L65M)Dagney Johnson Law
Group
2170 Highland Avenue, Suite 250
Birmingham, Alabama 35205
T: 205.590.6986
F: 205.809.7899
E: anil@dagneylaw.com
* Local Counsel

## <u>CERTIFICATE OF SERVICE</u>

      I, Ruth Brown, hereby certify that on January 11, 2022, I caused the foregoing ConsolidatedResponse to Motion to Dismiss to be filed using the Court's CM/DOC. system, causing it to be filed on counsel for all Defendants.

      /s/ Ruth Brown
      *One of Plaintiff's Attorneys*